# 25-721

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

-----------------------------------------------------------

JESSICA BERGIN,

*Plaintiff-Appellee*

v.

New York State Unified Court System

*Defendant-Appellant.*

-----------------------------------------------------------

**On Appeal from the Decision and Order of the United States District Court for the Eastern District of New York**

---

## JOINT APPENDIX

## Vol. II

---

Michael J. Siudzinski
*Attorney for Defendant-Appellant*
Office of Court Administration
25 Beaver Street, 10th Floor
New York, New York 10004
(212) 428-2150
msiudzin@nycourts.gov

Steven M. Warshawsky
*Attorney for Plaintiff-Appellant*
The Warshawsky Law Firm
118 North Bedford Road, St. 100
Mount Kisco, New York 10459
(914) 864-3353
smw@warshawskylawfirm.com

## Table of Contents


Exhibit 3 - The Amended Verified petition filed in N. Ventresca-Cohen et al v. J. M. DiFiore (Document 16-3) JA – 86

Exhibit 4 - Two Supplemental Questionnaire Responses (Document 16-4) JA – 139

Order denying Motion to Dismiss, filed November 27, 2022 JA – 151

Defendant's Answer, filed December 13, 2022 (Document 19) JA – 153

Defendant's Response to the First Set of Interrogatories (Document 25-1) JA – 163

Plaintiff's Exhibit A, filed July 28, 2023 (Document 26-2) JA – 172

Declaration of Michael S. Siudzinski dated July 28, 2023 (Document 28) JA – 193

Exhibit F - The Supreme Court, Rockland County's Order in the matter of Ferelli v. State of New York (Document 28-1) JA – 195

Exhibit G - The Supreme Court, Steuben County's Order in the matter of Brignall v. Unified Court System (Document 28-2) JA – 217

Exhibit H - The New York State Unemployment Insurance Appeal Board's Decision of the Board in the matter of Donna Cichon (Document 28-3) JA – 240

Exhibit I - The New York State Unemployment Insurance Appeal Board's Decision of the Board in the matter of Marie Zweig (Document 28-4) JA – 243

Exhibit J - M. Jeng's email sent to plaintiff's supervisors (Document 28-5) JA – 245

Exhibit K - An Excerpt (pages 77-80) from the transcript of J. Barry's Deposition (Document 28-6) JA – 246

Affidavit of Justin Barry, filed July 28, 2023 (Document 29) JA – 247

Declaration of Mindy, filed July 28, 2023 (Document 30) JA – 274

Supplemental Declaration of Michael S. Siudzinski, filed August 11, 2023 (Document 32) JA – 282

Exhibit L - Two emails sent by plaintiff to "nyscourtemployees.nomandate@gmail.com" (Document 32-1) JA – 284

Exhibit M - Email sent by plaintiff to UCS Director of Human Resources, Carolyn Grimaldi (Document 32-2) JA – 286

Memorandum Decision and Order, filed October 8, 2024 (Document 36) JA – 310

Memorandum Decision and Order, filed November 4, 2024 (Document 40) JA – 318

Consent Judgment and Order, filed March 10, 2025 (Document 44) JA – 327

Notice of Appeal, filed March 27, 2025 (Document 45) JA – 346

**Jessica Bergin v. New York State Unified Court System**
**22-CV-5264(BMC)(EDNY)**

**Plaintiff's Opposition to Defendant's Motion to Dismiss**

# Exhibit 3

**STATE OF NEW YORK**
**SUPREME COURT COUNTY OF ALBANY**

---

**Nicole Ventresca-Cohen, Steven Annunziata, Adrienne Asencio, Karen Boback, Richard Brink, Monica Bunce, Roxanne Buss, Fran-Marie Cheresnowsky, Donna Cichon, Suzette Colon, Jeannette Dantes, Danielle Davidson, Heather Dulaney, John Fleming, Patricia Hall, Jamie Hawley, Evelyn Herrera, Wanda Ingraham, Margaret McCormick, Emilce Mercuri, Victoria O'Donnell, Victoria Ososkalo, Jason Pashoukos, Noelle Platt, Meredith Pratt, Jamie Rahm, Alyssa Sullivan, Brian Wilson, and Marjorie Coons,**

**Petitioners,**

**For an Order and Judgment Pursuant to Article 78 of the Civil Practice Law and Rules,**

**-against-**

**JANET M. DiFIORE, as Chief Judicial Officer of the State and Chief Judge of the Court of Appeals; LAWRENCE K. MARKS, as Chief Administrative Judge of the Courts; and the NEW YORK STATE UNIFIED COURT SYSTEM,**

**Respondents.**

**AMENDED VERIFIED PETITION**

**Index No. 901953-22**

---

Petitioners Ventresca-Cohen, Steven Annunziata, Adrienne Asencio, Karen Boback, Richard Brink, Monica Bunce, Roxanne Buss, Fran-Marie Cheresnowsky, Donna Cichon, Suzette Colon, Jeannette Dantes, Danielle Davidson, Heather Dulaney, John Fleming, Patricia Hall, Jamie Hawley, Evelyn Herrera, Wanda Ingraham, Margaret McCormick, Emilce Mercuri, Victoria O'Donnell, Victoria Ososkalo, Jason Pashoukos, Noelle Platt, Meredith Pratt, Jamie Rahm, Alyssa Sullivan, Brian Wilson, and Marjorie Coons, by their attorney, DAREN J. RYLEWICZ, ESQ., (Steven M. Klein and Sarah M. Coligan, of counsel), for their verified petition, state:

## NATURE OF PROCEEDING

1. Petitioners bring this Article 78 proceeding seeking judicial review of 29 separate determinations by the Respondents denying the Petitioners' requests for religious exemptions from the Respondents' COVID-19 vaccination mandate.

## THE PARTIES

2. Petitioners are all non-judicial employees of Respondent New York State Unified Court System ("UCS"), and they work in various courts and UCS administrative offices throughout the State.

3. Petitioners have all applied for but have been denied a religious exemption from Respondents' requirement that they become fully vaccinated against the COVID-19 coronavirus. The details of each Petitioner's application and denial will be further explained below.

4. Respondent JANET M. DIFIORE is the duly appointed Chief Judge of State Court of Appeals and, as such, is the Chief Judicial Officer of UCS pursuant to Judiciary Law section 210.1.

5. Respondent LAWRENCE K. MARKS is the Chief Administrative Judge of the State pursuant to Judiciary Law section 210.3.

6. Respondent UNIFIED COURT SYSTEM ("UCS") is established pursuant to Article VI, Section 1 of the State Constitution. It is the employer for all the Petitioners.

## RELEVANT FACTS

7. On or about August 25, 2021, Respondents announced that all non-judicial UCS employees, including Petitioners, would have to become vaccinated against the COVID-19 coronavirus no later than September 27, 2021. (Exhibit A)

8. As part of its COVID-19 vaccination policy, Respondents permitted UCS employees to request an exemption from its vaccination mandate based on religious objections to receiving such a vaccination. (*Id.*)

9. Any UCS employee who wished to request such an exception would be required to complete a multi-page application in which the employee would be required to explain their objection and swear to the truthfulness of his or her claims. (Exhibit B)

10. Once a number of UCS employees submitted their initial application for a religious exemption, UCS determined that it needed additional information and required many of those employees to complete a supplemental application form. (Exhibit C)

11. Petitioners are aware of at least six UCS employees who applied for and were granted a religious exemption by UCS.

12. With these six employees' permission, Petitioners have attached as Exhibits D - I their applications for a religious exemption that were ultimately approved by UCS. The email address and phone numbers for each of these six UCS employees have been redacted from these exhibits.

13. UCS employee Brandon Bailey submitted his initial request for religious exemption from COVID-19 vaccination on or about October 18, 2021. His request included a lengthy statement describing the basis for his request for exemption. Mr. Bailey identified himself as an Orthodox Christian and explained his objection to the COVID-19 vaccines was based on the use of fetal cell lines derived from aborted human fetuses in the development and testing of those vaccines. He also expressed his objection to any coerced medical treatment due to the importance his faith places on following one's own conscience. Mr. Bailey included lengthy excerpts from "Synodal Statements, Medical Studies, Professional Dissertations, and Hierarchical and Monastic

Statements," which forbid or "recommend against" receiving the available COVID-19 vaccines. He asserted that abortion – and any benefit derived from it – is absolutely forbidden by his faith, and therefore receiving one of the COVID-19 vaccines would result in his "spiritual death." Mr. Bailey also noted the concerns of various religious leaders that the vaccine constitutes "microchipping", is a method of population control, and carries the "mark of the beast," among other concerns.

14. UCS directed Mr. Bailey to submit supplemental information based on the contents of his initial request, and he completed and submitted the supplemental form, sections A and B, on or about December 1, 2021. He indicated in section A that he has not used medication tested on fetal cells in the last two years and would not in the future, nor has he received vaccines other than the Measles, Mumps, and Rubella vaccine, and flu vaccines. He explained in section B that he abstains from substances that contain or were tested on aborted fetal material and has done so since August 2019. He referred to his original submission in response to the third question in section B rather than providing an additional explanation of why his faith requires him to abstain. He noted that although he has previously received some vaccinations, those vaccinations predated his religious beliefs.

15. Mr. Bailey received correspondence from UCS dated December 28, 2021, approving his religious exemption from the COVID-19 vaccine mandate. Relevant documents pertaining to Mr. Bailey are annexed as Exhibit D.

16. Zachary Church is an employee of UCS, and he submitted a request for religious exemption from COVID-19 vaccination on or about October 21, 2021. Mr. Church's application asserts that the COVID-19 vaccines are foreign, man-made substances which he cannot, in accordance with his faith, introduce into his body. He further asserts that receiving a vaccine which made use of aborted fetal tissue would violate his faith and religious beliefs. Mr. Church

emphasized his faith in God, rather than science. His application cited passages from the Bible, specifically Matthew 4:23 and Psalms 3:3. Mr. Church noted in his application that vaccines he received early in life were out of his control, but as an adult he bases medical decisions on his faith.

17. By correspondence dated December 28, 2021, UCS directed Mr. Church to submit supplemental information based on the contents of his initial request. He was directed to complete both sections A and B of the supplemental form, which he submitted on or about January 3, 2022. He indicated in section A that he has not used medication tested on fetal cells in the last two years and would not in the future, nor has he received other vaccines. In section B, Mr. Church explained that he does not take any medication and makes decisions about medical procedures only after seeking guidance through prayer. When asked by UCS' form to provide an explanation of why his faith requires him to abstain from medicines and medical procedures, he explained that his religious beliefs require loyalty to God and faith in God's protection, citing Exodus 15:26. Mr. Church further stated that receiving the vaccine would "negate[] God's protection."

18. Mr. Church received correspondence from UCS dated January 26, 2022, approving his religious exemption from the COVID-19 vaccine mandate. Relevant documents pertaining to Mr. Church are annexed as Exhibit E.

19. Jason Fiet is an employee of UCS who submitted a request for religious exemption from COVID-19 vaccination on or about September 23, 2021. His request included a lengthy statement describing his upbringing and the evolution of his religious beliefs, as well as the basis for his request to be exempt from COVID-19 vaccination. He explained his objection to the COVID-19 vaccines is based on the use of fetal cell lines derived from aborted human fetuses in the development and testing of those vaccines. He has concluded, based on his own research, that the COVID-19 vaccines permanently alter the makeup of one's cells. He stated that his religious

beliefs teach that he was made in God's image, and therefore altering his body with the vaccine would defile God's image and betray his faith in God. Mr. Fiet's request included numerous passages from the Bible to support his request.

20. UCS directed Mr. Fiet to submit supplemental information based on the contents of his initial request, and he submitted the supplemental form, sections A and B, on or about December 3, 2021. He indicated in section A that he has taken over the counter drugs tested on fetal cells but differentiated between drugs tested on fetal cells long after those drugs were developed and drugs or vaccines that were developed using fetal cells. He noted that he avoids taking medications developed or manufactured using fetal cells and reiterated some of the beliefs he described in his initial request. Mr. Fiet noted in section B that he has abstained from all vaccinations as an adult. He asserted that "[t]he Holy Spirit has been very clear that this vaccine would go against the Lord's command for my life." He cited additional passages from scripture in his supplemental responses.

21. Mr. Fiet received correspondence from UCS dated January 19, 2022, approving his religious exemption from the COVID-19 vaccine mandate. Relevant documents pertaining to Mr. Fiet are annexed as Exhibit F.

22. Jeromie Giesser is an employee of UCS who submitted a request for religious exemption from COVID-19 vaccination on or about October 18, 2021. Mr. Giesser noted his disagreement with a number of statements included in the "Affidavit of Religious Objection to COVID-19 Vaccination," and added that he was only initialing the statements – which are part of the exemption request – "under duress and coercion by UCS[.]" Mr. Giesser's request included a brief statement explaining his objection to COVID-19 vaccination. That statement asserts, with a few corresponding citations to the Bible, that his body is a temple of the holy spirit, that life is

sacred, and therefore receiving a COVID-19 vaccination developed with or tested on fetal cells would be impermissible participation in abortion, no matter how long ago the abortion in question occurred. Mr. Giesser explained that he has concluded, through prayer, that he cannot be vaccinated against COVID-19. He concluded his explanation by stating that to receive the vaccine would be a sin, and would jeopardize his relationship with God.

23. UCS directed Mr. Giesser to submit supplemental information in part A based on the contents of his initial request, and he did so on or about December 3, 2021. In his response to section A, Mr. Giesser indicated that he had taken over the counter medication tested on fetal cells in the past. He explained that he did not realize these drugs were tested on fetal cells and would henceforth abstain from those drugs. He acknowledged having received a number of other vaccines that utilized fetal cells in production or testing.

24. Mr. Giesser received correspondence from UCS dated December 29, 2021, approving his religious exemption from the COVID-19 vaccine mandate. Relevant documents pertaining to Mr. Giesser are annexed as Exhibit G.

25. June Leddo is an employee of UCS who submitted a request for religious exemption from COVID-19 vaccination on or about October 18, 2021. Ms. Leddo stated that her body is the "temple of God," and that her "family's personal religious beliefs prohibits [sic] the injections of foreign substances into our bodies." Receiving the vaccine, according to Ms. Leddo, would alter the state into which she was born and represent a criticism of God's omnipotence. She specifically noted her disagreement with the Pope's position on COVID-19 vaccination and provided citations to the Bible in support of her position.

26. UCS directed Ms. Leddo on or about November 19, 2021, to submit supplemental information based on the contents of her initial request. She was directed to complete section B of

the supplemental form. She submitted her supplemental responses on or about December 9, 2021. In her response, Ms. Leddo indicated that she abstains from medicines, medical procedures, and vaccines because she is healthy and because she has faith in God to protect her, and that she has so abstained since January of 2019. She stated that she cannot recall receiving any vaccine as an adult. She included additional citations to scripture.

27. Ms. Leddo received correspondence from UCS dated December 27, 2021, approving her religious exemption from the COVID-19 vaccine mandate. Relevant documents pertaining to Ms. Leddo are annexed as Exhibit H.

28. Sarah Pieper is an employee of UCS who submitted a request for religious exemption from COVID-19 vaccination on or about October 31, 2021. Ms. Pieper submitted a brief explanation of her religious objection to COVID-19 vaccination. She referenced her own prior illness and the loss of her husband and noted that God helped her to heal. She stated her belief that God will continue to guide her and protect her. Ms. Pieper also noted that she does not need to be a member of any religion to qualify for an exemption, nor does refusal of vaccines need to be a tenet of any religion she might follow. She did not include any citations to the Bible or any other religious texts in her request.

29. UCS directed Ms. Pieper to submit supplemental information based on the contents of her initial request. She completed and submitted the supplemental form, section B, on or about December 6, 2021. In her response, Ms. Pieper indicated that she abstains from all medications, medical procedures, and vaccines "that go against [her] sincerely held religious beliefs." She indicated that she was saved and formed a unique relationship with God about 5 years ago, and has abstained from immunizations since then. In response to the third question in section B, which asks for an explanation of why her religious beliefs require her to refrain from medications and other

substances, Ms. Pieper indicated that her "religion does not require anything[,]" but that through her relationship and conversations with God, she believes the vaccine could potentially harm her, in violation of her duty to care for and not defile her body. She included citations to the Bible, specifically Corinthians, in support of this explanation.

30. Ms. Pieper received correspondence from UCS dated December 28, 2021, approving her religious exemption from the COVID-19 vaccine mandate. Relevant documents pertaining to Ms. Pieper are annexed as Exhibit I.

31. In contrast with the 6 aforementioned UCS employees who were all approved for a religious exemption from the UCS vaccination mandate, the 29 Petitioners all requested and were denied such an exemption. Their applications and UCS' denials thereof are summarized below and are attached as Exhibits J through LL.

32. Petitioner Nicole Ventresca-Cohen is an employee of UCS who submitted a request for a religious exemption from COVID-19 vaccination on or about October 25, 2021. Her request included a statement asserting that God teaches that a person's body is a temple and should be treated as such. Further, a person's body is made in God's image, and each individual has a duty to keep their body pure and uncontaminated in both a physical and spiritual sense. Additionally, Petitioner Ventresca-Cohen stated that she is opposed to abortion and described her activism relative to her anti-abortion beliefs. She asserted that she researches products which use fetal cells and boycotts those products. Consequently, since "known ingredients in COVID vaccines contain fetal cell lines, or they were used in the testing phase," Petitioner Ventresca-Cohen is unwilling to receive a COVID-19 vaccine. She explained that receiving the vaccine would be impermissible participation in or endorsement of abortion. She also described certain events in her personal life which have informed her faith. She cited the Bible's insistence that she follow her conscience, and

that to betray her conscience regarding the vaccine would be to ignore the voice of God, a sin. She expressed her trust in God to protect her and concluded that receiving the vaccine would prevent her from worshipping God as she sees fit. Petitioner Ventresca-Cohen cited to passages in the Bible in support of her request.

33. UCS directed Petitioner Ventresca-Cohen on or about December 2, 2021, to submit supplemental information based on the contents of her initial request. She was directed to complete both sections A and B of the supplemental form, which she submitted on or about December 14, 2021. In section A, Petitioner Ventresca-Cohen indicated that she had previously taken some of the over-the-counter and prescription medications listed, and that she would take the listed products in the future so long as fetal cell lines were not used in the origin of the products. She stated that she received the Measles, Mumps, and Rubella vaccine as a child, but has not received any vaccine developed using fetal cell lines as an adult. She drew a distinction between medications which were developed without the use of fetal cell lines, and the COVID-19 vaccines, which were developed using fetal cell lines. Although she has received an influenza vaccine, she noted that none of the influenza vaccines used in the United States were developed using fetal cell lines.

34. In section B, Petitioner Ventresca-Cohen described her practice of boycotting products and companies that in any way support Planned Parenthood or other "abortion-endorsing organizations."

35. Petitioner Ventresca-Cohen received correspondence from UCS dated January 6, 2022, denying her religious exemption from the COVID-19 vaccine mandate. Relevant documents pertaining to Petitioner Ventresca-Cohen are annexed as Exhibit J.

36. Petitioner Steven Annunziata is an employee of UCS who submitted a request for religious exemption from COVID-19 vaccination on or about September 24, 2021. His request

included a statement describing the basis for his request for exemption in which he identified himself as a Catholic and explained his objection to the COVID-19 vaccines based on the use of fetal cell lines derived from aborted human fetuses in the development and testing of those vaccines. Petitioner Annunziata also noted that the Catholic Church has proclaimed that vaccines must be voluntary and that Catholics are obligated to obey their own consciences, citing the Congregation for the Doctrine of Faith and the Catechism of the Catholic Church. He concluded that his only moral choice is to seek an exemption from vaccination based on these beliefs. Petitioner Annunziata included an affidavit of membership in the Confraternity of Our Lady of Fatima, which includes a statement explaining that he believes abortion to be a crime and that receiving a vaccine developed or tested using aborted fetal cells is immoral and unacceptable to Catholics.

37. UCS directed Petitioner Annunziata to submit supplemental information based on the contents of his initial request, and he submitted the supplemental form on or about November 24, 2021. He indicated that he has used medication tested on fetal cells and would continue to do so, but that he has not received other vaccinations. He explained at length that his beliefs allow him to take the medications indicated because, unlike the COVID-19 vaccines, they were not developed using fetal cells, only tested on fetal cells subsequently. He noted that he would resist taking any medications that were developed using fetal cells.

38. Petitioner Annunziata received correspondence from UCS dated December 15, 2021, denying his religious exemption from the COVID-19 vaccine mandate. Relevant documents pertaining to Petitioner Annunziata are annexed as Exhibit K.

39. Petitioner Adrienne Asencio is an employee of UCS who submitted a request for religious exemption from COVID-19 vaccination on or about September 27, 2021. Her request

included a lengthy handwritten statement describing the basis for her request for exemption, explaining that she has the utmost faith in God and her God-given immune system to protect her. She noted that receiving the COVID-19 vaccine would defile her body by altering her natural immune system and would also be an indication that she lacks faith in God and would be "the very way of death." Petitioner Asencio quoted extensively from the Bible in explaining her basis for exemption. She included with her submission a letter from a chaplain affiliated with the Ha Nasheem congregation with whom she is personally acquainted in support of her exemption request, noting that she has been a member of her faith community for more than 25 years and is a member of the congregation in good standing. The letter also states that Petitioner Asencio is known to the chaplain to be a woman of devout faith who sincerely attributes her good health to God and is not willing to betray her trust in God by receiving a COVID-19 vaccination.

40. UCS directed Petitioner Asencio to submit supplemental information based on the contents of her initial request. She completed and submitted the supplemental form on or about December 3, 2021. Petitioner Asencio indicated that she abstains from everything forbidden in the books of Leviticus and Deuteronomy in the Old Testament, including the dietary laws contained therein. She indicated that she could not recall receiving any other vaccines. When asked to explain why her faith requires to abstain from certain substances, she explained that the God-given laws in the Bible dictate what is acceptable or unacceptable to consume.

41. Petitioner Asencio received correspondence from UCS dated January 6, 2022, denying her religious exemption from the COVID-19 vaccine mandate. She then received correspondence from UCS dated January 24, 2022, declaring her unfit for service based on non-compliance with the vaccine policy. Relevant documents pertaining to Petitioner Asencio are annexed as Exhibit L.

42. Petitioner Karen Boback is an employee of UCS who submitted a request for religious exemption from COVID-19 vaccination on or about September 24, 2021. Her request included a lengthy statement with multiple exhibits attached describing the basis for her exemption request. In her statement, Petitioner Boback identified herself as a Catholic sincerely opposed to abortion, and as such, she would be complicit in the evil of abortion if she were to receive a vaccine developed with or tested on aborted fetal cell lines, no matter how remote the connection to an abortion. She noted the Catholic Church's position that vaccination must be voluntary and explained that the Church requires an individual to follow their informed conscience, even if that means rejecting a vaccine. She noted some concerns with the safety and efficacy of the vaccines and indicated that to receive one of the vaccines would be a violation of her bodily autonomy and religious conviction. Petitioner Boback concluded by saying that if she received a COVID-19 vaccination, she would be complicit in abortion and it would be a sin against God. She quoted from religious texts and writings by religious leaders in supporting her request and attached significant documentation in support of that request.

43. UCS directed Petitioner Boback on or about November 12, 2021, to submit supplemental information based on the contents of her initial request. She was directed to complete section A of the supplemental form. She submitted her supplemental responses on or about November 24, 2021, providing a lengthy personal statement. She indicated that she has taken over-the-counter medication tested on fetal cell lines, but not prescription medication. In her supplemental statement, she noted that she objects to vaccines and medications developed using fetal cell lines. She explained that she has learned more about the use of fetal cell lines in drug and vaccine development over the past few years and has abstained since then. Petitioner Boback asserted that she has not received any vaccinations as an adult. She also drew a distinction in her

statement between drugs developed using fetal cells and those developed well before the use of fetal cells, but which may have been tested on fetal cells subsequently. She believes that the former are tainted by their necessary connection to abortion in a way the latter are not. She concludes that due to differences in development, her religious beliefs do not prevent her from taking medication developed without the use of fetal cell lines but do prevent her from receiving any of the COVID-19 vaccines.

44. Petitioner Boback received correspondence from UCS dated December 23, 2021, denying her religious exemption from the COVID-19 vaccine mandate. Relevant documents pertaining to Petitioner Boback are annexed as Exhibit M.

45. Petitioner Richard Brink is an employee of UCS who submitted a request for religious exemption from COVID-19 vaccination on or about September 27, 2021. His request included a statement explaining that, according to the Congregation for the Doctrine of the Faith, vaccination is voluntary. He expressed his objection to the use of cell lines derived from aborted human fetuses, since according to the Bible, all human life is valued. Therefore, he noted, taking a vaccine developed with or tested on aborted fetal cells would "devalue human life and reduce faith in God." Petitioner Brink also cited case law in support of his request for an exemption.

46. By correspondence dated November 22, 2021, UCS directed Petitioner Brink to submit supplemental information based on the contents of his initial request. Although he was only directed to complete section A, he completed and submitted both sections A and B on or about December 6, 2021. He indicated in section A that he has taken over-the-counter medications, including within the last two years, tested on fetal cell lines. He expressed uncertainty as to whether he would take those medications in the future. He denied taking any prescription drugs, at any time, that were tested on fetal cells, and indicated that he would not take those medications in the future.

In reference to his uncertainty about over-the-counter medications, Petitioner Brink explained that he was not aware those drugs had been tested on fetal cell lines. He noted that some of the drugs listed were developed prior to fetal cells being used for drug development, but that he would nonetheless pray and consult his church leaders before taking them in the future. He reiterated his belief that receiving a COVID-19 vaccine developed using fetal cells would encourage the use of new cell lines from aborted fetuses. When asked about other vaccines he has received, Petitioner Brink answer that he believed he had received some, but not others. By way of explanation, he noted that "most if not all" of the vaccines he received previously were administered when he was a minor. As with his response regarding medications, Petitioner Brink indicated he would pray and consult with church leaders before receiving vaccines in the future.

47. In section B, Petitioner Brink stated that he does not abstain from medicines, medical treatments, vaccines, or foods due to his religious beliefs. He noted that he received one flu vaccine and a tetanus shot as an adult. He explained that he was not aware of other vaccines being developed with or tested on fetal cells.

48. Petitioner Brink received correspondence from UCS dated January 14, 2022, denying his religious exemption from the COVID-19 vaccine mandate. That same day, he replied to the UCS email enclosing its denial letter, requesting additional information about his denial. He received no response, so he again emailed UCS, noting that he had not received a response and that he had not been contacted about the feasibility of an accommodation. He included information from the New York City Law Department regarding the City's review of accommodation requests. He quoted from his exemption request and asked that UCS discuss the sincerity of his beliefs with him if he was denied based on his prior medication or vaccination history.

49. A short time later, Petitioner Brink received a response from UCS Counsel Mindy Jeng, which did not specifically address his questions. Instead, it briefly explained UCS' review process and urged him to speak with his "union or association" if he had any further questions.

50. Petitioner Brink responded to Ms. Jeng, asking for a copy of any relevant UCS policy, if different from the memoranda issued on January 15, 2021, and September 10, 2021. Ms. Jeng responded only to say that information about the vaccine mandate "should have been sent to all employees by e-mail." Relevant documents pertaining to Petitioner Brink are annexed as Exhibit N.

51. Petitioner Monica Bunce is an employee of UCS who submitted a request for religious exemption from COVID-19 vaccination on or about October 18, 2021. Her request included a short, handwritten statement in which she noted that the Bible declares human life to be sacred and that her body is a temple. Petitioner Bunce explained that she is opposed to abortion and is therefore opposed to a vaccine developed with or tested on cell lines derived from aborted human fetuses. She cited Genesis 1:26-27 and 1 Corinthians 6:19-20 in support of her description of her beliefs.

52. UCS directed Petitioner Bunce on or about November 19, 2021, to submit supplemental information based on the contents of her initial request. She was directed to complete both sections of the supplemental form. She submitted her supplemental responses on or about December 3, 2021. She indicated in section A that she has taken both over-the-counter and prescription medication tested on fetal cell lines – circling and underlining three specific medications among those listed – and that she would continue to do so. She went on to explain that she only takes over-the-counter medication as a last resort if essential oils fail to relieve pain she might experience, and that she only takes one prescription medication to address a serious thyroid

condition. Petitioner Bunce noted that she received certain vaccinations as a minor but has not received the other vaccinations listed.

53. In section B Petitioner Bunce explained that she abstains from medications developed or tested using fetal cell lines, with the exception of her thyroid medication, that she has not received any vaccine as an adult, and that she underwent a surgery to remove cancerous growths. She has abstained from taking such medication and vaccines since at least 1992. When asked to explain why her faith requires her to abstain, Petitioner Bunce reiterated her respect for life and for her body and maintained that she would not introduce any medication or vaccine developed or tested with fetal cell lines into her body unless necessary to preserve her life.

54. Petitioner Bunce received correspondence from UCS dated January 14, 2022, denying her religious exemption from the COVID-19 vaccine mandate. Relevant documents pertaining to Petitioner Bunce are annexed as Exhibit O.

55. Petitioner Roxanne Buss is an employee of UCS who submitted a request for religious exemption from COVID-19 vaccination on or about September 27, 2021. Her request included a statement that coerced vaccination is contrary to her faith, as the Bible says individuals possess free will. She expressed her faith in God and the body he gave her to protect her from COVID-19. Petitioner Buss explained that her faith affirms the importance of an individual following their own conscience, and that the conscience directs her not to receive a COVID-19 vaccination. She also explained that according to her faith, the body is the temple of the Holy Spirit, and she is obligated to care for her body and not introduce any substance that could cause harm. She also believes that the vaccines contain impurities and manipulate one's genes, both of which are contrary to her beliefs. In explaining the foregoing, Petitioner Buss cited to numerous passages from the Bible.

56. UCS directed Petitioner Buss on or about November 12, 2021, to submit supplemental information based on the contents of her initial request. She was directed to complete section B of the supplemental form. She submitted her supplemental responses on or about November 23, 2021, indicating that she abstains from medicines, procedure, and vaccines that are not medically necessary according to her medical providers, and she has been abstaining from any unnecessary medical intervention for over twenty years. She referred back to her original application and included a copy with her supplement. Petitioner Buss stated that she is guided by the Holy Spirit and has concluded, as a result of prayer, that she is not permitted to receive a COVID-19 vaccination. When asked about her vaccination history, Petitioner Buss noted that she received a vaccination in 2018 that her physician deemed particularly important, but that she has otherwise refused vaccinations for at least twenty years. She provided a few specific examples of medications she was prescribed but declined to take based on her religious beliefs.

57. Petitioner Buss received correspondence from UCS dated January 7, 2022, denying her religious exemption from the COVID-19 vaccine mandate. Relevant documents pertaining to Petitioner Buss are annexed as Exhibit P.

58. Petitioner Fran-Marie Cheresnowsky is an employee of UCS who submitted a request for religious exemption from COVID-19 vaccination on or about October 18, 2021. Her request included a handwritten statement explaining that she was raised Catholic and believes that the Bible warns of COVID-19 and assures believers that if they have absolute belief and faith in God they will be protected from the virus. Therefore, receiving the vaccine would demonstrate a lack of faith in God's protection and would constitute an interference with divine intervention.

59. UCS directed Petitioner Cheresnowsky on or about November 18, 2021, to submit supplemental information based on the contents of her initial request. She was directed to complete

section B of the supplemental form. She submitted her supplemental responses on or about December 13, 2021. Although the introductory paragraph of section B indicates that the individual completing that section was directed to do so because their initial application expressed faith-based concerns about bodily sanctity or purity that require abstention from certain substances, Petitioner Cheresnowsky noted that her exemption request was not based on the sanctity or purity of her body and questioned whether her initial application had even been reviewed. She further stated that she abstains from the COVID-19 vaccinations and has since the beginning of the pandemic. She explained that her faith does not require her to abstain, but rather it is her personal choice, based upon her belief that the pandemic is a test of faith in God. She attached numerous passages from the Bible to her supplemental submission in support of her responses.

60. Petitioner Cheresnowsky received correspondence from UCS dated January 3, 2022, denying her religious exemption from the COVID-19 vaccine mandate. On January 6, 2022, Petitioner Cheresnowsky replied to the UCS email enclosing the denial letter and requested additional information about her denial.

61. Having received no response to her email, Petitioner Cheresnowsky emailed UCS again on January 13, 2022, stating that she learned the exemption requests were reviewed based on sincerity of belief, not whether accommodation was possible, and expressed her anger that the individuals reviewing the requests would question her sworn statements about her faith. On January 18, 2022, Petitioner Cheresnowsky received a reply from Carolyn Grimaldi, UCS' Director of Human Resources in its Office of Court Administration. Ms. Grimaldi's response appeared to be a generic response to inquiries which described the review process but did not address Petitioner Cheresnowsky's emails directly. Ms. Grimaldi's response included a prior email in the same thread between Ms. Grimaldi and Nancy Barry, UCS Chief of Operations, in which Ms. Barry wrote,

apparently in response to Petitioner Cheresnowsky's second email, "One more for the pile when we get the response hammered out." Relevant documents pertaining to Petitioner Cheresnowsky are annexed as Exhibit Q.

62. Petitioner Donna Cichon is an employee of UCS who submitted a request for religious exemption from COVID-19 vaccination on or about September 27, 2021. Her request included a statement in which she cited the use of aborted human fetal cells in the development or testing of the COVID-19 vaccines and noted that abortion is contrary to the Bible's Fifth Commandment prohibition against taking a life. She also noted her belief that the vaccines alter one's cells and therefore would impermissibly modify what God has created. She cited to 1 Corinthians 6:19 and Genesis 1:27 in support of these beliefs. Petitioner Cichon also recounted that she tested positive for COVID-19 in January 2021 and prayed that she and her family would survive. They did, and she professed her faith in her God-given immune system. She included with her exemption request a copy of her Certificate of Baptism and a copy of her positive COVID-19 test result.

63. UCS directed Petitioner Cichon to submit supplemental information based on the contents of her initial request. She completed and submitted the entire supplemental form on or about December 1, 2021. She indicated in section A that she has taken both over-the-counter and prescription medication tested on fetal cell lines, and would continue to do so, but only three specific medications she identified (including acetaminophen and aspirin). She denied receiving any vaccines as an adult. In explaining her answers, she noted that acetaminophen (Tylenol) and aspirin were developed prior to the use of fetal cell lines in drug development. She drew a distinction between these drugs and the COVID-19 vaccines. which were developed and tested using fetal cell lines. She stated that the use of fetal cells in development and testing make it

immoral for her to receive a COVID-19 vaccine. She also identified a medication she takes for a thyroid condition, levothyroxine. She explained that prior to taking this medication, she researched it, and found no evidence that it was developed using fetal cells. Petitioner Cichon noted that she stopped taking this medication after reading the supplemental questionnaire, which indicates the medication was developed using fetal cell lines. Her doctor was upset that she had stopped the medication and told her that the information about this drug on the supplemental questionnaire was incorrect.

64. In section B, Petitioner Cichon indicated that she abstains from most medications due to the use of fetal cells in the development of some medications, but also because she believes that God created the human body to heal itself. She stated that she has abstained from taking medications after knee surgeries, and that the surgeries were not to alter her body, but to repair it. She also abstains from all vaccines. She noted that she has abstained from medications and vaccines for at least thirty-five or forty years. Petitioner Cichon reiterated her belief that abortion is a sin and therefore she refrains from taking substances that utilized fetal cell lines. She has received one or more flu vaccines, but only after confirming that they were made using chicken embryos.

65. Petitioner Cichon received correspondence from UCS dated January 3, 2022, denying her religious exemption from the COVID-19 vaccine mandate. She subsequently received a notice from UCS dated January 13, 2022, declaring her unfit for service based on her non-compliance with the vaccine policy. Relevant documents pertaining to Petitioner Cichon are annexed as Exhibit R.

66. Petitioner Suzette Colon is an employee of UCS who submitted a request for religious exemption from COVID-19 vaccination on or about October 18, 2021. Her request included a brief statement that her "faith and informed consciousness" prevent her from receiving

the COVID-19 vaccines because abortion is a sin, the vaccines were developed or tested using aborted fetal cells, and therefore to receive one of the vaccines would condone abortion. She also stated that she must avoid introducing unclean or unnatural substances into her body, and that vaccines are unlike other medical treatments because they are used by healthy people. She cited passages from the Bible – Corinthians 6:19-20, Psalm 118:8, and Matthew 11:28 – in support of her beliefs.

67. UCS directed Petitioner Colon on or about November 19, 2021, to submit supplemental information based on the contents of her initial request. She was directed to complete both sections of the supplemental form. She submitted her supplemental responses on or about December 2, 2021. She indicated in section A that she has taken over-the-counter medication tested on fetal cell lines, and would continue to do so, noting that the medications have been FDA approved for over twenty-five years. She indicated that she has taken some of the prescription drugs listed, but not in the last two years, and she expressed uncertainty about whether she would take any of them in the future. She noted that she would research the listed drugs to determine their uses. Petitioner Colon explained that she is "opposed to all products" that are developed using fetal cells, including medications, vaccines, and foods. She has received some vaccinations but denied having received others.

68. In section B, Petitioner Colon indicated that she as abstained from medications, vaccines, and medical treatments for at least five years, because God intends that natural fruits, vegetables, and herbs he created should be used to heal the body. She noted that her religious beliefs have changed since she last received a vaccination. Petitioner Colon included a few documents discussing the use of fetal cells in the development and testing of medications and vaccines.

69. Petitioner Colon received correspondence from UCS dated January 6, 2022, denying her religious exemption from the COVID-19 vaccine mandate. Relevant documents pertaining to Petitioner Colon are annexed as Exhibit S.

70. Petitioner Jeannette Dantes is an employee of UCS who submitted a request for religious exemption from COVID-19 vaccination on or about November 5, 2021. Her request included a statement in which she identified herself as a born-again Christian and explained that she has a personal relationship with God that allows her to speak with him and receive responses from him. She explained that the Bible commands her to put God first in her life, and that in doing so, she will receive everything she needs. She also stated that she has prayed about the COVID-19 vaccine and that the answer she has received from God indicates that she should not receive it. Petitioner Dantes noted that she also abstains from other vaccines and medications due to her belief that God will protect her. She also discussed the Biblical teaching that the body is a temple of the Holy Spirit, which should not be defiled with man-made, and therefore unholy substances. She concluded that receiving a COVID-19 vaccine would be contrary to the direct guidance she received from God and contrary to her beliefs.

71. UCS directed Petitioner Dantes on or about November 22, 2021, to submit supplemental information based on the contents of her initial application. She was directed to complete section B of the supplemental form. She submitted her supplemental responses on or about December 6, 2021, indicating that she has abstained from all vaccines for more than five years, and any medicines or medical treatments are prayed about and accepted or refused as God instructs. She had not taken over-the-counter medications for at least a year and has never undergone an elective medical procedure; she has, however, undergone medically necessary procedures after prayer and with God's blessing. Petitioner Dantes explained that while her faith

does not require her to abstain from the substances or procedures listed, she has free will and makes faith-based decisions to abstain from these interventions.

72. Petitioner Dantes received correspondence from UCS dated January 6, 2022, denying her religious exemption from the COVID-19 vaccine mandate. Relevant documents pertaining to Petitioner Dantes are annexed as Exhibit T.

73. Petitioner Danielle Davidson is an employee of UCS who submitted a request for religious exemption from COVID-19 vaccination on or about October 18, 2021. Her request included a statement describing her religious upbringing and her religious practices as an adult. She stated that "the most morally questionable issue regarding vaccination in Catholicism is using cell lines derived from a voluntarily aborted fetus," and that "vaccination is an act of interfering with divine providence." She stated that receiving a COVID-19 vaccine would constitute cooperation with an immoral action. She also expressed her belief in the curative power of prayer, and her decision to seek help through spiritual means.

74. UCS directed Petitioner Davidson to submit supplemental information based on the contents of her initial request. She submitted the entire supplemental response on or about December 6, 2021. In section A, Petitioner Davidson indicated that she has previously used listed over-the-counter and prescription drugs, and that she would continue to do so, but only if she had exhausted all other options, including "spiritual/holistic" healing. When asked to explain why her beliefs permit her to take these medications but not receive a COVID-19 vaccine, she differentiated between drugs developed without or prior to the use of fetal cells, and the COVID-19 vaccinations which were developed and tested using fetal cell lines. She denied having received the listed vaccinations.

75. In section B, Petitioner Davidson indicated that she abstains from any products, including vaccines, that come from animals deemed unclean by the Levitical law. She noted that she has abstained from these substances as an adult. She explained that her religious beliefs require her to obey God and rely on the power of prayer, and that receiving a COVID-19 vaccine would violate those beliefs.

76. Petitioner Davidson received correspondence from UCS dated January 6, 2022, denying her religious exemption from the COVID-19 vaccine mandate. Relevant documents pertaining to Petitioner Davidson are annexed as Exhibit U.

77. Petitioner Heather Dulaney is an employee of UCS who submitted a request for religious exemption from COVID-19 vaccination on or about September 24, 2021. Her request included a brief statement asserting that God is her sovereign leader and because her body is his temple and is to be treated as such. She referenced the Biblical teaching that medical intervention should be sought when ill, not when healthy. Petitioner Dulaney asserted that everything she allows to enter her body is pure in order to serve God, and that receiving a COVID-19 vaccination — which relied on the use of fetal cell lines — would therefore be a betrayal of her faith. Petitioner Dulaney cited to passages from the Bible in support of her request.

78. UCS directed Petitioner Dulaney on or about November 8, 2021, to submit supplemental information based on the contents of her initial request. She was directed to complete both sections of the supplemental form and submitted her supplemental responses on or about November 22, 2021. In section A, Petitioner Dulaney indicated that she has used some of the listed over-the-counter and prescription drugs in the past, including within the last two years, "prior to being educated on them," but that she would use any of the listed drugs in the future "only in a life or death situation." She noted that she received vaccines as a minor, but that she has not received

the other vaccines listed and would only receive a vaccine developed or tested using fetal cell lines in a life-or-death situation.

79. In section B, Petitioner Dulaney stated that she abstains from any manmade chemicals, medicines, and procedures. Rather, she uses acupuncture, yoga, herbs, and oils to treat ailments; she grows her own vegetables and herbs; and buys non-processed meat from a local farmer so that she consumes the least amount of chemicals as possible. She noted that she has followed these practices for years and continues to modify her practices as she learns more. Petitioner Dulaney referred to the beliefs described in her initial request and reiterated her belief that her body is the temple of God and must be treated accordingly. Additionally, Petitioner Dulaney stated that she received "shots" prior to deploying to Saudi Arabia when she was nineteen but has since educated herself "not to make those mistakes again." Petitioner Dulaney attached various documents, including UCS' mission statement, the cover page from the EEOC website, a page from UCS' sexual harassment training, and dictionary definitions of "sincere," "religious," and "belief."

80. Petitioner Dulaney received correspondence from UCS dated January 7, 2022, denying her religious exemption from the COVID-19 vaccine mandate. Relevant documents pertaining to Petitioner Dulaney are annexed as Exhibit V.

81. Petitioner John Fleming is an employee of UCS who submitted a request for religious exemption from COVID-19 vaccination on or about September 27, 2021. His request included a statement in which he explained that based on commands set forth by God in the Bible, he is prohibited from receiving vaccines. According to his beliefs, receiving any vaccine would express a lack of faith in God's power to protect and heal. He stated that receiving a vaccine which was developed using fetal cell lines would "defile [his] body and dishonor God." He explained that

according to Church teachings, abortion is so grave a crime that any connection to it, even remote, is immoral and unacceptable. He concluded that receiving any of the COVID-19 vaccines would be a grave sin. Petitioner Fleming cited to passages from the Bible and referenced the Sacred Congregation of the Doctrine of Faith in support of his request.

82. UCS directed Petitioner Fleming on or about November 17, 2021, to submit supplemental information based on the contents of his initial request. He was directed to complete both sections of the supplemental form. He submitted his supplemental responses on or about December 1, 2021. In section A, Petitioner Fleming indicated that he has used over-the-counter drugs listed in the supplemental form, including within the last two years, and that he would be willing to do so in the future. As for the listed prescription drugs, he denied using any of these drugs, but stated that he would be willing to use them in the future. In explaining the foregoing answers, he stated that he was previously unaware that most of the listed products were tested using fetal cell lines, but that he will now take greater precautions and conduct research regarding medications and vaccines. He noted that most of the over-the-counter drugs listed were developed prior to the use of fetal cell lines. Petitioner Fleming indicated that of the vaccines listed, he has received the hepatitis-A vaccine.

83. In section B, Petitioner Fleming stated that he avoids "anything" tested or produced using fetal cell lines or any products that alter one's DNA, and he has so abstained since approximately 2000. He explained that he is required to abstain from these things because injecting a vaccine into his healthy body would denounce the protective and healing powers of God. He noted that, at the time he received the hepatitis-A vaccine in order to start working at the jail, he was unaware that the vaccine was developed or tested using fetal cell lines.

84. Petitioner Fleming received correspondence from UCS date January 7, 2022, denying his religious exemption from the COVID-19 vaccine mandate. He then received correspondence from UCS dated January 19, 2022, declaring him unfit for service based on non-compliance with the vaccine policy. Relevant documents pertaining to Petitioner Fleming are annexed as Exhibit W.

85. Petitioner Patricia Hall is an employee of UCS who submitted a request for religious exemption from the COVID-19 vaccine mandate on or about September 17, 2021. Her request noted that she is a Spiritual Holistic practitioner in the area of Reiki Healing, and she provided copies of certificates to substantiate this claim. She is also a student and minister with a non-denominational church called Spiritually Rooted in Miracles. According to Petitioner Hall's statement, a person's life force energy may become imbalanced, which can cause physical or emotional illness, and using Reiki Healing can work to restore an individual's balance. Energy, she explained, is how a person connects with God. She indicated her belief that receiving a COVID-19 vaccine would create an imbalance in her mind, body, and spirit, which would conflict with natural harmony and the flow of energy. She concluded that receiving a COVID-19 vaccine would negatively affect her path toward her "Higher Self" and her connection to God. She also noted her church's teaching that miracles exist, including the physical and spiritual bodies created by God.

86. UCS directed Petitioner Hall on or about November 4, 2021, to submit supplemental information based on the contents of her initial request. She was directed to complete section B of the supplemental form, and also to initial each box on the "Affidavit of Religious Objection to COVID-19 Vaccination" form. She submitted her supplemental responses and the initialed affidavit on or about November 16, 2021. In her response, Petitioner Hall indicated that she is obligated by the Holy Spirit to protect her body and keep it pure, and that she chooses what to put into her body

based on guidance from God. When asked to explain why her faith requires her to abstain from any substances, she explained that altering her God-given immune system would deny God's infallibility and that she is required to respect her body as the temple of God. She denied receiving other vaccinations as an adult.

87. Petitioner Hall received correspondence from UCS dated December 29, 2021, denying her religious exemption from the COVID-19 vaccine mandate. On January 6, 2020, she sent an e-mail to UCS asking for an explanation of the exemption review process and an explanation of why her stated beliefs were not accepted. She received a response from UCS Counsel Mindy Jeng indicating that the Committee would not provide an explanation of its decision. She then received correspondence from UCS dated January 11, 2022, declaring her unfit for service based on non-compliance with the vaccine policy. Relevant documents pertaining to Petitioner Hall are annexed as Exhibit X.

88. Petitioner Jamie Hawley is an employee of UCS who submitted an initial request for religious exemption from COVID-19 vaccination on or about September 27, 2021. Her request included a brief statement declaring that her religious beliefs prevent her from being vaccinated and seeking an exemption on that basis.

89. Petitioner Hawley received correspondence from UCS on or about November 9, 2021, denying her religious exemption from the COVID-19 vaccine mandate. She then submitted a second, more detailed request for religious exemption from COVID-19 vaccination on or about November 22, 2021. This time, she included a lengthy statement explaining the basis for her request. First, she addressed her belief in God's sovereignty over life. She stated her belief that the COVID-19 vaccines alter one's immune system, and that receiving such a vaccine would express a lack of faith in God and his creation. She also explained that abortion is murder and therefore

prohibited, and that receiving a vaccine developed or tested on fetal cell lines would interfere with God's sovereignty over life and death. Petitioner Hawley added that she does not take any action to either hasten or delay her own death due to her belief in God's sovereignty. Second, Petitioner Hawley explained her belief that her body is not hers, but belongs to God, and therefore everything she puts in her body should glorify God; she does not believe that the COVID-19 vaccine does so. Petitioner Hawley also gave a number of other explanations for her exemption request, including her belief that the Bible commands her to obey authority – including the Constitution and the Bill of Rights – and to resist coerced vaccination, and that violating her conscience would interfere with her relationship with God. Petitioner Hawley cited to many passages from the Bible in support of the beliefs she described.

90. Petitioner Hawley received an e-mail from UCS dated November 23, 2021, indicating that her latest request for exemption had been received and was being reviewed. The email stated that she would receive a separate e-mail with a decision on her request, or if additional information was required.

91. Petitioner Hawley received correspondence from UCS dated December 9, 2021, declaring her unfit for service based on non-compliance with the vaccine policy. Relevant documents pertaining to Petitioner Hawley are annexed as Exhibit Y.

92. Petitioner Evelyn Herrera is an employee of UCS who submitted a request for religious exemption from COVID-19 vaccination on or about October 18, 2021. Her request included a statement in which Petitioner Herrera identified herself as a Christian and noted her opposition to abortion and to the use of aborted fetuses and fetal cell lines in commerce in any way. She considers it to be desecration of human remains. As such, she stated that receiving a COVID-19 vaccine would make her responsible for perpetuating the immoral use of fetal cell lines,

regardless of how remote in time the abortions in question occurred. Petitioner Herrera also described her belief that her body is a temple of the Holy Spirit, her obligation to keep her body pure, and her opposition to introducing various components of the vaccines into her body. She stated that she objects to any vaccine that would alter her God-given immune system; to do so would be to alter God's design. Petitioner Herrera included citations to passages from the Bible in support of her request. In addition to her personal statement, she included a letter from Kevin Barry, Esq., in support of her request for a religious exemption from the COVID-19 vaccine.

93. UCS directed Petitioner Herrera on or about November 19, 2021, to submit supplemental information based on the contents of her initial request. She was directed to complete both sections of the supplemental form and she submitted her supplemental responses on or about December 3, 2021. In her response to section A of the supplemental form, she noted that God has instructed her to avoid the COVID-19 vaccine regardless of its ingredients. She acknowledged that she has used some of the over-the-counter drugs listed, although she has not done so in the last two years to the best of her knowledge. She does not believe she has ever taken any of the listed prescription drugs. Petitioner Herrera indicated that if she is required to take any medication as a condition of her employment, she would pray about it and seek direction from God. She stated that she is unaware of whether she received the Measles, Mumps, and Rubella vaccine, but that she has not received the other vaccines listed.

94. In section B, Petitioner Herrera explained that she abstains from all vaccines, and has for as long as she can remember. She also noted that if UCS wished to provide her with a longer list of medications, or a list of procedures, she would be willing to specify for each whether she abstains. She stated that receiving a COVID-19 vaccine would violate her "God-given conscience." She denied having received any vaccine as an adult.

95. Petitioner Herrera received correspondence from UCS dated December 23, 2021, denying her religious exemption from the COVID-19 vaccine mandate. She received correspondence from UCS dated January 3, 2022, declaring her unfit for service based on non-compliance with the vaccine policy. Relevant documents pertaining to Petitioner Herrera are annexed as Exhibit Z.

96. Petitioner Wanda Ingraham is an employee of UCS who submitted a request for religious exemption from COVID-19 vaccination on or about September 23, 2021. Her request included a statement explaining that her body is God's temple, and that vaccination is an act of interfering with divine providence. She asserted her faith in God and described events in her personal life during which God provided for her or others. She also cited her belief in bodily autonomy. She voiced her objection to the use of fetal cell lines in the development of the COVID-19 vaccines. Petitioner Ingraham included citations to passages from the Bible in support of her request.

97. UCS directed Petitioner Ingraham to submit supplemental information based on the contents of her initial request. She submitted the entire supplemental form on or about November 15, 2021. In her responses to section A of the supplemental form, she indicated that she has possibly taken some of the listed over-the-counter drugs, including within the last two years, but that she will not use any of these drugs in the future, even if recommended by a physician, until she does further research. She does not believe that she has ever taken any of the listed prescription drugs and stated that she will not use any of these drugs in the future, even if recommended by a physician, until she does further research. Petitioner Ingraham indicated that she may have received the Measles, Mumps, and Rubella vaccine as a child, but denied having received any of the other vaccines listed.

98. In section B, Petitioner Ingraham indicated that she does not eat meat, and has not since she was a teenager. She also stated that she will be engaging in further research into the contents of various medications. Petitioner Ingraham did not recall receiving any vaccines as an adult. She included an additional personal statement expanding on her objection to the vaccine and citing to passages from the Bible.

99. Petitioner Ingraham received correspondence from UCS dated February 9, 2022, denying her religious exemption from the COVID-19 vaccine mandate. Relevant documents pertaining to Petitioner Ingraham are annexed as Exhibit AA.

100. Petitioner Margaret McCormick is an employee of UCS who submitted a request for religious exemption from COVID-19 vaccination on or about September 22, 2021. Her request included a statement explaining that she has determined, through faith and prayer, that she should not receive a COVID-19 vaccine. She quoted passages from the Dignitatis Humanae and the Catechism of the Catholic Church which explain that conscience is communication from God, and that an individual is obligated to follow their conscience. She stated that receiving the vaccination would be denouncing her faith in God and could violate her trust in God's will. According to Petitioner McCormick, receiving the vaccine would be contrary to God's will and therefore a sin.

101. UCS directed Petitioner McCormick on or about November 4, 2021, to submit supplemental information based on the contents of her initial request. She was directed to complete section B of the supplemental form and she submitted her responses on or about November 17, 2021. She indicated that she abstains from all medications, treatments, and procedures until she has exhausted all natural options, and that she also abstains from receiving vaccines, and has done so since the early 2000s. When asked to explain why her faith requires her to abstain, she cited to scripture proclaiming the human body to be the temple of God. She explained that she could not, in

good conscience, receive a vaccine which might harm her or receive medical treatment when she is not ill. Petitioner McCormick noted that she received a pneumonia vaccine when she was younger but classified it as a mistake she would not repeat.

102. Petitioner McCormick received correspondence from UCS on or about December 23, 2021, denying her religious exemption from the COVID-19 vaccine mandate. Relevant documents pertaining to Petitioner McCormick are annexed as Exhibit BB.

103. Petitioner Emilce Mercuri is an employee of UCS who submitted a request for religious exemption from COVID-19 vaccination on or about September 27, 2021. In her request she identified herself as a Roman Catholic. She noted the Church's teachings that the human body is the temple of the holy spirit, and that "the sin of abortion is of immense gravity." Based on these beliefs, she stated that she could not in good conscience receive a vaccine developed using fetal cell lines. She also noted that the Church does not obligate vaccination and supports an individual's decision to refuse a vaccine based on their own conscience. She stated further that receiving such a vaccine would violate her faith that God will protect her. In support of her request, Petitioner Mercuri cited the Book of Genesis and a published letter from a Catholic priest.

104. UCS directed Petitioner Mercuri to submit supplemental information based on the contents of her initial request, and she submitted her supplemental responses on or about November 17, 2021. She indicated that she has previously taken over-the-counter medications listed, but would not do so in the future, and she denied taking any of the listed prescription medication, adding a notation about when they were developed relative to the use of fetal cell lines. She stated that she objects to all drugs that used fetal cell lines in their initial development. She denied having received any vaccines as an adult. She included with her submission an additional written statement

voicing objection to the vaccine mandate, exemption process, and masking and testing requirements.

105. Petitioner Mercuri received correspondence from UCS on or about December 23, 2021, denying her religious exemption from the COVID-19 vaccine mandate. Petitioner Mercuri sent correspondence to the UCS Office of Court Administration dated December 23, 2021, requesting additional information about her denial and the process by which it was rendered. Relevant documents pertaining to Petitioner Mercuri are annexed as Exhibit CC.

106. Petitioner Victoria O'Donnell is an employee of UCS who submitted a request for religious exemption from COVID-19 vaccination on or about September 21, 2021. Her request included a handwritten statement in which she identified herself as a Christian and described her personal history of religious upbringing and church involvement. She went on to note an objection to abortion and to anything connected to abortion, including the COVID-19 vaccine developed with or tested on fetal cell lines. She explained that receiving a vaccine would be "condoning and justifying" abortion, which is a sin. Petitioner O'Donnell also explained her objection to introducing any substance into her body which could alter her genetic makeup and therefore alter God's creation. She concluded that receiving a COVID-19 vaccine would violate her conscience and faith. Her statement included citations to scripture, and she attached to her submission a letter from a church rector confirming her membership; that she is a person of faith; and that she is active in the church.

107. UCS directed Petitioner O'Donnell on or about November 18, 2021, to submit supplemental information based on the contents of her initial request. She was directed to complete both sections of the supplemental form and she submitted her supplemental responses on or about December 2, 2021. She indicated in section A that she has used certain over-the-counter medication

tested on fetal cells and would continue to do so, but that she has not taken and would not take the listed prescription medication. When asked to explain why her beliefs permit her to take those medications, she indicated that they are temporary remedies which pass through the body. She also noted that she tries natural remedies before taking medication and has previously refused prescription medication.

108. Petitioner O'Donnell indicated in part B that she abstains from eating meat on Ash Wednesday and on Fridays during Lent, and she abstains from eating an hour before receiving communion. She noted that the only vaccine she has received as an adult was to prevent tetanus, and she differentiated between the tetanus vaccine and the COVID-19 vaccines, indicating that the former has been subject to long-term use and study.

109. Petitioner O'Donnell received correspondence from UCS on or about January 6, 2022, denying her religious exemption from the COVID-19 vaccine mandate. Relevant documents pertaining to Petitioner O'Donnell are annexed as Exhibit DD.

110. Petitioner Victoria Ososkalo is an employee of UCS who submitted a request for religious exemption from COVID-19 vaccination on or about September 24, 2021. Her request included a statement explaining that she seeks guidance from God through studying the Bible and prayer. Petitioner Ososkalo expressed her conviction that life begins at conception, and therefore abortion is murder. Based on this conviction, she believes that receiving any of the COVID-19 vaccines would be cooperating in abortion and therefore a sin. She also believes that the human body is the temple of the holy spirit, and that receiving a vaccine developed with or tested on fetal cell lines would dishonor that temple and constitute sin. Petitioner Ososkalo cited to passages from the Bible in support of the beliefs she described.

111. UCS directed Petitioner Ososkalo to submit supplemental information based on the contents of her initial request, and she submitted the entire supplemental form on or about November 22, 2021. She indicated in section A that she has used over-the-counter medication tested on fetal cells and would continue to do so, and that she would also take the prescription medications listed in the future. When asked to explain why her beliefs permit her to take those medications, she noted that certain medications were developed prior to the use of fetal cell lines.

112. In part B, Petitioner Ososkalo listed medications and vaccines from which she abstains. She also indicated that she abstains from elective abortions and any medicine developed with or tested on fetal cells. Petitioner Ososkalo explained that she has always abstained from abortion and began to abstain from the vaccines she listed once she learned, in 2021, that they were developed using aborted fetal cells. Finally, although she has received certain vaccinations in the past, she indicated that she received them in ignorance, and would choose to abstain from them today.

113. Petitioner Ososkalo received correspondence from UCS on or about December 23, 2021, denying her religious exemption from the COVID-19 vaccine mandate. She received correspondence from UCS dated January 3, 2022, declaring her unfit for service based on non-compliance with the vaccine policy. Relevant documents pertaining to Petitioner Ososkalo are annexed as Exhibit EE.

114. Petitioner Jason Pashoukos is an employee of UCS who submitted a request for a religious exemption from COVID-19 vaccination on or about September 23, 2021. His request included a lengthy statement asserting that his body is God's temple where God dwells within him, and that he is not to defile his body by the forceful injection of any substance into his body against his will. Additionally, he explained his belief that vaccinating a healthy body and replacing a

natural immune system with a synthetic/mRNA system is unnatural and would defile God's creation by corrupting the sanctity of the blood with unnatural components not created by God, which would create a "false" God in the vaccine, and which directly violates God's word. Petitioner Pashoukos also expressed opposition to the use of fetal cell lines in the production and development of COVID-19 vaccines and believes that, if he were to become vaccinated, he would be in direct violation of the word of God. Petitioner Pashoukos cited to passages in the Bible in support of his request.

115. UCS directed Petitioner Pashoukos on or about November 15, 2021, to submit supplemental information based on the contents of his initial request. Petitioner Pashoukos submitted the supplemental form on or about November 24, 2021. He stated that he abstains from the COVID-19 shot due to his religious beliefs. Although he confirmed that he has received the Tetanus shot as an adult, he differentiated between the Tetanus shot and the COVID-19 vaccines by explaining that the Tetanus shot does not replace a natural immune system with an unnatural alternative immune system. Additionally, he stated that the COVID-19 vaccine is the first of its kind and cannot be compared to past vaccines because it constitutes "an unnatural method introduced into the body that is unclean, [and] which taints the body and blood because it is not natural." Petitioner Pashoukos also attached a lengthy explanation of why his religious faith requires him to abstain from the COVID-19 vaccine, which echoes many of the statements made in his initial request. He also explained the specific methods he uses to cleanse his body and remove toxins and impurities, as well as his medical concerns with regard to the COVID-19 vaccine. These concerns consist of a previous condition of Bell's Palsy/Lyme Disease; an undisclosed and/or undiagnosed heart/cardiovascular condition; and a history of adverse reactions to immunotherapy treatment for allergies, as well as antibiotics, which required medical intervention.

116. Petitioner Pashoukos received correspondence from UCS dated January 7, 2022, denying his religious exemption from the COVID-19 vaccine mandate. Relevant documents pertaining to Petitioner Pashoukos are annexed as Exhibit FF.

117. Petitioner Noelle Platt is an employee of UCS who submitted a request for a religious exemption from COVID-19 vaccination on or about September 27, 2021. Her request included a lengthy statement, as well as voluminous attachments, describing the basis for her request. In her statement, Petitioner Platt asserted that she was raised Catholic since birth and that she believes that one's autonomy is most important when it comes to one's religious beliefs. In addition, she took issue with the fact that Pfizer and Moderna used aborted fetal cell lines within their research to develop the COVID-19 vaccines, and that the Johnson & Johnson vaccine "has the aborted fetal cell lines within it." Specifically, Petitioner Platt stated that she does not support the use of aborted fetal cells due to her religious belief that "you shall not kill." She explained that she previously suffered a miscarriage, which was followed by a pregnancy that led to preeclampsia as a result of the baby's fatal diagnosis of triploidy. Petitioner Platt quoted extensively from the Pastoral Constitution of the Church in the Modern World in support of her request. As for the attachments to her religious exemption, she attached pictures from her first communion; printouts from the Charlotte Lozier Institute regarding vaccines in general and the use of abortion-derived cell lines in COVID-19 vaccines; and a variety of articles regarding vaccines in general and COVID-19 vaccines for people with underlying medical conditions.

118. Petitioner Platt received correspondence from UCS dated January 7, 2022, denying her religious exemption from the COVID-19 vaccine mandate. She then received correspondence from UCS dated January 18, 2022, declaring her unfit for service based on non-compliance with the vaccine policy. Relevant documents pertaining to Petitioner Platt are annexed as Exhibit GG.

119. Petitioner Meredith Pratt is an employee of UCS who submitted an initial request for religious exemption from COVID-19 vaccination on or about October 29, 2021. Her request included a brief statement declaring that her religious beliefs prevent her from being vaccinated and seeking an exemption on that basis.

120. Petitioner Pratt received correspondence from UCS dated November 22, 2021, denying her religious exemption from the COVID-19 vaccine mandate. She then submitted a more detailed request for religious exemption from COVID-19 vaccination on or about December 6, 2021. She included a longer statement explaining the basis for her request, stating that receiving a vaccine would show a lack of faith in the immune system God created. She noted her belief that medical treatment, including vaccination, should not be coerced but should rather be a decision she makes with her family, doctor, and God. She expressed faith in her natural immunity derived from having COVID-19 as well as concerns regarding the efficacy of the COVID-19 vaccines.

121. Petitioner Pratt received an e-mail from UCS dated December 6, 2021, indicating that her request for exemption had been received and was being reviewed. The email stated that she would receive a separate e-mail with a decision on her request, or if additional information was required.

122. Petitioner Pratt received correspondence from UCS dated December 7, 2021, declaring her unfit for service based on non-compliance with the vaccine policy. On January 21, 2022, Petitioner Pratt emailed UCS asking for an explanation of why her exemption request was denied. She received a response from UCS Counsel Mindy Jeng providing a general explanation of the review process. The response from Ms. Jeng was not specific as to Petitioner Pratt and did not provide any explanation for why her request was denied. Relevant documents pertaining to Petitioner Pratt are annexed as Exhibit HH.

123. Petitioner Jamie Rahm is an employee of UCS who submitted a request for religious exemption from COVID-19 vaccination on or about October 18, 2021. Her request included a statement asserting that the Bible forbids her from shedding innocent blood and committing murder, and that she is therefore opposed to abortion. She stated her objection to the COVID-19 vaccines based on their use of fetal cell lines. Additionally, Petitioner Rahm expressed her belief that the COVID-19 vaccines can alter one's God-given immune system. She affirmed her trust in God and her immune system to protect her. Petitioner Rahm cited to passages from the Bible in support of her request.

124. UCS directed Petitioner Rahm on or about November 22, 2021, to submit supplemental information based on the contents of her initial request. She was directed to complete the entire supplemental form, and she submitted her responses on or about December 6, 2021. In section A, Petitioner Rahm indicated that she takes Tylenol "only as a last resort and on rare occasions," and that she has previously taken Azithromycin (Zithromax), although she asserts that she has not taken this product in the last two years and would not use it again, even if recommended by her doctor. She expanded on this answer in a lengthy attachment and explained that she would only take a prescription medication if extremely ill and it was absolutely necessary. Otherwise, she relies on natural immunity and prayer. She also distinguished between drugs developed prior to the use of fetal cell lines, and the COVID-19 vaccines which were developed using fetal cell lines.

125. In section B, Petitioner Rahm described her efforts to "stay medication free" and engage in healthy eating. She indicated that she has engaged in the above-mentioned efforts since 2016 due to a renewal of her religious faith at that time. She confirmed that she received the flu vaccine on two occasions since turning eighteen years old, but that this was "years" ago, and she

will not receive the flu vaccine again. She reiterated her objection to abortion and therefore to vaccines and medications developed using fetal cell lines and included additional quotations from the Bible.

126. Petitioner Rahm received correspondence from UCS dated January 6, 2022, denying her religious exemption from the COVID-19 vaccine mandate. Relevant documents pertaining to Petitioner Rahm are annexed as Exhibit II.

127. Petitioner Alyssa Sullivan is an employee of UCS who submitted a request for religious exemption from COVID-19 vaccination on or about September 21, 2021. Her request included a lengthy statement describing her "personal religious journey." She explained that she received various vaccines as a minor, but would refuse them now, because receiving man-made vaccinations would be choosing man over God. She noted the scriptural obligation to follow one's conscience. She also explained the obligation to keep one's body clean, and that she would not be able to maintain her bond with God if she introduced "foreign contaminants" (including vaccines) into her body. According to her beliefs, it is up to her to decide what is clean or unclean. Petitioner Sullivan cited to passages from the Bible in support of the beliefs she described.

128. UCS directed Petitioner Sullivan to submit supplemental information based on the contents of her initial request, and she submitted the entire supplemental form on or about November 17, 2021. She indicated in section A that she has used over-the-counter medication tested on fetal cells and would continue to do so, and that she would also take the prescription medications listed in the future. When asked to explain why her beliefs permit her to take those medications, stated that she is empowered by her beliefs to determine what is clean or unclean.

129. Petitioner Sullivan indicated in part B that she abstains from all vaccines and from eating fish. She began to abstain from vaccination at the age of eighteen. She explained that,

according to her religious beliefs, she must abstain from anything she deems unclean; to do otherwise would be to sin.

130. Petitioner Sullivan received correspondence from UCS on or about December 15, 2021, denying her religious exemption from the COVID-19 vaccine mandate. Relevant documents pertaining to Petitioner Sullivan are annexed as Exhibit JJ.

131. Petitioner Brian Wilson is an employee of UCS who submitted a request for religious exemption from COVID-19 vaccination on or about October 18, 2021. His request included a short, handwritten statement describing his religious upbringing. He asserted his belief that receiving a COVID-19 vaccine, given the vaccines' use of fetal cell lines, would be morally wrong in the eyes of the Lord.

132. UCS directed Petitioner Wilson on or about November 22, 2021, to submit supplemental information based on the contents of his initial request. He was directed to complete section A of the supplemental form and he submitted his supplemental responses on or about December 6, 2021, indicating that he has used some of the over-the-counter drugs listed and that he would continue to do so in the future. With respect to the prescription drugs listed, Petitioner Wilson indicated that he has not taken them in the past and would not do so in the future. He noted that he had received some of the listed vaccines but agreed that it would violate his religious beliefs to now receive any of these vaccines or other vaccines which are tested on or produced by means of fetal cell lines.

133. Petitioner Wilson received correspondence from UCS dated January 6, 2022, denying his religious exemption from the COVID-19 vaccine mandate. Relevant documents pertaining to Petitioner Wilson are annexed as Exhibit KK.

134. Petitioner Marjorie Coons is an employee of UCS who submitted a request for religious exemption from COVID-19 vaccination on or about September 27, 2021. Her request included a statement describing religious beliefs. She described the Biblical basis for her belief that abortion is murder, and stated her opposition to receiving a COVID-19 vaccine due to the use of aborted fetal cells in the development and testing of the vaccines. She noted that any association with abortion would be a sin. Petitioner Coons explained that she seeks guidance through prayer, and that based on the guidance she has received, she does not believe it is God's will for her to receive the vaccine. She also explained her belief that the human body is the temple of God and that receiving the vaccine would be harmful or introduce an impurity to her body, which "would be displeasing to God." Petitioner Coons concluded that receiving a COVID-19 vaccine would "alter [her] relationship with God." She included citations to passages from the Bible in support of her request.

135. UCS directed Petitioner Coons on or about November 17, 2021, to submit supplemental information based on the contents of her initial request. She was directed to complete both sections of the supplemental form and she submitted her supplemental responses on or about December 1, 2021. In her response to section A of the supplemental form, she indicated that she has used some of the over-the-counter and prescription drugs listed, but not within the last two years. As for future use, she indicated that she might use such drugs if necessary for her survival, after research and discussion with her doctor. She denied receiving any vaccines developed or tested using fetal cell lines as an adult. Petitioner Coons included with her supplemental responses a letter from First Harvest Ministries in support of her accommodation request.

136. In her response to section B, Petitioner Coons explained that she abstains from all medications and certain foods, and that all the decisions she makes are based on guidance from

God. She acknowledged receiving a tetanus vaccine as an adult, but noted that it was not an experimental vaccine, and that she has since "developed a more spiritual belief."

137. Petitioner Coons received correspondence from UCS dated January 7, 2022, denying her religious exemption from the COVID-19 vaccine mandate. Relevant documents pertaining to Petitioner Coons are annexed as Exhibit LL.

138. No previous application for the relief sought herein has been made.

**AS AND FOR A FIRST CLAIM**

139. Petitioners reallege and repeat paragraphs 1 through 138, as if fully set forth herein.

140. A comparison of the attached religious exemption request approvals (Exhibits D – I) with the Petitioners' exemption request denials (Exhibits J – LL) shows that there are no substantive differences between the two groups.

141. For example, all the UCS employees who were granted religious exemptions by Respondents quoted from or cited to the Bible or other religious writings in their requests for exemptions, supplemental submissions, or both.

142. Similarly, 27 of the Petitioners cited to or quoted from the Bible or other religious writings, such as the Congregation for the Doctrine of Faith and the Catechism of the Catholic Church, in their requests for exemptions, supplemental submissions, or both. These 27 Petitioners are Ventresca-Cohen (Exhibit J), Annunziata (Exhibit K), Asencio (Exhibit L), Boback (Exhibit M), Brink (Exhibit N), Bunce (Exhibit O), Buss (Exhibit P), Cheresnowsky (Exhibit Q), Cichon (Exhibit R), Colon (Exhibit S), Dantes (Exhibit T), Davidson (Exhibit U), Dulaney (Exhibit V), Fleming (Exhibit W), Hall (Exhibit X), Hawley (Exhibit Y), Herrera (Exhibit Z), Ingraham (Exhibit AA), McCormick (Exhibit BB), Mercuri (Exhibit CC), O'Donnell (Exhibit DD), Ososkalo

(Exhibit EE), Pashoukos (Exhibit FF), Platt (Exhibit GG), Rahm (Exhibit II), Sullivan (Exhibit JJ), and Coons (LL).

143. Nonetheless, none of these 27 Petitioners were granted a religious exemption.

144. Additionally, 4 of the employees who were granted a religious exemption cited the use of aborted human fetal cell lines in the development and testing of the presently-available COVID-19 vaccines as a reason for their objection. These are Mr. Bailey (Exhibit D), Mr. Church (Exhibit E), Mr. Fiet (Exhibit F), and Mr. Giesser (Exhibit G).

145. Similarly, 22 of the Petitioners cited this same connection as a basis for objecting to the vaccine mandate. These are Petitioners Ventresca-Cohen (Exhibit J), Annunziata (Exhibit K), Boback (Exhibit M), Brink (Exhibit N), Bunce (Exhibit O), Cichon (Exhibit R), Colon (Exhibit S), Davidson (Exhibit U), Dulaney (Exhibit V), Fleming (Exhibit W), Hawley (Exhibit Y), Herrera (Exhibit Z), Ingraham (Exhibit AA), Mercuri (Exhibit CC), O'Donnell (Exhibit DD), Ososkalo (Exhibit EE), Pashoukos (Exhibit FF), Platt (Exhibit GG), Rahm (Exhibit II), Sullivan (Exhibit JJ), Wilson (Exhibit KK), and Coons (LL).

146. Again, despite this similarity, none of these 22 Petitioners were granted a religious exemption to the mandate.

147. Additionally, several employees granted exemptions and several Petitioners denied exemptions drew distinctions between those vaccines and medications developed with the use of fetal cell lines, and those vaccines and medications developed without the use of fetal cell lines but subsequently tested on fetal cell lines.

148. Moreover, both groups include UCS employees who admitted to ignorance of the fact that vaccines or medications they have received in the past were tested on fetal cell lines.

149. Five of the 6 individuals for whom exemptions were granted cited, as a basis for their objection to receiving a COVID-19 vaccine, their belief that the human body is the temple of God, and that receiving a COVID-19 vaccine would in some way defile that temple or otherwise violate the obligations imposed by their faith in this respect. These are Mr. Church (Exhibit E), Mr. Fiet (Exhibit F), Mr. Giesser (Exhibit G), Ms. Leddo (Exhibit H), and Ms. Pieper (Exhibit I).

150. Likewise, 21 of the Petitioners raised this same objection, but none were granted a religious exemption. These are Petitioners Ventresca-Cohen (Exhibit J), Asencio (Exhibit L), Bunce (Exhibit O), Buss (Exhibit P), Cichon (Exhibit R), Colon (Exhibit S), Dantes (Exhibit T), Dulaney (Exhibit V), Fleming (Exhibit W), Hall (Exhibit X), Hawley (Exhibit Y), Herrera (Exhibit Z), Ingraham (Exhibit AA), McCormick (Exhibit BB), Mercuri (Exhibit CC), O'Donnell (Exhibit DD), Ososkalo (Exhibit EE), Pashoukos (Exhibit FF), Rahm (Exhibit II), Sullivan (Exhibit JJ), and Coons (Exhibit LL).

151. Further, both groups include employees who described their personal relationships and communications with God, with some in each group indicating that they make medical decisions on a case-by-case basis through prayer.

152. Finally, both groups include requests that vary greatly in terms of length, complexity, and reliance on supplemental materials.

153. By approving 6 UCS employees' religious exemption requests, while denying Petitioners' substantially similar requests, the Respondents' denials were clearly arbitrary, capricious and irrational.

**AS AND FOR A SECOND CLAIM**

154. Petitioners reallege and repeat paragraphs 1 through 153, as if fully set forth herein.

155. Respondents' denials of Petitioners' religious exemption requests did not contain any detailed or specific reasons for the denials.

156. Respondents provided Petitioners with formulaic denial letters stating only that the individual's request for a religious exemption was considered and denied.

157. The short form denials are so bereft of detail that they prevented Petitioners from understanding why their requests were denied.

158. When some of the Petitioners asked Respondents to explain why their requests were denied, Respondents provided only a description of the process and a statement that specific reasons for denials would not be provided.

159. Respondents have thus never explained why the 29 Petitioners were denied their religious exemption requests, even when specifically asked for such a detailed explanation.

160. Respondents' failure to provide any sort of detailed, specific reason for its denials of the 29 religious exemption requests at issue in this proceeding renders its denials arbitrary, capricious and irrational.

**WHEREFORE**, Petitioners respectfully request an order and judgment granting the following relief:

a. ORDER that Respondents grant Petitioners' religious exemption requests;

b. ORDER that Respondents reinstate any Petitioner ultimately terminated from UCS' employment for a failure to obtain a COVID-19 vaccination;

c. ORDER Respondents to make all Petitioners whole for lost wages and benefits, including reimbursement any out-of-pocket medical expenses incurred as a result of Respondents' illegal actions towards Petitioners and including any retroactive retirement contributions due and owing to the New York State and Local Employees Retirement System; and

d. GRANTING any other and such further relief as this Court deems just and proper.

Dated: April 26, 2022
Albany, New York

Yours, etc.,

DAREN J. RYLEWICZ
Attorney for Petitioners

By: ______________________
Steven M. Klein, of counsel
Civil Service Employees Association, Inc.
Box 7125, Capitol Station
143 Washington Avenue
Albany, New York 12224
(518) 257-1443

PL/22-0041/SMC/ks/Amended Verified Petition #1074986

TO: **JANET M. DiFIORE,** as Chief Judicial Officer of the State
and Chief Judge of the Court of Appeals
New York State Court of Appeals
20 Eagle Street
Albany, New York 12207

**LAWRENCE K. MARKS,** as Chief Administrative Judge of the Courts
NYS Unified Court System - Albany Office
Office of Court Administration
4 ESP, Suite 2001
Empire State Plaza
Albany, NY 12223-1450

**NYS UNIFIED COURT SYSTEM**
NYS Unified Court System - Albany Office
Office of Court Administration
4 ESP, Suite 2001
Empire State Plaza
Albany, NY 12223-1450

**Letitia James, Esq.**
NYS Attorney General
Empire State Plaza
Justice Building, 2nd Floor
Albany, NY 12224

PL/22-0041/SMC/ks/Amended Notice of Petition &Verified Petition #1074987

# VERIFICATION

STATE OF NEW YORK )
) SS.:
COUNTY OF ALBANY )

NICOLE VENTRESCA-COHEN, being duly sworn, deposes and says:

Deponent is a Petitioner in this proceeding; deponent has read the foregoing Amended Petition and knows the contents thereof; the same is true to deponent's own knowledge, except as to matters stated to be alleged on information and belief, and as to those matters deponent believes them to be true.

The grounds of deponent's belief as to all matters not stated upon deponent's knowledge are as follows: examination of relevant documents and conversations with my attorney.

Nicole Ventresca Cohen
NICOLE VENTRESCA-COHEN

Sworn to and subscribed
before me this 26th day
of April 2022

Steven Klein
Notary Public
State of New York

STEVEN M. KLEIN
NOTARY PUBLIC, STATE OF NEW YORK
QUALIFIED ... ALBANY NO. 4964239
COMMISSION ... MARCH 26, 2026

PL/22-0041/SMK/kb/verification #1079740

All exhibits referenced in the amended verified petition, with the exception of newly-added Exhibit LL, were previously filed electronically with the Court. Exhibits A–KK are assigned NYSCEF Document Numbers 3–39. Exhibit LL is annexed to the amended verified petition.

**Jessica Bergin v. New York State Unified Court System**
**22-CV-5264(BMC)(EDNY)**

**Plaintiff's Opposition to Defendant's Motion to Dismiss**

# Exhibit 4

**Employee #1**

**<u>SUPPLEMENTAL AFFIDAVIT OF RELIGIOUS OBJECTION TO COVID-19 VACCINATION</u>**

## Section A

We understand that you have expressed concerns about the connection between fetal cells and the development of the COVID-19 vaccines. It is critical for everyone to have all relevant information to make fully informed decisions regarding COVID-19 vaccination. Please read and review the information below, which summarizes the current medical and scientific information regarding the COVID-19 vaccines and their development. Please also keep in mind that getting vaccinated is an important step we can take to protect ourselves, our community, our workplace, and our family and friends from severe disease and death from COVID-19.

Please review the following statements of fact on the use of fetal cell lines in the development of COVID-19 vaccines.

- Fetal cell lines are not the same as fetal tissue (tissue obtained from a human embryo or fetus). Fetal cell lines are cells that grow in a laboratory. Historical fetal cell lines were derived in the 1960s and 1970s from two elective abortions. Abortions from which fetal cells were obtained were elective and were not done for the purpose of vaccine development. Scientists duplicated those original cells and caused them to multiply into many new cells over the past several decades. Current fetal cell lines are thousands of generations of duplication removed from the cells extracted from fetal tissue. Fetal cell lines are widely used in cancer research, vaccine development, and drug testing.

- COVID-19 vaccine developers Moderna, Pfizer, and Johnson & Johnson/Janssen used two fetal cell lines in testing or manufacturing their vaccines—HEK-293, a kidney cell line that was isolated from a fetus in 1973 from either a spontaneous miscarriage or an elective abortion, and PER.C6, a retinal cell line that was isolated from an aborted fetus in 1985.

- While fetal cell lines were used to develop or manufacture these COVID-19 vaccines, <u>no aborted fetal cells are in the vaccines themselves.</u>

- Neither the Pfizer nor Moderna vaccines use fetal cell lines in the production of their vaccines. HEK-293, however, was used to test the effectiveness and safety of both vaccines.

- Production of the Johnson & Johnson/Janssen vaccine requires the use of a fetal cell line, specifically PER.C6.

- Newly aborted fetal tissue is not used to generate HEK-293 or PER.C6 cells, to modify these cell lines, or to maintain them in a laboratory. The use of HEK-293 and PER.C6 cell lines <u>does not necessitate or create demand for future abortions</u>.

*Even after reviewing all of the facts above, I swear or affirm that taking <u>any</u> of the COVID-19 vaccines would violate my sincere religious beliefs due to their connection to fetal cell lines in either testing or production.*

Signature:

Below is a list of some common pharmaceutical products that have been tested using fetal cell line HEK-293 (the same fetal cell line used in the testing of the Moderna and Pfizer COVID-19 vaccines). To completely avoid using products tested with the fetal cell line HEK-293, individuals would have to avoid the use of many medical treatments and products and certain processed food and cosmetics.

Please provide the requested information for each group of products and initial each line. *I understand that by initialing each statement below I swear or affirm that the information I have provided is true to the best of my knowledge.*

| **Initial** | **Name of Pharmaceutical Product Tested on HEK-293 Cell Line (Common Brand Name(s))** | **1. Have you ever used any of the products listed in this group? Yes/No** | **2. Have you used any of the products listed in this group within the last two years? Yes/No** | **3. Would you use any of the products listed in this group in the future, even if recommended or prescribed by a physician? Yes/No** |
|---|---|---|---|---|
| | Over-the-counter drugs<br>Acetaminophen (Tylenol); Ibuprofen (Advil, Motrin); Acetylsalicylic Acid (Aspirin); Naproxen (Aleve); Pseudoephedrine (Sudafed, SudoGest, Suphedrine); Diphenhydramine (Benadryl); Loratadine (Claritin); Dextromethorphan (Robitussin, Delsym, Robafen); Guaifenesin (Mucinex); Calcium Carbonate (Tums); Aluminum Hydroxide and Magnesium Hydroxide (Maalox); Docusate (Ex-Lax Stool Softener, Colace); Senna Glycoside (Sennoside, Senna, Ex-Lax, Senokot); Bismuth Subsalicylate (Pepto-Bismol); Phenylephrine (Preparation H, Vazculep, Suphedrine PE); Mepyramine or Pyrilamin; Lidocaine (Lidoderm, Recticare) | Please see attached for additional information Personal Health Info covered under Title VII | | NO |
| | Prescription drugs<br>Hydroxychloroquine (Plaquenil); Levothyroxine (Synthroid, Tirosint, Levoxyl); Remdesivir (Veklury); Azithromycin (Zithromax); Ivermectin (Stromectol); Cerivastatin (Baycol, Lipobay), Fluvastatin, (Lescol), Pitavastatin, (Livalo), Pravastatin, (Pravachol), or Rosuvastatin (Crestor) | Please see attached for additional info. Personal Health information covered under Title VII | | NO |

If you answered "Yes" to question 3 for over-the-counter drugs and/or prescription drugs, please explain how your religious beliefs permit you to take these medications but prohibit the taking of a COVID-19 vaccine.

Personal Health Information covered under title VII of the Civil Rights Act.

Multiple other vaccines utilize HEK293, PER.C6, or other fetal cell lines in production and/or testing, including the MMR (measles, mumps, and rubella), shingles, chicken pox, and hepatitis A vaccines. Please initial and answer the following questions below.

*I understand that by initialing each response I am swearing or affirming that the information I have provided is true.*

| Initials | Question | Yes/No |
|---|---|---|
| | 4. Have you ever received the MMR (Measles, Mumps, Rubella) vaccine? | NO |
| | 5. Have you ever received the chicken pox vaccine? | NO |
| | 6. Have you ever received the shingles vaccine? | NO |
| | 7. Have you ever received the hepatitis-A vaccine? | NO |
| | 8. Based upon the information above, would it violate your religious beliefs to now receive the MMR (measles, mumps, and rubella), shingles, chicken pox, hepatitis A, or any other vaccine that is tested on or produced by means of fetal cell lines, including HEK-293? | YES |

If you answered "No" to question 8, please explain how your religious beliefs permit you to take these vaccines but prohibit the taking of a COVID-19 vaccine.

Please complete notarization and signature on page 7.

## Section B

You have provided information in a previous statement indicating that your religious faith calls for you to abstain from medicines and vaccines due to concerns regarding the sanctity of your body or its purity. Please answer the below questions to allow us to gain a better understanding of your beliefs.

1. Please list all the medicines, medical treatments and procedures, vaccines, and/or foods that you abstain from due to your religious beliefs:

   Please provide information on how this question pertains to my reasonable accomodation. Personal Health information covered under title VII

2. Please list the date you began to abstain from the above listed medicines and vaccines and/or other medical treatments:

   Please provide information on how this question pertains to my reasonable accomodation. Personal Health information covered under title VII.

3. Please provide a detailed explanation as to why your religious faith requires you to abstain from the listed substances in question 1.

   Please see additional information attached.

   I have submitted my exemption to be followed by reasonable accomodations. any further medical questions are unnecessary and intrusive under title VII.

(continue to next page)

4. Have you received an influenza (flu), pneumonia, tetanus, shingles, HPV or any other type of vaccine since turning 18 years of age? If yes, please specify the type of vaccine(s) and when it/they was/were administered.

NO

5. If you listed any vaccines in question 4, please explain how your religious beliefs permit you to take these vaccines but prohibit the taking of a COVID-19 vaccine.

Please complete notarization and signature on page 7.

I acknowledge that false statements intentionally made herein can lead to disciplinary action, up to and includin s class A misdemeanor under PL 210.05.

Signature: ____________________

Date: 11-22-2021

Print Name: ____________________

Email:

Phone: ____________________

Sworn and subscribed before me
This 22 day of November, 2021

Jestina Bryan
Notary Public

My commission expires: 2·14·22

JESTINA E. BRYAN
Notary Public - State of New York
No. 01BR6037207
Qualified in Nassau County
My Commission Expires 2·14·22

**Employee #2**

Date: November 29, 2021

From: Court Office

To Sir or Madam:

This lettter is in response to the supplemental form sent out by UCS.

The supplemental form of questioning is in violation of Title VII of the Civil Rights Act of 1964. I have attached links from EEOC as well as OSHA, siting their ruling on November 12, 2021 that suspended implementation and enforcement of the vaccine mandate.

- https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination
- https://www.eeoc.gov/laws/guidance/what-you-should-know-workplace-religious-accommodation
- https://www.osha.gov/coronavirus/ets2

My request is to continue to receive my reasonable accomodation and keep working the way I have been all along, which was not an undue hardship or a direct threat of others.

To reiterate my last submission, I have attached below the letter I submitted to you originally.

In that I am a member of the Ss Cyril and Methodius Catholic Church, I am exercising my right to receive a religious exemption for vaccination. First and foremost, the vaccines I oppose include the current COVID-19 mRNA vaccines and the Jansen vaccine which are produced with aborted fetal cell lines.

The Johnson & Johnson vaccine, the Jansen vaccine, uses retinal cells from a fetus that was aborted in 1985 and treated in a lab since; the Pfizer and Moderna vaccines test the mRNAs on an aborted fetus from 1973.

In regard to using such vaccines, the Vatican has instructed the faithful that:
*"As regards the diseases against which there are no alternative vaccines which are available and ethically acceptable, it is right to abstain from using these vaccines if it can be done without causing children, and indirectly the population as a whole, to undergo significant risks to their health." (Moral Reflections on Vaccines Prepared From Cells Derived From Aborted Human Fetuses, Pontifical Academy for Life, June 2005).*

Therefore as a faithful Catholic, I cannot according to the Church tenets on conscience

which are outlined below, use any product that takes its origin in abortion. The Vatican document I outline below:

*"They should take recourse, if necessary, to the use of conscientious objection with regard to the use of vaccines produced by means of cell lines of aborted human fetal origin." "Such a duty may lead, as a consequence, to taking recourse to "objection of conscience" when the action recognized as illicit is an act permitted or even encouraged by the laws of the country and poses a threat to human life. The Encyclical Letter Evangelium Vitae underlined this "obligation to oppose" the laws which permit abortion or euthanasia 'by conscientious objection.'*

*"It is up to the faithful and citizens of upright conscience (fathers of families, doctors, etc.) to oppose, even by making an objection of conscience, the ever more widespread attacks against life and the "culture of death" which underlies them." "[T]here is a grave responsibility to use alternative vaccines and to make a conscientious objection with regard to those which have moral problems." "As regards those who need to use such vaccines* ***for reasons of health****, it must be emphasized that, apart from every form of formal cooperation, in general, doctors or parents who resort to the use of these vaccines for their children, in spite of knowing their origin (voluntary abortion), carry out a form of* ***very remote mediate material cooperation****, and thus very mild, in the performance of the original act of abortion, and a* ***mediate material cooperation****, with regard to the marketing of cells coming from abortions, and* ***immediate,*** *with regard to the marketing of vaccines produced with such cells. However, in this situation, the aspect of passive cooperation is that which stands out most. It is up to the faithful and citizens of upright conscience (fathers of families, doctors, etc.) to oppose, even by making an objection of conscience, the ever more widespread attacks against life and the "culture of death" which underlies them. From this point of view, the use of vaccines whose production is connected with procured abortion constitutes at least a* ***mediate remote passive material cooperation*** *to the abortion, and an* ***immediate passive material cooperation*** *with regard to their marketing."*

Further, the Catechism of the Catholic Church which Pope John Paul II declared to be the "sure teaching norm of the Catholic Church" contains the tenets of our faith and our duty to adhere to these teachings regarding the right of conscience objections states:

> *1776 Deep within his conscience man discovers a law which he has not laid upon himself but which he must obey. Its voice, ever calling him to love and to do what is good and to avoid evil, sounds in his heart at the right moment.... For man has in his heart a law inscribed by God.... His conscience is man's most secret core and his sanctuary. There he is alone with God whose voice echoes in his depths.*
> *1777 Moral conscience, present at the heart of the person, enjoins him at the appropriate moment to do good and to avoid evil. It also judges particular choices, approving those that are good and denouncing those that are evil. It bears witness to the authority of truth in reference to the*

*supreme Good to which the human person is drawn, and it welcomes the commandments. When he listens to his conscience, the prudent man can hear God speaking.*

*1778 Conscience is a judgment of reason whereby the human person recognizes the moral quality of a concrete act that he is going to perform, is in the process of performing, or has already completed. In all he says and does, man is obliged to follow faithfully what he knows to be just and right. It is by the judgment of his conscience that man perceives and recognizes the prescriptions of the divine law:*

*Conscience is a law of the mind; yet [Christians] would not grant that it is nothing more; I mean that it was not a dictate, nor conveyed the notion of responsibility, of duty, of a threat and a promise.... [Conscience] is a messenger of him, who, both in nature and in grace, speaks to us behind a veil, and teaches and rules us by his representatives. Conscience is the aboriginal Vicar of Christ.*

*1779 It is important for every person to be sufficiently present to himself in order to hear and follow the voice of his conscience. This requirement of interiority is all the more necessary as life often distracts us from any reflection, self-examination or introspection.*

*Return to your conscience, question it.... Turn inward, brethren, and in everything you do, see God as your witness.*

*1806 Prudence is the virtue that disposes practical reason to discern our true good in every circumstance and to choose the right means of achieving it. Prudence is 'right reason in action,' writes St. Thomas Aquinas. It is called auriga virtutum (the charioteer of the virtues); it guides the other virtues by setting rule and measure. It is prudence that immediately guides the judgment of conscience. The prudent man determines and directs his conduct in accordance with this judgment.*

We are also taught through the teachings of Papal Encyclicals that conscience is the Divine Law which is inscribed into the heart and soul of man by God. For example: *"The natural law is written and engraved in the soul of each and every man, because it is human reason, ordaining him to do good and forbidding him to sin...But this command of human reason would not have the force of law if it were not the voice and interpreter of a higher reason to which our spirit and freedom must be submitted." (Leo XIII Libertas Praestantissimum, 597)*

*"On his part, man perceives and acknowledges the imperatives of the divine law through the mediation of conscience. It is through his conscience that man sees and recognizes the demands of divine law. He is bound to follow this conscience faithfully in all his activity so that he may come to God, who is his last end. Therefore he must not be forced to act contrary to his conscience. Nor must he be prevented from acting according to his conscience, especvially in religious matters. The reason is that the exercise of religion, of its very nature, consists before all else in those internal, voluntary and free acts whereby man sets the course of his*

*life directly toward God. Acts of this kind cannot be commanded or forbidden by any merely human authority." (Dignitatis Humanae, Pope Paul VI, 1965).*

**Synod of Bishops' address to the United Nations October 2, 1979:** *"In accordance with their dignity, all human beings, because they are persons, that is, beings endowed with reason and free will and, therefore, bearing a personal responsibility, are both impelled by their nature and bound by a moral obligation to seek the truth, especially religious truth. They are also bound to adhere to the truth once they come to know it and to direct their whole lives in accordance with its demands" (Dignitatis humanae, 2). "The practice of religion by its very nature consists primarily of those voluntary and free internal acts of conscience by which a human being directly sets his course towards God. No merely human power can either command or prohibit acts of this kind"*

**Pope Paul VI, 1965 Gaudium et Spes:** *"For its part, authentic freedom is an exceptional sign of the Divine image within man. For God has willed that man remain "under the control of his own decisions, so that he can seek his Creator spontaneously, and come freely to utter and blissful perfection through loyalty to Him. Hence man's dignity demands that he act according to a knowing and free choice that is personally motivated and prompted from within, not under blind internal impulse nor by mere external pressure."* **Fourth Lateran Council:** *"The Divine Law," says Cardinal Gousset, "is the supreme rule of actions; our thoughts, desires, words, acts, all that man is, is subject to the domain of the law of God; and this law is the rule of our conduct by means of our conscience. Hence it is never lawful to go against our conscience; as the Fourth Lateran council says, 'Quidquid fit contra conscientiam, aedificat ad gehennam.'" ["Whatever is done in opposition to conscience is conducive to damnation."]*

The Centers for Disease Control, which is responsible for declaring public health emergencies, has not attested to any sort of significant risk to the health of the community at this time that would preclude our right to abstain in accord with this teaching. According to the Section 564 of the Federal Food, Drug, and Cosmetic Act, a lawful application of the terms of a lawful emergency use authorization ("EUA") pursuant includes the right of informed consent and the option to refuse. The FDA's guidance on the right to informed consent and the option to refuse is highlights the right of informed consent and the option to refuse governing the administration of Emergency authorized "unapproved products." https://www.fda.gov/vaccines-blood-biologics/vaccines/emergency-use-authorization-vaccines-explained

Therefore as a faithful Catholic, opposed to abortion and raised in the old school catholic ways, I cannot according to the Church tenets on conscience which I outlined use any product that takes its origin in abortion.

In that the use of these vaccines would be both a violation of Catholic doctrine on the duty to adhere to moral conscience and also in contradiction with the instruction of the Vatican, therefore, under the teachings of the Catholic Church to which I follow, am religiously and morally bound, I submit this exemption for vaccination.

If you still choose to move forward and deny this exemption, I will be filing an appeal and open a formal claim against UCS with EEOC for discrimination. I truly hope that you take the time to research what you are trying to enforce and realize this is unlawful.

Sincerely,

| | |
|---|---|
| **From:** | ecf_bounces@nyed.uscourts.gov |
| **To:** | nobody@nyed.uscourts.gov |
| **Subject:** | Activity in Case 1:22-cv-05264-BMC Bergin v. New York State Unified Court System Order on Motion to Dismiss for Failure to State a Claim |
| **Sent:** | 11/27/2022 5:38:33 PM |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
*****NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

**U.S. District Court**

**Eastern District of New York**

## Notice of Electronic Filing

The following transaction was entered on 11/27/2022 at 5:37 PM EST and filed on 11/27/2022

**Case Name:** Bergin v. New York State Unified Court System
**Case Number:** 1:22-cv-05264-BMC
**Filer:**
**Document Number:** No document attached

**Docket Text:**
**ORDER denying [12] Motion to Dismiss for Failure to State a Claim. It is not at all clear to the Court which side stopped participating in the interactive process. It is true that instead of answering the questions on the questionnaire, plaintiff objected to each question and explained why she was objecting. That was arguably not an abandonment of the interactive process; for all she knew, defendant might have acknowledged her objection and dispensed with the need for the questionnaire. It is not as if she failed to respond at all; rather, she interacted by sending in the questionnaire with her objections. When defendant then dug in and effectively told her that her objections were not acceptable, plaintiff interacted again shortly thereafter (apparently after consulting with counsel), submitting what appear to be adequate responses to the questionnaire. It was then that defendant refused to interact by declining to even consider her revised submission. Thus, it may well turn out that it was defendant who unreasonably terminated the interactive process.**

**Defendant seems to believe that it is sufficient for an employer to say: "We have an interactive process that has prescribed steps. You have to do it precisely as we lay it out or you will be found to not have interacted**

**and you will be given no second chance." But the employer is not immune just by having a process because, by its nature, "the interactive process is usually a 'fact-sensitive and case-by-case inquiry into the good faith and reasonable efforts of the parties in light of the complete set of circumstances.' *Feringa v. Andrews*, No. 19-cv-656, 2021 WL 2036676, at *9 (N.D.N.Y. May 20, 2021), quoting, *Quadir v. N.Y. State Dep't of Labor*, 39 F. Supp. 3d 528, 540 (S.D.N.Y. 2014). Both the employer and the employee must reasonably communicate. *See Sheng v. M&T Bank Corp.*, 848 F.3d 78, 87 n.3 (2d Cir. 2017); *McBride v. BIC Consumer Prod. Mfg. Co.*, 583 F.3d 92, 102 (2d Cir. 2009) (citing *Parker v. Columbia Pictures Industries*, 204 F.3d 326 (2d Cir. 2000)). These cases can rarely be determined solely by the employer's formulaic application of its dispute resolution plan. Ordered by Judge Brian M. Cogan on 11/27/2022. (Cogan, Brian)**

**1:22-cv-05264-BMC Notice has been electronically mailed to:**

Steven M Warshawsky smw@warshawskylawfirm.com

Michael John Siudzinski msiudzin@nycourts.gov, KKashtan@nycourts.gov

Robyn Leigh Rothman rrothman@nycourts.gov

**1:22-cv-05264-BMC Notice will not be electronically mailed to:**

Please be CAREFUL when clicking links or opening attachments from external senders.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X
JESSICA BERGIN,

Plaintiff,

-against-

NEW YORK STATE UNIFIED COURT SYSTEM,

Defendants.
---------------------------------------------------------------------X

Ind. No. 22-CV-5264 (BMC)

**ANSWER ON BEHALF OF NYS UNIFED COURT SYSTEM**

Defendant New York State Unified Court System (UCS), by its attorney, ANTHONY R. PERRI, in answer to the Complaint, hereby alleges as follows:

**NATURE OF THE ACTION**

1. Asserts that the allegations contained in paragraph 1 of the Complaint are personal opinions and legal conclusions to which no response is required. To the extent a response is required, UCS denies the allegations that it discriminated against plaintiff or otherwise took any illegal action, and denies that plaintiff is entitled to the relief requested therein, but admits that plaintiff asserts claims under the statutes and provisions cited therein.

2. Admits the allegations as contained in paragraph 2 of the Complaint.

3. Admits the allegations as contained in paragraph 3 of the Complaint.

**JURISDICTION AND VENUE**

4. Asserts that the allegations contained in paragraph 4 of the Complaint are legal conclusions to which no response is required. To the extent a response is required, UCS denies knowledge and information sufficient to form a belief as to

the truth of the allegations, but admits that plaintiff asserts jurisdiction under the provisions cited therein.

5. Asserts that the allegations contained in paragraph 5 of the Complaint are legal conclusions to which no response is required. To the extent a response is required, UCS does not contest venue.

**ADMINISTRATIVE EXHAUSTION**

6. Asserts that the allegations contained in paragraph 6 of the Complaint are legal conclusions to which no response is required. To the extent a response is required, UCS denies knowledge and information sufficient to form a belief as to the truth of the allegations.

7. Denies knowledge and information sufficient to form a belief as to the truth of the allegations as contained in paragraph 7 of the Complaint, but avers that plaintiff filed a complaint with the Equal Employment Opportunity Commission related to her employment with UCS.

8. Denies knowledge and information sufficient to form a belief as to the truth of the allegations as contained in paragraph 8 of the Complaint and refers the Court to the relevant documents for the truth of the statements made therein.

9. Denies knowledge and information sufficient to form a belief as to the truth of the allegations as contained in paragraph 9 of the Complaint.

**ALLEGATIONS**

10. Admits the allegations as contained in paragraph 10 of the Complaint.

11. Admits the allegations as contained in paragraph 11 of the Complaint.

12. Admits the allegations as contained in paragraph 12 of the Complaint.

13. Asserts that the allegations contained in paragraph 13 of the Complaint are personal opinions and legal conclusions to which no response is required. To the extent a response is required, UCS denies the allegations.

14. Admits the allegations as contained in paragraph 14 of the Complaint and refers the Court to the relevant documents for the truth of the statements made therein.

15. Admits the allegations as contained in paragraph 15 of the Complaint and refers the Court to the relevant documents for the truth of the statements made therein.

16. Admits the allegations as contained in paragraph 16 of the Complaint and refers the Court to the relevant documents for the truth of the statements made therein.

17. Admits the allegations as contained in paragraph 17 of the Complaint and refers the Court to the relevant documents for the truth of the statements made therein.

18. Admits the allegations as contained in paragraph 18 of the Complaint and refers the Court to the relevant documents for the truth of the statements made therein.

19. Admits the allegations as contained in paragraph 19 of the Complaint.

20. Denies knowledge and information sufficient to form a belief as to the truth of the allegations as contained in paragraph 20 of the Complaint.

21. Admits the allegations as contained in paragraph 21 of the Complaint and refers the Court to the relevant documents for the truth of the statements made therein.

22. Admits the allegations as contained in paragraph 22 of the Complaint and refers the Court to the relevant documents for the truth of the statements made therein.

23. Admits the allegations as contained in paragraph 23 of the Complaint and refers

the Court to the relevant documents for the truth of the statements made therein.

24. Admits the allegations as contained in paragraph 24 of the Complaint and refers the Court to the relevant documents for the truth of the statements made therein.

25. Denies that plaintiff submitted answers to the questions as alleged in paragraph 25 of the Complaint, but admits that plaintiff submitted a personal statement on or about November 16, 2021, and refers the Court to the relevant documents for the truth of the statements made therein.

26. Denies the allegations as contained in paragraph 26 of the Complaint.

27. Admits that UCS asked some employees who had made requests to be exempt from its COVID-19 vaccine policy for religious reasons to complete the "follow-up questions," but denies the remaining allegations contained in paragraph 27 of the Complaint.

28. Admits the allegations as contained in paragraph 28 of the Complaint and refers the Court to the relevant documents for the truth of the statements made therein.

29. Admits the allegations as contained in paragraph 29 of the Complaint and refers the Court to the relevant documents for the truth of the statements made therein.

30. Admits the allegations as contained in paragraph 30 of the Complaint and refers the Court to the relevant documents for the truth of the statements made therein.

31. Denies knowledge and information sufficient to form a belief as to the truth of the allegations as contained in paragraph 31 of the Complaint concerning plaintiff's knowledge and avers that the remaining allegations are legal conclusions to which no response is required. To the extent a response is required, UCS denies the

allegations.

32. Denies knowledge and information sufficient to form a belief as to the truth of the allegations as contained in paragraph 32 of the Complaint concerning plaintiff's knowledge, but admits that plaintiff submitted a further response to UCS' request for information on or about January 3, 2022.

33. Admits the allegations as contained in paragraph 33 of the Complaint and refers the Court to the relevant documents for the truth of the statements made therein.

34. Admits the allegations as contained in paragraph 34 of the Complaint.

35. Denies knowledge and information sufficient to form a belief as to the truth of the allegations as contained in paragraph 35 of the Complaint.

36. Admits the allegations as contained in paragraph 36 of the Complaint and refers the Court to the relevant documents for the truth of the statements made therein.

37. Denies the allegations as contained in paragraph 37 of the Complaint.

38. Admits that UCS employees were required to engage in COVID-19 safety precautions, but denies the remaining allegations as contained in paragraph 38 of the Complaint.

39. Denies knowledge and information sufficient to form a belief as to the truth of the allegations as contained in paragraph 39 of the Complaint.

40. Admits that plaintiff worked full-time "while her request for a religious exemption was pending," but denies the remaining allegations as contained in paragraph 40 of the Complaint.

41. Denies the allegations as contained in paragraph 41 of the Complaint.

Case: 25-721, 08/25/2025, DktEntry: 24.1, Page 76 of 283

42. Asserts that the allegations contained in paragraph 42 of the Complaint are personal opinions and legal conclusions to which no response is required. To the extent a response is required, UCS denies knowledge and information sufficient to form a belief as to the truth of the allegations.

43. Asserts that the allegations contained in paragraph 43 of the Complaint are personal opinions and legal conclusions to which no response is required. To the extent a response is required, UCS denies knowledge and information sufficient to form a belief as to the truth of the allegations.

44. Asserts that the allegations contained in paragraph 44 of the Complaint are personal opinions and legal conclusions to which no response is required. To the extent a response is required, UCS denies knowledge and information sufficient to form a belief as to the truth of the allegations.

45. Denies knowledge and information sufficient to form a belief as to the truth of the allegations as contained in paragraph 45 of the Complaint.

46. Denies knowledge and information sufficient to form a belief as to the truth of the allegations as contained in paragraph 46 of the Complaint.

47. Denies knowledge and information sufficient to form a belief as to the truth of the allegations as contained in paragraph 47 of the Complaint.

48. Denies knowledge and information sufficient to form a belief as to the truth of the allegations as contained in paragraph 48 of the Complaint concerning plaintiff's knowledge, but admits that some UCS employees were granted exemptions to its COVID-19 vaccine policy, and denies the remaining allegations.

49. Admits the allegations as contained in paragraph 49 of the Complaint, but denies knowledge and information sufficient to form a belief as to the truth of the allegations concerning plaintiff's "insurance benefits."

50. Denies knowledge and information sufficient to form a belief as to the truth of the allegations as contained in paragraph 50 of the Complaint.

51. Denies knowledge and information sufficient to form a belief as to the truth of the allegations as contained in paragraph 51 of the Complaint.

**COUNT ONE: VIOLATION OF TITLE VII**

52. Denies the allegations as contained in paragraph 52 of the Complaint.

53. Asserts that the allegations contained in paragraph 53 of the Complaint are legal conclusions to which no response is required. To the extent a response is required, UCS denies that it violated plaintiff's rights under Title VII and refers the Court to relevant statutes for the truth of the statements therein.

54. Asserts that the allegations contained in paragraph 54 of the Complaint are legal conclusions to which no response is required. To the extent a response is required, UCS denies that it violated plaintiff's rights under Title VII and refers the Court to relevant statutes for the truth of the statements therein.

55. Denies the allegations as contained in paragraph 55 of the Complaint.

56. Denies the allegations as contained in paragraph 56 of the Complaint.

**DEMAND FOR A JURY TRIAL**

57. Asserts that the allegations contained in paragraph 57 of the Complaint are personal opinions and legal conclusions to which no response is required. To the

extent a response is required, UCS denies knowledges and knowledge and information sufficient to form a belief as to the truth of the allegations contained therein.

**PRAYER FOR RELIEF**

58. Avers that the allegations contained in the "Wherefore" clause, including sub-paragraphs (A) through (H), of the Complaint, are plaintiff's legal conclusions to which a response is not required. To the extent a response is deemed to be required, UCS denies that plaintiff is entitled to the relief she requests.

**AS AND FOR A FIRST AFFIRMATIVE DEFENSE**
**UCS ALLEGES THAT:**

59. The Complaint fails to state a claim or facts sufficient to constitute a claim upon which relief can be granted.

**AS AND FOR A SECOND AFFIRMATIVE DEFENSE**
**UCS ALLEGES THAT:**

60. Plaintiff fails to allege or sufficiently plead either a constitutional, statutory, or regulatory violation upon which relief can be granted in her Complaint.

**AS AND FOR A THIRD AFFIRMATIVE DEFENSE**
**UCS ALLEGES THAT:**

61. Plaintiff cannot demonstrate a discriminatory animus by the defendants, necessary to plead a cause of action under Title VII of the Civil Rights Act of 1964.

**AS AND FOR A FOURTH AFFIRMATIVE DEFENSE**
**UCS ALLEGES THAT:**

62. At all times relevant to the allegations in the Complaint, UCS's actions were taken in compliance with lawful procedure.

**AS AND FOR A FIFTH AFFIRMATIVE DEFENSE**
**UCS ALLEGES THAT:**

63. UCS acted in good faith compliance with all relevant constitutional and statutory laws and denies that it has ever acted in willful disregard of plaintiff's rights; thus plaintiff is not entitled to any damages, including punitive, double or any other exemplary damages.

**AS AND FOR A SIXTH AFFIRMATIVE DEFENSE**
**UCS ALLEGES THAT:**

64. Plaintiff's claims fail on the basis of the doctrine of qualified immunity.

**AS AND FOR A SEVENTH AFFIRMATIVE DEFENSE**
**UCS ALLEGES THAT:**

65. Some or all of plaintiff's alleged injuries were the result of plaintiff's actions.

**AS AND FOR A EIGHTH AFFIRMATIVE DEFENSE**
**UCS ALLEGES THAT:**

66. Plaintiff's claims for damages are barred to the extent that she failed to mitigate said damages.

**AS AND FOR AN NINTH AFFIRMATIVE DEFENSE**
**UCS ALLEGES THAT:**

67. Plaintiff cannot perform the essential functions of her job with the requested reasonable accommodation.

**AS AND FOR AN TENTH AFFIRMATIVE DEFENSE**
**UCS ALLEGES THAT:**

68. Providing Plaintiff's requested reasonable accommodations would create an undue hardship.

**AS AND FOR AN ELEVENTH AFFIRMATIVE DEFENSE**
**UCS ALLEGES THAT:**

69. Plaintiff failed to adequately inform UCS of any reason why she was entitled to a reasonable accommodation.

**AS AND FOR AN TWELFTH AFFIRMATIVE DEFENSE**
**UCS ALLEGES THAT:**

70. UCS intends to rely on such other and further defenses that may become available or apparent during pre-trial proceedings or at trial in this action, and hereby reserves its right to amend its Answer to assert any such additional defenses.

**WHEREFORE,** it is respectfully prayed that the relief requested by plaintiff be in all respects denied, that the relief requested by UCS be granted, and that the Complaint be dismissed in its entirety, with costs and disbursements.

Dated: New York, New York
December 13, 2022

ANTHONY R. PERRI
Acting Counsel
Attorney for New York State Unified
Court System
By:

/S/
MICHAEL J. SIUDZINSKI
Assistant Deputy Counsel

ROBYN ROTHMAN
Associate Counsel
25 Beaver Street
New York, New York 10004
(212) 428-2150

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
JESSICA BERGIN,

Plaintiff,

-against-

NEW YORK STATE UNIFIED COURT SYSTEM,

Defendant.
-----------------------------------------------------------------------X

Ind. No. 22-CV-5264 (BMC)

**DEFENDANT'S RESPONSE TO PLAINTIFF'S FIRST SET OF DISCOVEY REQUESTS**

Defendant New York State Unified Court System ("UCS"), by its attorney, Anthony R. Perri, Acting Counsel, New York State Office of Court Administration, hereby responds to Plaintiff's First Set of Interrogatories directed to it as follows:

<u>GENERAL OBJECTIONS</u>

1. Defendant UCS objects to each request to the extent that it does not seek specific information, but rather is asking defendant to make admissions as to the allegations in plaintiff's complaint. Any response by defendant to plaintiff's request does not constitute an admission as to the allegations in the complaint.
2. Defendant objects to each request to the extent that it seeks information protected against disclosure by the attorney-client privilege, the work-product doctrine, material prepared in anticipation of or for litigation privilege, or any other applicable privilege or rule of confidentiality. Defendant construes each request as not seeking information which has come into the existence or custody of defendant because of this litigation.
3. Defendant objects generally to the requests to the extent that they seek to impose

obligations which are beyond those imposed by the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the Eastern District of New York and to the extent that the requests are over broad and unduly burdensome and seek information and material which is neither relevant nor reasonably calculated to lead to the discovery of admissible evidence in this action.

4. By answering or responding to any of the following requests in a good faith attempt to facilitate the progress of the case, defendant does not waive objections thereto whether during further discovery or during the progress of the case to its conclusion. Defendant reserves the right to supplement his responses if it obtains additional information or documentation.

5. Defendant objects generally to the requests to the extent they seek to have defendant provide documentary materials in addition to the statement made in response to the interrogatory.

**INTERROGATORIES**

1. Identify all persons who were members of the UCS Vaccination Exemption Review Committee/Working Group B, including each person's name, job title, and dates of service on the committee.

Response to Int. #1

UCS objects to this request that it is overly broad and unduly burdensome. Notwithstanding these objections, the identify of individuals who may be responsive to this request have been previously identified in UCS' February 22, 2023 Rule 26 disclosures including but not limited to Nancy Barry, Chief of Operations; Shawn Kirby, Counsel, Labor Relations; Linda Dunlap-Miller, Chief of Staff for the Deputy Chief Administrative

Judge for the New York City Courts; Scott Murphy, Chief of Staff for the Deputy Chief Administrative Judge for the Courts Outside New York City; and Daniel Weitz, Director of Professional and Court Services.

2. Identify all persons who were personally involved in reviewing, discussing, evaluating, and/or deciding whether or not to approve Jessica Bergin's application for a religious exemption to the UCS COVID-19 vaccination policy, including each person's name and job title.

<u>Response to Int. #2</u>

UCS objects to this request that it is overly broad and unduly burdensome. Notwithstanding these objections, the identify of individuals who may be responsive to this request have been previously identified in UCS' February 22, 2023 Rule 26 disclosures including but not limited to Nancy Barry, Chief of Operations; Shawn Kirby, Counsel, Labor Relations; Linda Dunlap-Miller, Chief of Staff for the Deputy Chief Administrative Judge for the New York City Courts; Scott Murphy, Chief of Staff for the Deputy Chief Administrative Judge for the Courts Outside New York City; and Daniel Weitz, Director of Professional and Court Services.

3. If there was a final decision-maker with respect to Jessica Bergin's application for a religious exemption to the UCS COVID-19 vaccination policy, identify such person's name and job title.

<u>Response to Int. #3</u>

UCS objects to this request as vague, overly broad, unduly burdensome, not limited in scope, to the extent that it seeks information that is protected by the attorney-client

communications privilege and attorney work production doctrine. UCS further objects that the request for dates of communications calls for information beyond the requirements of Local Rule 33.3 and is more appropriately obtained through the use of a deposition pursuant to Local Rule 33.3(b). Notwithstanding these objections, a "final decision-maker" does not exist. Each exemption request was evaluated by either the full or a quorum of the committee and the decision to grant or deny was based upon a majority vote of the committee. For a listing of names please see response to Int. #1 and Int. #2.

4. For each of the alleged comparators who have been previously identified by Plaintiff (see ECF Doc. 22), identify all persons who were personally involved in reviewing, discussing, evaluating, and/or deciding whether or not to approve each comparator's application for a religious exemption to the UCS COVID-19 vaccination policy, including each person's name and job title.

Response to Int. #4

UCS objects to this request that it is overly broad and unduly burdensome. Notwithstanding these objections, the identify of individuals who may be responsive to this request have been previously identified in UCS' February 22, 2023 Rule 26 disclosures including but not limited to Nancy Barry, Shawn Kirby, Linda Dunlap-Miller, Scott Murphy, Daniel Weitz. With respect to alleged co-comparators RID #1092 and RID #2232, each of their initial exemption requests were evaluated by Committee A, which was comprised of the following people: Justin Barry, Chief of Administration, Co-Chair; Jennifer DiLallo, Deputy Chief of Staff for the Deputy Chief Administrative Judge for the Courts Outside New York City; Keith Miller, Principal Management Analyst, Human

Resources; Michelle Smith, Chief of Staff for the Office of the Judicial Institute; and John Sullivan, UCS Statewide ADA Coordinator. With respect to alleged co-comparators RID #1092 and RID #2232, their supplemental requests were reviewed by a combination of members from Committee A and Committee B.

5. For each of the alleged comparators who have been previously identified by Plaintiff (see ECF Doc. 22), if there was a final decision-maker with respect to each comparator's application for a religious exemption to the UCS COVID-19 vaccination policy, identify such person's name and job title.

Response to Int. #5

UCS objects to this request as vague, overly broad, unduly burdensome, not limited in scope, to the extent that it seeks information that is protected by the attorney-client communications privilege and attorney work production doctrine. UCS further objects that the request for dates of communications calls for information beyond the requirements of Local Rule 33.3 and is more appropriately obtained through the use of a deposition pursuant to Local Rule 33.3(b). Notwithstanding these objections, a "final decision-maker" does not exist. Each exemption request was evaluated by either the full or a quorum of the committee and the decision to grant or deny was based upon a majority vote of the committee. For a listing of names please see response to Int. #1, Int. #2, and Int. #4.

6. Identify all reasons why Jessica Bergin's application for a religious exemption to the UCS COVID-19 vaccination policy was denied.

Response to Int. #6

UCS objects to this request that it is ambiguous and overly broad, calls for a legal conclusion, and to the extent it seeks information that is protected by the privilege against disclosure of attorney-client communications and attorney work product. UCS further objects to this request on the grounds that it seeks irrelevant information which is not reasonably calculated to lead to the discovery of admissible evidence and that it seeks information beyond the scope of Local Rule 33.3. UCS contends that Plaintiff failed to provide sufficient information about her beliefs which would have allowed the committee to grant her request.

7. If Defendant contends that Ms. Bergin lacked a bona fide, good faith religious objection to the COVID-19 vaccine, identify, with as much specificity as possible, the basis for this contention.

Response to Int. #7

UCS objects to this request that it is ambiguous and overly broad, calls for a legal conclusion, and to the extent it seeks information that is protected by the privilege against disclosure of attorney-client communications and attorney work product. UCS further objects to this request on the grounds that it seeks irrelevant information which is not reasonably calculated to lead to the discovery of admissible evidence and that it seeks information beyond the scope of Local Rule 33.3. Further, UCS does not contend that Plaintiff lacked a bona fide, good faith religious objection, see response to Int. #6.

8. Identify all person(s) with personal knowledge concerning Defendant's answer to Interrogatory No. 7, including each person's name and job title.

Response to Int. #8

UCS objects to this request that it is overly broad and unduly burdensome. Notwithstanding these objections, the identity of individuals who may be responsive to this request have been previously identified in UCS' March 9, 2023 Rule 26 disclosures including but not limited to Nancy Barry, Chief of Operations; Shawn Kirby, Counsel, Labor Relations; Linda Dunlap-Miller, Chief of Staff for the Deputy Chief Administrative Judge for the New York City Courts; Scott Murphy, Chief of Staff for the Deputy Chief Administrative Judge for the Courts Outside New York City; and Daniel Weitz, Director of Professional and Court Services.

9. If Defendant contends that it would have caused an undue hardship to grant Ms. Bergin a religious exemption to the UCS COVID-19 vaccination policy, identify, with as much specificity as possible, the nature, scope, and cost of this alleged undue hardship.

Response to Int. #9

UCS objects to this request as vague, overly broad, unduly burdensome, not limited in scope, to the extent that it seeks information that is protected by the attorney-client communications privilege and attorney work production doctrine. UCS further objects that the request for dates of communications calls for information beyond the requirements of Local Rule 33.3 and is more appropriately obtained through the use of a deposition pursuant to Local Rule 33.3(b). Further, UCS does not contend that it would have caused an undue hardship to grant Plaintiff a religious exemption. See response to Int. #6.

10. Identify all persons with personal knowledge concerning Defendant's answer to Interrogatory No. 9, including each person's name and job title.

Response to Int. #10

UCS objects to this request that it is ambiguous, overly broad, unduly burdensome. UCS further objects to this request on the grounds that it seeks irrelevant information which is not reasonably calculated to lead to the discovery of admissible evidence, and it seeks information beyond the scope of Local Rule 33.3. Further, in light of UCS' response to Int. #9, this Interrogatory is not applicable to UCS.

Dated: New York, New York
April 8, 2023

ANTHONY R. PERRI
Acting Counsel
Attorney for New York State Unified
Court System
By:

/S/
ROBYN L. ROTHMAN
Associate Counsel
25 Beaver Street
New York, New York 10004
(212) 428-2150

To: Steven M. Warshawsky
Counsel for Plaintiff
The Warshawsky Firm
118 North Bedford Road, Suite 100
Mt. Kisco, NY 10549
(914) 864-3353

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
JESSICA BERGIN,

Ind. No. 22-CV-5264 (BMC)

Plaintiff,

-against-

NEW YORK STATE UNIFIED COURT SYSTEM,

Defendant.
-------------------------------------------------------------------X

INTERROGATORY VERIFICATION

STATE OF NEW YORK )
ss.:
COUNTY OF NEW YORK )

ROBYN L. ROTHMAN, being duly sworn, deposes and says that deponent is an Associate Counsel in the Office of Court Administration of the State of New York; that deponent has read the foregoing Defendant's Response to Plaintiff's Interrogatories dated March 8, 2023 and knows the contents thereof, that the same is true to deponent's own knowledge and information and belief. This verification is made by deponent because Defendant is a public agency of the State of New York, and deponent is acquainted with the facts. The grounds of deponent's belief as to all matters not stated upon deponent's knowledge are the books and records of the Unified Court System, and conversations with its agents and employees.

[signature]
Robyn L. Rothman

Sworn to before me this
10th day of April, 2023

[signature]
Notary Public

PEDRO MORALES
Notary Public, State of New York
No. 02MO5008822
Qualified in Queens County
Commission Expires March 01, 2027

**Jessica Bergin v. New York State Unified Court System**

**22-CV-5264-BMC**

**Plaintiff's Motion for Summary Judgment**

# Exhibit A:

# Deposition of Justin Barry (excerpts)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------X

JESSICA BERGIN,

Plaintiff,

v. Case No.: 22-cv-5264(BMC)

NEW YORK STATE UNIFIED COURT SYSTEM,

Defendant.
-----------------------------------------X

June 1, 2023
9:37 a.m.

Examination of JUSTIN BARRY, held pursuant to Notice, held via Zoom conference, before Ruthayn Shalom, a shorthand Reporter and Notary Public within and for the State of New York.

A P P E A R A N C E S :

THE WARSHAWSKY LAW FIRM
Attorneys for Plaintiff
118 North Bedford Road, Suite 100
Mount Kisco, New York 10549
BY: STEVEN M. WARSHAWSKY, ESQ.
smw@warshawskylawfirm.com

NYS OFFICE OF COURT ADMINISTRATION
Attorneys for Defendant
25 Beaver Street, 10th Floor
New York, New York 10004
BY: MICHAEL J. SIUDZINSKI, ESQ.
msiudzin@nycourts.gov
-and-
BY: ROBYN L. ROTHMAN, ESQ.
rrothman@nycourts.com

IT IS HEREBY STIPULATED AND AGREED, by and between the attorneys for the respective parties hereto, that this examination may be sworn to before any Notary Public.

IT IS FURTHER STIPULATED AND AGREED that the sealing and filing of the said examination shall be waived.

IT IS FURTHER STIPULATED AND AGREED that all objections to questions except as to form shall be reserved for trial.

J U S T I N B A R R Y, having been first duly sworn by Ruthayn Shalom, a Notary Public of the State of New York, and stating his address as 25 Beaver Street, New York, New York 10004, was examined and testified as follows:

EXAMINATION BY

MR. WARSHAWSKY:

Q Good morning, Mr. Barry.

A Good morning.

Q My name is Steven Warshawsky and I represent the Plaintiff, Jessica Bergin, in this lawsuit against the New York State Unified Court System. Sometimes during today's deposition I will refer to the Defendant as UCS. Will you understand that acronym to be referring to the New York State Unified Court System?

A Yes.

Q Today's proceeding is called a deposition, during which I will be asking questions related to Ms. Bergin's lawsuit that you're required to answer truthfully and to the best of your ability.

Do you understand?

A Yes.

Q Do you agree to do this?

J. Barry

Q Can you recall what cases those were in which you submitted a sworn affidavit?

A There were many of them. Forelli, their were two Forellis, I know, I think I submitted one in the PERB action, I submitted many of them.

Q Do you recall if the Forelli cases were in federal or state court?

A I think they were in federal. I think one was in federal and one was in state, but not something I keep track of. I have Michael and Robyn and a law department that track that.

Q Got it.

MR. SIUDZINSKI: We can find that information for you. There have been a few cases. We can find the names of the cases for you that the affidavits that have been submitted, let us know.

MR. WARSHAWSKY: I appreciate that, Michael.

BY MR. WARSHAWSKY:

Q If we can take a look at what has been marked as Plaintiff's Exhibit 1, which is the Deposition Notice.

(Plaintiff's Exhibit 1, Marked for Identification.)

J. Barry

BY MR. WARSHAWSKY:

Q Mr. Barry, do you have Plaintiff's Exhibit 1 in front of you?

A I do.

Q Is this one of the documents that you reviewed in advance of today's deposition?

A It is.

Q To confirm on the record, you have been designated to testify on behalf of the New York State Unified Court System in connection with this 30(b)(6) Deposition Notice?

A I have.

Q Are you employed by the court system?

A I am.

Q What is your position?

A My title is Chief of Administration.

Q How long have you been in that position?

A About two years.

Q Were you employed by the court system prior to being in the position you are in now?

A Yes.

Q What was the previous position that you held with the court system?

A Chief Clerk of New York City Criminal

Court.

Q Approximately how long were you in that position for?

A Eleven years.

Q In total, how many years have you been employed by the court system?

A Twenty-one.

Q Can you briefly describe your educational and professional background after high school?

A Went to college at Haverford College, I received a BA. I went to Villanova Law School, received a JD, and you want my education and that's it?

Q That's fine. So you're trained as an attorney?

A Yes.

Q Referring back to Plaintiff's Exhibit 1, have you had an opportunity to review the matters for examination listed on page two of this deposition notice?

A Yes.

Q Are you authorized to testify on behalf of the New York State Unified Court System with respect to each of the matters for examination listed on

J. Barry

this deposition notice?

A Yes.

Q Sitting here today, do you consider yourself sufficiently knowledgable or otherwise prepared to testify about information known or reasonably available to the court system with respect to each of the matters for examination listed on the deposition notice?

A Yes.

Q I would like to turn now to Plaintiff's Exhibit 3.

(Plaintiff's Exhibit 3, Marked for Identification.)

BY MR. WARSHAWSKY:

Q I will describe Plaintiff's Exhibit 3 for the record. This is a four-page document. It is not Bates-stamped. The top of the first page of the exhibit says, State of New York-Unified Court System Request for Religious Exemption from COVID-19 vaccination. Do you have that exhibit in front of you?

A I do.

Q Are you familiar with this form?

A I am.

Q Is this the form application that the

J. Barry

Q Now, the next line in the same paragraph states, quote, Upon request, UCS will grant a religious exemption for sincerely held religious beliefs and practices which prohibit a judge or employee from receiving a COVID-19 vaccine; do you see that?

A I do.

Q Is this an accurate statement of the court system's policy with respect to religious exemptions to the COVID-19 vaccine?

A It is.

Q Now, let's continue down. If we go four paragraphs down, there is a small paragraph that states, quote, UCS will carefully review all requests for religious exemptions, however, approval is not guaranteed. After your request has been reviewed and processed, you will be notified, in writing, if an exemption was been granted or denied; do you see that?

A I do.

Q So this now brings me to the big opening question, which is: Can you please describe what the process was by which the court system would review and evaluate and make a decision whether or

J. Barry

Q As part of the evaluation process, did the committee take into consideration any issues of whether granting a religious exemption for a particular committee would impose any kind of undue hardship on the court system?

MR. SIUDZINSKI: Objection. You can answer.

A No. That was not part of our process. The part of our process was exactly what I said, was the objection to the vaccination religious in nature and was it sincerely held period.

Q So in evaluating the applications along these two parameters, was it religious in nature and was it sincerely held, how did the committee go about determining whether or not an employee's expressed objection was religious in nature?

A Well, I will give some background on the supplemental form that I think is important. You didn't ask expressly about it or directly about it, but I think it needs to be part of the conversation. We very quickly, upon reviewing the first submissions that were being sent in by judges and employees, determined that most of the objections to the religious objections and the request for

J. Barry

drugs?

A Yes.

Q Here the committee is looking for specific information or specific answers to specific questions that they posed to the employee applicant; is that correct?

A That's correct.

Q Focusing now on page three of this form, were there specific answers to these questions that the committee basically required the employee to give in order to approve, or I suppose deny, the employees's request for religious exemption?

A No. There were no specific instructions that were given to committee members about this. What I would say in background is that the supplemental form was always considered in conjunction as a part of a whole with the initial form. So the committee always reviewed the answers to the supplemental form submitted by an employee or a judge with the initial form itself.

Now, what the committee was looking for in conjunction to these questions about over-the-counter drugs and prescription drugs and vaccinations that were developed or manufactured or

J. Barry

committee into two working groups, sort of divide and conquer. We determined some ground rules for those working groups and the full committee.

The first was that if we reviewed the first application, the initial application and it appeared to hold a religious, sincerely held religious belief that objected to the vaccine based on fetal stem cell use or body integrity, we agreed that, in that application, we would direct our counsel to contact the person who was requesting an exemption and direct that person to submit the supplemental form either A or B or both depending on what was contained inside that initial application.

The ground rules were that after we -- in virtually all religious exemption requests, there were a couple, I think, I couldn't tell you how many that were approved on the initial application, but if it's two, that's probably it, but I can't remember.

Virtually all of them were asked to fill out one or both of the sections of the supplemental form and the ground rules were that a working group would then review both the initial form and the supplemental form once it had been

J. Barry

submitted and would vote to recommend either approve or deny. If the working group approved it, it was approved right then and there, and counsel was instructed to notify the individual and the supervisor that the religious exemption request had been approved.

If the working group voted to recommend denial, it was then scheduled for a de novo review for the entire committee.

Q In terms of the voting process that either the subcommittee or the entire committee would go through on a particular application, I take it each member received a vote?

A Correct.

Q Was it a majority-rule approach or was it a required-consensus approach?

A We tried to get consensus but that was not required. It was majority-rule vote.

Q In your experience, how often -- in general, how often would you say there was a situation where an application would be approved based on a majority vote but there were definitely members of the committee who had voted to deny?

A It happened. I couldn't tell you the

J. Barry

in both forms, we deemed it as unresponsive.

Q So an employee makes objections that you deem to be unresponsive, does that disqualify the employee from being approved for religious exemption?

A I will tell you that in this instance, again, similarly to the previous exhibit that we went over, this individual would have appeared and I have no recollection of reviewing this individual's application and these forms, but knowing how we discuss these, this person was responsive as to Section A related to fetal stem cell lines, and it showed sincerity in the religious held beliefs against using substances with fetal stem cell lines, so we granted it based on the responses based on Section A.

Q In situations where an employee's answers to the supplemental form question were considered unresponsive by the committee, did the committee ever engage in any followup communication with that employee asking him or her to provide responsive answers to those questions?

A I don't believe so. There were instances where a person would not initial the statements in

J. Barry

number three on the initial application that I think that we asked the individual to fully complete or if they didn't notarize the application, we asked them to resubmit with a notarization, but not -- other than those, no, I don't believe so.

Q Was there -- in determining the process that the court system would go through for reviewing and evaluating employees' applications for religious exemptions, did you make a predetermination that you would not engage in any followup communications with employees about the substance of their answers to either to the supplemental form?

A We had discussed what the process and the procedures should be and the exchange of ideas between the exemption review committee and the person asking for the exemption both with our own internal counsel and our external counsel.

We also took into consideration the number of expected exemption requests that we were going to be getting in a large organization such as this and it did turn out that we received a large number of these requests. We determined that, based upon the applicable law and our understanding of the exchange of information that was required between

J. Barry

knowledge and experience as having served on the UCS committee that dealt with these applications why Ms. Bergin's initial application for religious exemption, based on what we see in Plaintiff's Exhibit 8, would not have been deemed sufficient to grant her request based on this submission alone?

A Based on my review, it looks like she was expressing concerns about bodily integrity and particularly from a letter from her pastor, I believe it was, from the International Christian Center Senior Pastor, objections related to the use of stem cells in the development of the vaccine.

In order to gauge of the sincerity of both of those beliefs, the work grouping would typically and very frequently, if not almost all the time with those two objections or concerns, request that the individual fill out the supplemental form.

Q In fact, in this case that's what happened. If we take a look at Plaintiff's Exhibit 9, please.

A Yes.

Q Before we get to Plaintiff's Exhibit 9, is it fair to say that the reason the committee would have asked Ms. Bergin to submit the supplemental

J. Barry

form was because her personal statement invoked these issues of fetal stem cells as well as the bodily integrity concept as opposed to there being something intrinsically inadequate with her initial submission to the committee?

MR. SIUDZINSKI: Objection. You can answer.

A No. I would say her initial submission was perfectly adequate and it explained a religious belief based upon a number of issues that she presents and we wanted to explore it some more.

Q So if we look now at Plaintiff's Exhibit 9, which I will describe for the record. This is an eight-page document which is comprised of a one-page cover letter and then a seven-page supplemental form and it's Bates-stamped Bergin 50 to Bergin 57.

(Plaintiff's Exhibit 9, Marked for Identification.)

BY MR. WARSHAWSKY:

Q Do you have that exhibit?

A Yes.

Q It appears that this would be another example where the committee requested more information from the applicant, in this case,

J. Barry

then for the narrative questions on Section B, she said, Please see attached, and she attached to this supplemental form a one-page statement dated November 10, 2021.

Do you see that?

A I do.

Q So we know that Ms. Bergin's application was denied and so I guess my question to you would be: What was inadequate or insufficient about her response, her statement response to the supplemental form? I will leave it at that. Let me restart.

The first question is: Based on your knowledge and experience as one of the committee members who reviewed religious exemption applications, is it your opinion that Ms. Bergin's submission and response to the request for a supplemental form was sufficient or insufficient for the committee's purposes?

A It was insufficient.

Q Why was it insufficient?

A It was not responsive.

Q In what ways did you consider her submission to be nonresponsive?

MR. SIUDZINSKI: Objection. If you know.

J. Barry

A We were looking for really just yes-or-no answers in the questions to number one, two and three. We were looking for an explanation if the answers were yes in the subsequent question.

Again, we were looking for yes-or-no answers in four, five, six, seven and eight, and if the answer to eight was no, we were looking for an explanation as to how she would square her taking one vaccine or these vaccines rather than COVID-19 vaccines.

In Section B, we were looking for answers to those specific questions. She referred us to her statement which did not address any of those particular questions, and it's a fine statement that we would have taken no objection to as an attachment to the supplemental form, but we were specifically looking for direct answers to all the questions in A and B.

Q Why didn't anybody from UCS respond to Ms. Bergin and tell her that the committee was looking for specific answers to the questions in Section A and Section B and that what she gave, while fine in and of itself, was not the information you needed to make a final decision on her

J. Barry

A Correct.

Q Are you aware of any other reason besides the nonresponsiveness of her supplemental form for why her religious exemption application was denied?

A No.

Q If we can take a look please at Exhibit 12.

(Plaintiff's Exhibit 13, Marked for Identification.)

BY MR. WARSHAWSKY:

Q Strike that. Exhibit 13. Exhibit 13, I will describe for the record. This is a six-page document. It's not Bates-stamped. It is another supplemental affidavit form from Ms. Bergin, and this one for identification purposes was notarized on the 3rd of January 2022.

Do you have Plaintiff's Exhibit 13 in front of you?

A I do.

Q Do you know whether or not this copy of Ms. Bergin's supplemental form was ever submitted to any members of the committee to review?

A I have no direct knowledge of it, but I would doubt it.

Q Why would you doubt it?

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
JESSICA BERGIN,

Plaintiff,

-against-

NEW YORK STATE UNIFIED COURT SYSTEM,

Defendants.
----------------------------------------------------------------------X

Ind. No. 22-CV-5264 (BMC)

**DECLARATION OF MICHAEL J. SIUDZINSKI IN SUPPORT OF UCS's MOTION FOR SUMMARY JUDGMENT**

**MICHAEL J. SIUDZINSKI**, an attorney duly admitted to the Bars of this State and this Court, declares and states as follows, under penalties of perjury:

1. I am an Assistant Deputy Counsel in the office of Counsel for the New York State Office of Court Administration, attorney for defendant the New York State Unified Court System (hereinafter "UCS") in this action.

2. I submit this declaration in support of the UCS's motion for summary judgment on the grounds asserted in the accompanying Memorandum of Law.

3. All exhibits in support of UCS's motion are: (i) annexed hereto and continuing after UCS's previously submitted exhibits ("F", "G", "H", etc.); or (ii) pursuant to the Court's Individual Rules and Practices, Rule III.B.4, are not submitted herewith because they were previously submitted to the Court as part of prior motions, and are referred to by their Electronic Case Filing ("ECF") number and page (*e.g.* "ECF #__, p.__").

4. Attached hereto as Exhibit F is a copy of the Supreme Court, Rockland County's Order in the matter of *Ferrelli v. State of New York*, No. 031506/2022 (Sup. Ct. Rockland Co., Aug. 2, 2022).

5. Attached hereto as Exhibit G is a copy of the Supreme Court, Steuben County's Order in the matter of *Brignall v. Unified Court System*, Index No. E2022-0241CV (Sup. Ct. Steuben Co. 2022).

6. Attached hereto as Exhibit H is a copy of the New York State Unemployment Insurance Appeal Board's Decision of the Board, dated January 13, 2023, *In the Matter of Donna Cichon*.

7. Attached hereto as Exhibit I is a copy of the New York State Unemployment Insurance Appeal Board's Decision of the Board, dated January 13, 2023, *In the Matter of Marie Zweig*.

8. Attached hereto as Exhibit J is a copy of Mindy Jeng's email sent to plaintiff's supervisors, dated January 4, 2023, referenced in her complaint and discussed in Ms. Jeng's Declaration.

9. Attached hereto as Exhibit k is an excerpt (pages 77-80) from the transcript of Justin Barry's Deposition, dated June 1, 2023.

**WHEREFORE**, UCS respectfully requests that the Court issue an order granting its motion to for summary judgment, denying Plaintiff's motion for summary judgment and dismissing this action in its entirety, and granting such other and further relief as the Court deems just, proper, and appropriate.

Pursuant to 28 U.S.C. § 1746 I declare under penalty of perjury that the foregoing is true and correct. Executed on July 28, 2023.

/S/
MICHAEL J. SIUDZINSKI

*To commence the 30 day statutory time period for appeals as of right (CPLR 5513[a]), you are advised to serve a copy of this order, with notice of entry, upon all parties.*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF ROCKLAND
-----------------------------------------------------------------------X
CHERYL FERRELLI, JASON PASHOUKOS, MARIE ZWEIG, MELISSA MAINIERI, and SARAH SMITH

Plaintiffs-Petitioners,

-against-

THE STATE OF NEW YORK, THE NEW YORK STATE UNIFIED COURT SYSTEM, HON. LAWRENCE K. MARKS, NANCY J. BARRY, and JUSTIN A. BARRY

Defendants-Respondents.

-----------------------------------------------------------------------X

**DECISION, ORDER and JUDGMENT**
Index No.: 031506/2022

ZUGIBE, J.

**PRELIMINARY STATEMENT**

CHERYL FERRELLI ("Ferrelli"), JASON PASHOUKOS ("Pashoukos"), MARIE ZWEIG ("Zweig"), MELISSA MAINIERI ("Mainieri") and SARAH SMITH ("Smith") (hereinafter collectively referred to as "Petitioners") make an application pursuant to N.Y. CIV. PRAC. L&R ("CPLR") Article 78 as against THE STATE OF NEW YORK ("NYS"), THE NEW YORK STATE UNIFIED COURT SYSTEM ("UCS"), the HON. LAWRENCE K. MARKS ("Judge Marks"), NANCY J. BARRY, and JUSTIN A. BARRY (hereinafter, with the exception of the STATE OF NEW YORK, collectively referred to as "Respondents"[1]) seeking a judgment declaring the termination of Petitioners' employment based on the policy that required them to

---

[1] Although the "STATE OF NEW YORK" is named as a party in the caption of this proceeding, the Court notes that no affidavit of service was filed indicating the State was ever served, nor has the state appeared in these proceedings. Further, counsel for the other named Respondents has indicated in his motion papers that his firm does not represent the State of New York in this proceeding. Therefore, as used in this Decision, the term "Respondents" does not include the State of the New York.

receive the COVID-19 vaccination to be arbitrary, capricious, and an abuse of discretion. In addition, Petitioners seek an Order reinstating their employment with UCS as well as for compensatory damages in the form of back pay, front pay, past and future employment benefits, damages for emotional distress, punitive damages, and counsel fees.

In addition, Respondents have filed a motion to dismiss the aforementioned Petition pursuant to CPLR §3211(a)(7) and §7804(f) based on Petitioners' failure to state a cause of action.

In connection with these applications, the Court has read and considered the following papers:

| | **NYSCEF DOC. NOS.:** |
|---|---|
| Notice of Petition/Verified Petition/Exhibits A-1 Through E-7 | 1-37 |
| Notice of Motion to Dismiss/Affidavit in Support/ Exhibits 1-7 | 44, 46-53 |
| Memorandum of Law in Support of Motion to Dismiss | 45 |
| Affirmation in Opposition[2]/Exhibits A-J | 59-69 |
| Memorandum of Law in Opposition | 58 |
| Memorandum of Law in Reply | 70 |

**RELEVANT FACTUAL AND PROCEDURAL BACKGROUND**

March of 2020 was an unprecedented time in the history of our nation and the world. By Administrative Order ("AO") of the Chief Judge of the State of New York dated March 17, 2020, said AO having been executed in response to the Centers for Disease Control and Prevention ("CDC") recommendations for preventing the spread of COVID-19, the New York State Courts adjourned all non-essential matters without date. Those were challenging days, to say the very least. Though Courts quickly responded by creating ways to litigate in a primarily virtual venue, life as we all knew it ceased to exist.

[2] This Affirmation was erroneously designated as an "Affirmation in Reply" however the Court notes that the document is an Affirmation in *Opposition* submitted in response to the Respondents' Motion to Dismiss. NYSCEF Doc. 59, ¶2.

Many circumstances surrounding the COVID-19 pandemic have changed since the early days of March 2020. This coronavirus has undergone a myriad of mutations and variations, always keeping health experts and the public guessing as to how each variant will impact our day to day lives. The relentless feeling of being "unsettled" puts it lightly. Further, and unfortunately, our society has had to learn ways to live with this ever-changing phenomenon, primarily through the use of various types of mitigation tactics in order to decrease the spread of the virus, such as installing better ventilation systems in buildings, wearing facemasks in certain settings where physical distancing is not practical or possible and in areas where transmission is high, increasing personal hygiene strategies (such as handwashing) and increasing the frequency of surface cleaning and disinfection, to name just a few. Most significantly, pharmaceutical companies worked swiftly to create vaccines with the goal of reducing one's chances of contracting the virus, mitigating the symptoms or severity of the virus, and/or decreasing the risk of spread.

In response to the COVID-19 virus, UCS administrative staff worked tirelessly to create policies and procedures that have allowed our courts to fully reopen in as safe a manner as possible so that justice need not be delayed any longer than absolutely necessary. Further, through said policies, officials endeavored to restore as many in-person proceedings as possible, as I think we can all agree that a return to some semblance of normalcy was necessary. Courthouses are public places that many people are required to enter every single day. The courtrooms themselves are enclosed spaces, and not all of them have windows. Jurors, whether seated in the jury box or deliberating in a jury room, are in close proximity to one another. The Court's many staff members and employees interact frequently with litigants and members of the public. It therefore goes without saying that it is no simple task to formulate policies and procedures that endeavor to keep everyone safe from a virus that spreads via airborne particles and droplets in this type of a setting.

On August 23, 2021, the U.S. Food and Drug Administration ("FDA") announced its final approval of the COVID-19 vaccine. On August 25, 2021, following the FDA's announcement, Chief Administrative Judge Marks communicated that UCS would be requiring all judicial and non-judicial employees to get vaccinated against COVID-19. The Court's vaccination policy was to take effect on September 27, 2021. *See*, NYSCEF Doc. 47, Ex. A.

On September 10, 2021, UCS issued a memorandum outlining the implementation of the mandatory vaccination policy. The memorandum also notified all UCS employees that exemptions to the vaccine requirement would be considered "for employees with underlying medical conditions that make receiving the COVID-19 vaccine unsafe for them and employees with sincerely held religious beliefs and practices that prohibit them from receiving a COVID-19 vaccine." NYSCEF Docs. 3 and 47 (Ex. B). The memorandum directed those seeking an exemption to the web portal containing the required forms and instructions. In addition, employees were notified that "[n]o exemption requests will be considered unless they are *fully completed on the appropriate form* and filed through the portal." *Id.* (emphasis added). Employees were further informed that they would be notified in writing of UCS' decision with respect to their request, or if more information was needed to consider the request. *Id.* The exemption requests were reviewed and considered by an eleven (11) member "Vaccination Exemption Review Committee" (the "Committee") comprised of individuals with diverse and varied backgrounds and areas of expertise. *See*, NYSCEF Doc. 49, ¶8. Employees who submitted exemption requests were notified in writing of the Committee's ultimate decision. On March 21, 2022, those who remained noncompliant with the policy were notified that termination would result absent UCS' receipt of proof of vaccination by April 4, 2022. *See*, NYSCEF Doc. 46, ¶23.

It is the denial of the five (5) named Petitioners' religious exemption requests, same having resulted in their termination from employment with UCS, that is the subject of the instant Article 78 proceeding.

Petitioner Ferrelli is a certified court reporter who began working for UCS in 1993. NYSCEF Doc. 1, ¶16. On or about October 18, 2021, in accordance with the vaccination policy referred to above, Ferrelli applied for a religious exemption from the mandate. *Id.* at ¶18. On November 18, 2021, UCS requested Ferrelli provide additional information with respect to her exemption request. *Id.* at ¶20. Ferrelli responded to the supplemental information request on December 1, 2021. *Id.* at ¶21; NYSCEF Doc. 6. On January 6, 2022, Ferrelli was informed in writing that her request for a religious exemption was denied. *See*, NYSCEF Doc. 7.

Petitioner Mainieri is a secretary who began working for UCS in 1999. NYSCEF Doc. 1, ¶27. On or about September 21, 2021, in accordance with the vaccination policy referred to above, Mainieri applied for a religious exemption from the mandate. *Id.* at ¶29. On November

5, 2021, UCS requested Mainieri provide additional information with respect to her exemption request. *Id.* at ¶31. Mainieri responded to the supplemental information request on November 16, 2021. *Id.* at ¶32; NYSCEF Doc. 13. On December 23, 2021, Mainieri was informed in writing that her request for a religious exemption was denied. *See*, NYSCEF Doc. 14.

Petitioner Pashoukos is a court officer who began working for UCS in 2015. NYSCEF Doc. 1, ¶38. On or about September 23, 2021, in accordance with the vaccination policy referred to above, Pashoukos applied for a religious exemption from the mandate. *Id.* at ¶40. On November 15, 2021, UCS requested Pashoukos provide additional information with respect to his exemption request. *Id.* at ¶42. Pashoukos responded to the supplemental information request on November 24, 2021. *Id.* at ¶43; NYSCEF Doc. 20. On January 7, 2022, Pashoukos was informed in writing that his request for a religious exemption was denied. *See*, NYSCEF Doc. 21.

Petitioner Zweig is a principal appellate court attorney who began working for UCS in 2001. NYSCEF Doc. 1, ¶48. On or about September 20, 2021, in accordance with the vaccination policy referred to above, Zweig applied for a religious exemption from the mandate. *Id.* at ¶50. On November 5, 2021, UCS requested Zweig provide additional information with respect to her exemption request. *Id.* at ¶52. Zweig responded to the supplemental information request on November 17, 2021. *Id.* at ¶53; NYSCEF Doc. 27. On December 29, 2021, Zweig was informed in writing that her request for a religious exemption was denied. *See*, NYSCEF Doc. 28.

Petitioner Smith is a judicial secretary who began working for UCS in 2004. NYSCEF Doc. 1, ¶59. Smith avers that she submitted a timely request for a religious exemption from the vaccine mandate in accordance with the vaccination policy referred to above, though the Court notes that said request is undated. NYSCEF Doc. 32. On November 19, 2021, UCS requested Smith provide additional information with respect to her exemption request. NYSCEF Doc. 1, ¶63. Smith responded to the supplemental information request, though the response is also undated. *Id.* at ¶64; NYSCEF Doc. 34. On January 14, 2022, Zweig was informed in writing that her request for a religious exemption was denied. *See*, NYSCEF Doc. 35.

Despite the denial of their religious exemption requests, the Petitioners, with the exception of Pashoukos, elected not to comply with the vaccination requirement by the allotted deadline. Each was sent a notification that they failed to meet their job qualifications, and that as

a result, they would not be permitted to report to work unless and until submission of proof of vaccination. Further, Petitioners were advised that their absences from work as a result of their failure to comply with the vaccination requirement would be charged to their accrued leave balances. *See generally*, NYSCEF Docs. 9, 15, 16, 22, 23, 29, 30, 36, 37. Pashoukos opted to obtain the vaccination and submitted proof of same either on or before the deadline. Accordingly, Pashoukos remains employed as a court officer by UCS. *See*, NYSCEF Doc. 46, ¶25. The remainder of the Petitioners do not. Though Pashoukos was not, therefore, terminated from employment, he still seeks damages against Respondents.

The Respondents herein include UCS, as well as the Hon. Lawrence K. Marks, Chief Administrative Judge of the New York State Courts, Nancy J. Barry, the Chief of Operations for UCS, and Justin A. Barry, the Chief of Administration for UCS. The individuals are named in their official capacities *only*. NYSCEF Doc. 1, ¶6-8.

**CONTENTIONS OF THE PARTIES**

The Petition asserts three causes of action. The first cause of action alleges that UCS' actions were violative of the New York State Constitution, were arbitrary and capricious and irrational in their implementation, and constituted an abuse of discretion. Petitioners contend that the policy as applied relies upon a subjective process of evaluating narrative explanations provided to support one's religious belief system and that UCS' supplemental requests for information were aggressive and interrogative in nature (NYSCEF Doc. 1, at ¶20, 22, 31, 42, 52, 63), that they caused embarrassment and humiliation, and that they demonstrated hostility and bias (NYSCEF Doc. 1, at ¶22, 33, 44, 54, 65).

Petitioners point to federal case law that they assert indicates once someone alleges that they sincerely hold a particular religious belief, any further inquiry into the validity of those beliefs violates the First Amendment. In addition, Petitioners contend the policy as applied violates the free exercise clause of the New York State Constitution insofar as they are subject to termination from employment if they do not submit to a vaccination that violates their sincerely held religious beliefs. Since, Petitioners submit, UCS can achieve their safety goals through less restrictive means (i.e. masking, distancing, testing), and because the mandate does not extend to members of the public who are freely able to enter the courthouse with or without being vaccinated, the mandate constitutes an abuse of discretion.

Second, Petitioners contend that the Respondents' actions in general infringe upon Petitioners constitutional rights to privacy and bodily integrity as guaranteed by Article 1, section 6 of the N.Y.S. Constitution and New York common law. Petitioners aver that the vaccine is tantamount to a "permanent medical procedure" and that to require employees to submit to same is violative of their "liberty interest in their right of bodily integrity." NYSCEF Doc. 1, ¶89.

Finally, Petitioners allege that UCS' actions in issuing a vaccine mandate exceed their delegation of authority from the Legislature. Petitioners contend that matters of public policy are reserved for the legislature, and not the Courts.

In opposition to the Petition, Respondents move to dismiss. They assert that one of the Petitioners herein, Ms. Ferrelli, already challenged the Court's vaccine policy in U.S. District Court, Northern District of New York, on many of the same grounds. Respondents point out that that she withdrew her case after unsuccessfully moving the Court for a temporary restraining order and preliminary injunction (NYSCEF Doc. 51) and that she re-filed here along with the other four (4) Petitioners in an attempt to forum shop.

Allegations of forum shopping aside, Respondents argue that Petitioners' contention that the vaccine mandate violates their free exercise clause is irrelevant, as the policy is facially neutral, and satisfies rational basis review. Further, Respondents point out that there is United States Supreme Court precedent indicating due process rights may be limited in some regard by policies enacted to address a public health crisis. In response to the allegation that the Courts have exceeded their delegation of authority from the state legislature, Respondents point to the New York State Constitution itself, which they contend clearly allows UCS to "establish standards and administrative policies for general application throughout the state." NYS Constitution, Art. VI, sec. 28. Finally, Respondents contend that the Petition was untimely filed based on their contention that the statute of limitations began to run upon the issuance of the challenged policy. For all the reasons set forth in their motion, Respondents request that the Petition be dismissed in its entirety.

In determining the motion to dismiss, the Court shall address each of Respondents' points separately, *infra*.

**STANDARD OF REVIEW**

"On a motion pursuant to CPLR 3211(a)(7) to dismiss for failure to state a cause of action, the court must afford the pleading a liberal construction, accept all facts as alleged in the

pleading to be true, accord the plaintiff the benefit of every possible favorable inference, and determine only whether the facts as alleged fit within any cognizable legal theory[.]" *Phillips v. Taco Bell Corp*., 152 A.D.3d 806, 807, 60 N.Y.S.3d 67, 69 (2d Dept. 2017) (internal references omitted). The same holds true in a pre-answer motion to dismiss commenced pursuant to CPLR 7804(f). *In the Matter of 1300 Franklin Avenue Members, LLC v. Board of Trustees of Incorporated Village of Garden City*, 62 A.D.3d 1004, 1006, 880 N.Y.S.2d 133 (2d Dept. 2009). Bare legal conclusions, however, need not be presumed true by the Court. *See, Brown v Foster*, 73 A.D.3d 917, 900 N.Y.S.2d 432 (2d Dept. 2010). Further, "'factual claims either inherently incredible or flatly contradicted by documentary evidence' are not entitled to any presumption of truth[.]" *Levy v. Stony Point*, 185 A.D.3d 689, 690, 127 N.Y.S.3d 504, 506 (2d Dept. 2020) (internal citations omitted). "Accordingly, '[w]hen evidentiary material outside the pleading's four corners is considered, and the motion is not converted into one for summary judgment, the question becomes whether the pleader has a cause of action, not whether the pleader has stated one and, unless it has been shown that a material fact as claimed by the pleader is not a fact at all, and unless it can be said that no significant dispute exists regarding it, dismissal should not eventuate'" *Id.* at 690-91 (internal citations omitted).

As relevant here, it is noted that judicial review of an administrative agency's action is limited to determining whether same was made in violation of lawful procedures, was affected by an error of law or was arbitrary and capricious. In determining whether the action was in fact arbitrary and capricious, the Court notes that generally "[t]his standard is, of course, an extremely deferential one: 'The courts cannot interfere [with an administrative tribunal's exercise of discretion] unless there is *no rational basis* for [its] exercise ... or the action complained of is arbitrary and capricious,' a test which 'chiefly relates to whether a particular action should have been taken or is justified ... and whether the administrative action is *without foundation in* fact'" *Beck Nichols v. Bianco,* 20 N.Y.3d 540, 559, 964 N.Y.S.2d 456, 465-66 (2013) *citing Matter of Pell v. Board of Educ. of Union Free School Dist. No. 1 of Towns of Scarsdale & Mamaroneck, Westchester County,* 34 N.Y.2d 222, 231, 356 N.Y.S.2d 833 (1974) (emphasis in original).

Indeed, the Court is not permitted to substitute its judgment for that of the agency that made the determination, but rather, "'must ascertain *only* whether there is a rational basis for the decision or whether it is arbitrary and capricious'" *Cohen v. State*, 2 A.D.3d 522, 525, 770

N.Y.S.2d 361, 363 (2d Dept. 2003) (internal citation omitted). "Consequently, even if different conclusions could be reached as a result of conflicting evidence, a court may not substitute its judgment for that of the agency where the agency's determination is supported by the record[.]" *Id.* (internal citations omitted).

**LEGAL ANALYSIS**

*A. The Free Exercise Clause*

Petitioners contend that UCS' vaccine policy violates their free exercise rights and that it does not satisfy the "strict scrutiny" test. In opposition, Respondents argue that the mandate does not violate Petitioners' free exercise rights, as it does not force them to accept a vaccination against their will, and that in any event, the mandate is not subject to strict scrutiny review.

Freedom of religion is guaranteed by the United States Constitution and the Constitution of the State of New York. U.S. CONST. Amend. 1; N.Y. CONST. Art. 1, § 3. The Free Exercise Clause acts to ensure that individuals enjoy the freedom to practice the religious faith of their choice, without government interference. *See, School Dist. of Abington Tp., Pa. v. Schempp*, 374 U.S. 203, 83 S.Ct. 1560 (1963). The Free Exercise Clause does not, however, "'relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his [or her] religion prescribes (or proscribes).'" *Central Rabbinical Congress of U.S. & Canada v. NYC Dept. of Health & Mental Hygiene*, 763 F.3d 183, 193 (2d. Cir. 2014) (internal citation omitted). As opposed to laws that are not both neutral and generally applicable which are subject to strict scrutiny review by the Court, laws that are *both* neutral *and* generally applicable are "subject to rational basis review." *Id.*

In cases where there are allegations that a particular law or policy is violative of the Free Exercise Clause as applied specifically to the plaintiffs (or petitioners), substantial deference is due to the Legislature or policy maker. *Catholic Charities of the Diocese of Albany v. Serio,* 7 N.Y.3d 510, 825 N.Y.S.2d 653 (2006). The party asserting the exemption has the burden of establishing the challenged law or policy, as aplied to that party, constitutes an unreasonable interference with their religious freedom. *Id.*

*1. Is the Policy Neutral and Generally Applicable?*

To determine neutrality, the Court must first examine whether the policy is discriminatory on its face. *Kane v. DeBlasio*, 19 F.4th 152, 164 (2d Cir. 2021). The Court must also consider whether the policy targets any certain religious conduct, whether plainly or subtly. *Id.*

The analysis for determining whether the policy is generally applicable is slightly more involved. A law may not be generally applicable if it either: "'invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized exemptions' or… 'if it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interest in a similar way.'" *Kane v. DeBlasio*, *supra*, at 165 (internal citation omitted).

The fact that a policy contains express exceptions for objectively defined categories does not mean the regulation is not generally applicable. *Id.* Rather, "there must be some showing that the exemption procedures are secularly motivated conduct to be favored over religiously motivated conduct." *Id; see also, We The Patriots, USA, Inc. v. Hochul*, 17 F.4th 266, 288-89 (2d Cir. 2021) (determining that "[t]he mere existence of an exemption procedure, absent any showing that secularly motivated conduct could be impermissibly favored over religiously motivated conduct, is not enough to render a law not generally applicable and subject to strict scrutiny" (internal quotation omitted)). A law need not apply "to all people, everywhere, at all times" to be considered "generally applicable;" rather, being applicable to an "entire class of people" is sufficient. *Kane*, *supra*, at 166.

The vaccine mandate presently at issue before the Court has already been determined by the United States District Court, Northern District of New York, to be *both* facially neutral *and* generally applicable. *Ferrelli, et al. v. State of New York Unified Court System, et al.*, 2022 WL 673863, at *6 (N.D.N.Y. March 7, 2022). The policy is facially neutral because it expressly applies to "all judges and non-judicial personnel" and requires that they all be vaccinated by September 27, 2021, "unless otherwise approved for an exemption due to medical reasons or sincerely held religious beliefs" (NYSCEF Doc. 3). This policy does not target any certain religious conduct, nor does it single out any group of people based on religious beliefs or their decision to decline to receive the vaccine on religious grounds.

The policy is also generally applicable. The NDNY in *Ferrelli, et al. v. State of New York Unified Court System, et al*., relies on the reasoning set forth in *Kane*, *supra*, in determining that the mandate does not cease to become generally applicable based merely on the availability of an exemption process. 2022 WL 673863, at *6. Petitioners would need to establish the exemption process itself "allows secularly motivated conduct to be favored over religiously motivated conduct." *Kane*, *supra*, at 165. Petitioners have failed to plead, much less actually demonstrate, that UCS' religious exemption process favors secularly motivated conduct.

Further, it is not relevant that the policy only applies to UCS employees, and not members of the general public. As set forth above a law need not apply "to all people, everywhere, at all times" to be considered "generally applicable;" rather, being applicable to an "entire class of people" is sufficient. *Kane*, *supra*, at 166. In this instance, the "entire class of people" that are subject to this policy are the UCS employees. UCS has a legal obligation to provide members of the public with access to justice. Indeed, that is the entire purpose of the court system. UCS has asserted – and properly so, in this Court's opinion, that it has no legal right to require members of the public at large to submit to a vaccine before entering. Indeed, vaccine mandates that apply *only to employees* who work in public buildings, and not members of the general public who enter those buildings, have been upheld by the Second Circuit. *See generally*, *Kane v. DeBlasio*, 19 F.4th 152 (2d Cir. 2021); *We The Patriots, USA, Inc. v. Hochul*, 17 F.4th 266 (2d Cir. 2021).

Petitioners' reliance on *Fulton v. City of Philadelphia* is somewhat misplaced. 141 S.Ct. 1868, 210 L.Ed.2d 137 (2021). In *Fulton*, the United States Supreme Court determined that a law lacks generally applicability for purposes of determining whether it should be subject to the strict scrutiny test under the Free Exercise Clause when it allows for individualized exemptions to an agency law or policy to be made at "the sole discretion" of a particular agency official. *Id.* at 1878. This type of policy cannot be deemed not generally applicable because it allows for the possibility of the official to favor secular justifications for exemptions over religious justifications. *Id.*

The U.S. District Court in *Ferrelli*, *supra*, determined that the Supreme Court's reasoning as expressed in *Fulton* is not tantamount to a ruling that anytime a policy or law has a religious exemption process, strict scrutiny review is required. *Ferrelli*, *supra*, at *7. This would, as the Hon. Judge Kahn appropriately concluded, "create a perverse incentive for government entities

to provide no religious exemption process in order to avoid strict scrutiny." *Id.*; *see also*, *We The Patriots, USA, Inc. v. Hochul*, *supra*. Moreover, Respondents herein have not, as noted by the U.S. District Court in *Ferrelli*, created a system of individualized exemptions wherein a sole decision maker has refused to extend the exemption for those with sincerely held religious beliefs.

Here, the decisions at issue were made by a Committee comprised of individuals with diverse and varied backgrounds and areas of expertise. *See*, NYSCEF Doc. 49, ¶8. Employees who had their exemption requests denied by the Committee were notified of same in writing. Indeed, a significant part of the Petitioners' claims in the present proceeding involve their dispute over why their requests for exemptions were denied, while many other UCS employees' requests were granted. This Court will address the Petitioners' claim regarding the arbitrary and capricious denial of their specific exemption requests *infra*.

In sum, this Court hereby determines that this policy is both facially neutral and generally applicable.

*2. Level of Scrutiny Applicable ~ Rational Basis Review*

As UCS' vaccine policy is facially neutral and generally applicable, contrary to Petitioners' assertion otherwise, rational basis review applies. *Kane*, *supra*, at 166. "Rational basis review requires [the policymaker] to have chosen a means for addressing a legitimate goal that is rationally related to achieving that goal." *Id.* Preventing the spread of the novel and potentially fatal COVID-19 virus, both to protect the general public and to help facilitate the safe re-opening of public courthouses, is rationally related to the requirement that all UCS employees receive the vaccination. *We The Patriots, USA, Inc. v. Hochul*, *supra*, at 290 (determining that the vaccination policy "easily" meets the rational basis standard as a chosen by the State as a means to address a legitimate goal); *see also*, *Strong v. Zucker*, __ F.Supp.3d___, 2022 WL 896525, at *5 (W.D.N.Y. 2022) ("[w]hatever their merits or efficacy, it cannot be said that the State's policies are an irrational means to achieve the legitimate goal of curbing the spread of COVID-19").

It is of no moment that there may be other and/or additional ways to minimize the spread of the virus and protect the public, or if different conclusions can be reached as a result of conflicting evidence. *See*, *Cohen v. State*, *supra* at 525 (the existence of conflicting expert

opinions on the environmental impact of a construction project was not sufficient to determine that the agency's decision was not rational, or was somehow arbitrary and capricious); *see also*, *C.F. v. New York City Dept. of Health & Mental Hygiene*, 191 A.D.3d 52, 69 (2d Dept. 2019) (the Board of Health's resolution requiring any person over six (6) months of age living/working/attending school in certain areas of Brooklyn to obtain the MMR vaccine, was not arbitrary, capricious or lacking in rational basis based on the Board's reliance on the conclusions of its own experts, rather than the contradictory conclusions of other experts).

This Court is aware of all the wide array of opinions that presently exist regarding COVID-19 mitigation tactics, including the vaccine. However, the function of the Court is not to determine whether UCS' policy perfectly achieves the desired results, but rather, the Court is only concerned with whether their decisions "have a legitimate end, and a rational basis for achieving that end." *Strong v. Zucker*, *supra*, at *5.

Petitioners' claims as asserted under the New York State Constitution are equally unpersuasive. "[W]hen the [s]tate imposes 'an incidental burden on the right to free exercise of religion' [this Court] must consider the interest advanced by the [policy] that imposes the burden, and that 'the respective interests must be balanced to determine whether the incidental burdening is justified'" *F.F. v. State of New York*, 194 A.D.3d 80, 88, 143 N.Y.S.3d 734 (3d Dept. 2021) (internal citations omitted). Given the State's well recognized "substantial interest in protecting the public health" (*Id*.), the Court holds that Petitioners fall short of establishing such a claim.

Therefore, the Court determines that UCS' policy survives rational basis review.[3]

*3. The Religious Exemption "As Applied" to Petitioners*

A law or policy that is facially neutral and generally applicable may still be violative of the Constitution "as applied" to a certain group of individuals.

UCS created a clear and unambiguous process by which employees could apply for an exemption based on medical circumstances or sincerely held religious beliefs. *See*, NYSCEF

[3] It is noted that the U.S. District Court in *Ferrelli* went on to determine that even if UCS' vaccination policy was subject to strict scrutiny, it would satisfy that rigorous test, as well. *Ferrelli*, *supra*, at *8-9; *see also*, *C.F. v. New York City Dept. of Health & Mental Hygiene*, *supra*, at 78 (determining that even if strict scrutiny were applied to the policy at issue, there exists "a plain and compelling interest in controlling" the outbreak of the disease).

Docs 3, 47 (Ex. B). All five (5) Petitioners herein applied for exemptions based on their purported sincerely held religious beliefs. All five (5) Petitioners' requests were denied. Therefore, the Petitioners contend that this religious exemption policy was violative of their rights "as applied" specifically *to them*. In order to succeed on a claim of this nature, Petitioners, as the parties seeking the exemption, must establish that the challenged policy as applied *to them* constitutes an unreasonable interference with religious freedom. *See generally*, *Catholic Charities of the Diocese of Albany v. Serio*, 7 N.Y.3d 115, 808 N.Y.S.2d 653 (2006). This Court determines that no such showing has been made by way of this Petition.

Although in analyzing a motion to dismiss the Court must accept as true all allegations in the Petition, allegations that are "either inherently incredible or flatly contradicted by documentary evidence' are not entitled to any presumption of truth[.]" *Levy v. Stony Point*, 185 A.D.3d 689, 690, 127 N.Y.S.3d 504, 506 (2d Dept. 2020).

Upon consideration of the exemption requests submitted by each of the Petitioners as attached to the Petition, as well as the Affidavit of Justin Barry, sworn to on April 18, 2022 (NYSCEF Doc. 46), it is abundantly clear that the Petitioners were *not* denied a religious exemption based on their professed beliefs, or because some religious beliefs were favored over others, but rather, because their applications were either incomplete or failed to identify an actual religious belief upon which an exemption should be granted.[4]

Petitioner Ferrelli failed to complete the supplemental information form utilized by UCS in evaluating requests for religious exemptions. *See*, NYSCEF Doc. 6. Instead of answering the questions posed, Ferrelli submitted a letter from her attorney asserting that UCS' inquiry was unlawful. *Id.* Petitioner Maineri also failed to complete the supplemental information form, and instead wrote a letter to the Committee stating her belief that UCS' request for additional information was unlawful. *See*, NYSCF Doc. 13. Petitioner Smith responded exactly as Petitioner Maineri- she failed to complete the supplemental information form and instead wrote her own letter. *See*, NYSCEF Doc. 34.

[4] Indeed, the U.S. District Court already came to this conclusion in its determination that the policy at issue was constitutional as applied to UCS employees generally, one of which was specifically Petitioner Ferrelli, as well as the other Plaintiffs in that particular action. *Ferrelli*, *supra*, at *8.

Petitioner Pashoukos, who received the vaccine and therefore remains a UCS employee, completed the supplemental information form, however, he failed to include therein any *religious based* objection to receiving the vaccine. *See*, NYSCEF Doc. 20. Personal beliefs and unsupported safety concerns are not the same as religious based beliefs, and cannot simply be couched or labelled as such to try and circumvent the policy.[5]

Petitioner Zweig also completed her supplemental information form, however, like Pashoukos, failed to identify a religious based objection to the vaccine. *See*, NYSCEF Doc. 27. Zweig affirmed therein that she understood that the over-the-counter medications she admittedly uses, as well as other vaccines she has received, contain the exact same fetal cell line that forms the basis of her purported religious exemption request. *Id.* Thus, Zweig's own exemption request contradicts itself and undermines the basis for her request.

As of April 12, 2022, UCS had granted 60% of its employees' requests for religious exemptions. NYSCEF Doc. 46, ¶18. UCS' decision to deny the requests at issue based on these reasons was not arbitrary and capricious, or an infringement upon Petitioners' sincerely held religious beliefs, but rather it was a purely appropriate decision based on the contents (or lack thereof) of these Petitioners' deficient requests. Ferrelli, Maineri, and Smith failed to complete, and in some instances even sign, the supplemental information forms. Pashoukos and Zweig failed to identify sincere religious beliefs that support their request for an exemption. The fact that others may disagree with UCS' decision is not sufficient to conclude that same was arbitrary or capricious.

Further, to the extent Petitioners attempt to allege that the supplemental information form itself was somehow improper, the Court must point out that the U.S. District Court, in evaluating the same supplemental information form, pointed out that the questions contained thereon did not "presuppose the illegitimacy of [religious] concerns about use of fetal cell lines" but rather, it "merely seeks to determine whether such concerns are the applicant's true motivation" for seeking the exemption. *Ferrelli*, *supra*, at *8; *see also*, *U.S. v. Seeger*, 380 U.S. 163, 185, 85 S.Ct. 850, 863 (1965) (noting that "while the 'truth' of a belief is not open to question, there

[5] Respondents contend that this specific Petitioner's claim should be dismissed based on his lack of standing as a result of his ultimate compliance with the vaccine policy. The Court, however, declines to address the standing argument, as the Petition is being dismissed on its merits for all the reasons set forth in this Decision.

Case 25-724, 08/25/2025, DktEntry: 24.1, Page 128 of 283
Case 1:22-cv-05264-BMC Document 28-1 Filed 07/28/23 Page 16 of 22 PageID #: 529

remains the significant question of whether it is 'truly held'..[and] [t]his is the threshold question of sincerity which must be resolved in every case"); *Turner v. Liverpool Cent. School*, 186 F.Supp.2d 187, 193 (N.D.N.Y. 2022) (determining that an inquiry as to whether professed religious beliefs are genuine or sincere does not require an assessment as to the actual validity of said beliefs).[6]

Therefore, the request to have an applicant for a religious exemption complete the supplemental information form in no way interferes with the neutrality of UCS' exemption process. *Ferrelli, supra*, at *8. To determine otherwise would essentially be tantamount to a determination that UCS must grant every request for a religious exemption, even where the request is incomplete or contains inconsistent or contradictory responses that undermine the stated reason for the request. That would, in this Court's opinion, completely dilute the import of the exemption process.

Based on the foregoing, this Court finds that the policy 'as applied' to the Petitioners was neutral and generally applicable, and as detailed, *supra*, satisfies rational basis review. In addition, the UCS' decision to deny these Petitioners' requests for religious exemptions was neither arbitrary nor capricious.

*B. Substantive and Procedural Due Process Claims*

Petitioners assert that UCS' vaccine policy violates their substantive and procedural due process rights insofar as it "strikes at the very heart of [their] liberty interest in their right of bodily integrity" NYSCEF Doc. 1, ¶89. To the extent that the policy at issue requires a vaccination, or a "permanent medical procedure" as it is referred to it the Petition, Petitioners

---

[6] The Court does not agree that the New York County Supreme Court determined in its recent Decision in *Loiacono v. The Board of Education of the City of New York, et al.*, that "questioning the sincerity of the [Petitioner's] religious beliefs was improper" as indicated by Petitioners' counsel in his post-submission letter of July 14, 2022 (NYSCEF Docs. 71, 72). *Loiacono v. The Board of Education of the City of New York, et al.*,Index No.: 154875/2022 (Sup. Ct. N.Y. Cnty 2022). Indeed, the Judge specifically notes in her Decision in *Loiacono* that the petition at issue before her did not ask the Court to opine on the validity of vaccine mandates *or the process by which accommodations were considered by the Respondent*. The Judge's Decision was expressly limited to the stated reason for the denial of Petitioner's accommodation request having been based on an unspecified "undue hardship" to the employer. These are not the facts presently before this Court.

allege that it impedes their right to maintain their job while at the time exercise their right to bodily autonomy. *Id.* at ¶88-89.

"Substantive due process rights are intended to safeguard individuals 'against the government's exercise of power without any reasonable justification in the service of a legitimate governmental objective.'" *Southerland v. City of New York*, 680 F.3d 127, 151 (2d Cir. 2012) (internal citations omitted) *citing Tenenbaum v. Williams*, 193 F.3d 581, 600 (2d Cir. 1999) (internal quotation omitted). The substantive due process doctrine bars certain state actions regardless of the fairness of the mechanisms and procedures used to implement them. *People v. Bell*, 3 Misc.3d 773, 778 N.Y.S.2d 837 (Sup. Ct. Bronx Cnty. 2003).

In order to establish a violation of substantive due process rights, a plaintiff must establish that the state action at issue was "'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Southerland*, *supra* (internal citations omitted). Further, the interference with the protected right must be "'so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection.'" *Id.* at 153 (internal citations omitted). The only rights, however, that are afforded such protection under substantive due process are those rights which are "fundamental or implicit in the concept of ordered liberty." *Maniscalco v. New York City Dept. of Education,* 563 F.Supp.3d 33, 38 (E.D.N.Y. 2021).

Procedural due process is, loosely stated, a guarantee of a fair procedure. It is intended to afford notice of a possible deprivation of a protected interest and a meaningful opportunity to contest the deprivation prior thereto. *People v. Bell, supra*, at 777. In order to state a claim that one's procedural due process rights have been violated, it must be established that the individual possessed a protected property or liberty interest, and that they were deprived of that interest without constitutionally adequate process. *See, W.D. v. Rockland County*, 521 F.Supp.3d 358, 380-81 (S.D.N.Y. 2021). It is not until the property or liberty interest is established that the Court looks to whether the procedure or policy at issue that interferes with that interest meets constitutional standards. *Id*.

To the extent that the Petition attempts to assert either a substantive or a procedural due process violation, Respondents move to dismiss on the basis that Petitioners have not established by way of their Petition the deprivation of a constitutionally protected right. This Court agrees.

This Court acknowledges that UCS' vaccination policy requires all employees who do not receive an exemption to get vaccination or else face the potential of losing their employment. NYSCEF Doc. 3. This Court does not take for granted that it is not always easy or convenient to find new employment. However, it is well established that the right to occupational choice is *only* afforded due process protection when a plaintiff is "'*completely prohibited* from engaging in his or her chosen profession.'" *Maniscalco, supra, citing*, *Hu v. City of New York*, 927 F.3d 81, 102 (2d Cir. 2019) (emphasis supplied); *see also, New York City Municipal Labor Committee v. City of New York*, 73 Misc.3d 621, 631, 156 N.Y.S.3d 681, 689 (Sup. Ct. N.Y. Cnty. 2021) (noting that, in accordance with Second Circuit precedent, property interests that are related to employment are "not among protected fundamental rights, [but] are 'simple contractual rights, without more'"). Accordingly, there is no fundamental liberty or property interest in continuing one's employment, and a state action is therefore not considered a due process violation unless its actions go as far as to completely bar a plaintiff from pursuing their chosen occupation. Without establishing such a deprivation, no due process claim may lie.

Further, it does not matter that there may exist other means besides vaccination that can be used to mitigate the spread of COVID-19, and protect health and welfare of those in the courthouses. It has already been established that the State, in this case UCS, has the right to implement a vaccine mandate in order to control the outbreak of a disease "without violating the liberty secured by the Fourteenth Amendment of the United States Constitution." *C.F. v. New York City Dept. of Health & Mental Hygiene*, *supra*, at 71; *see also*, *Brignall, et. al. v. New York State Unified Court System, et. al*., Index No.: E2022-0241cv (Sup. Ct. Steuben Cnty. 2022) (NYSCEF Doc. 52). In any event, this Court determines that the vaccine policy afforded UCS employees both notice and an opportunity to be heard, as mandated by the Constitution.

Petitioners' reliance on the Court of Appeals ruling in *Rivers v. Katz* is inapposite, as the facts in *Rivers* are completely distinct from the facts in the instant proceeding. 67 N.Y.2d 485, 504 N.Y.S.2d 74 (1996). The specific issue in *Rivers* was "whether and under what circumstances the State may forcibly administer antipsychotic drugs to a mentally ill patient who has been involuntarily confined to a State facility." *Id.* at 489-90. Indeed, this Court agrees wholeheartedly that individuals suffering from a mental illness should in no way be determined to have forfeited their civil rights, however this is not the issue presently before the Court.

In sum, the Court finds that Petitioners have not stated a substantive or procedural due process claim against Respondents.

C. *The Authority to Issue the Policy*

In their third and final cause of action, Petitioners contend that Judge Marks lacked the legal authority to issue the policy because "nothing in [22 NYCRR § 80.1 and Article VI, Section 28, of the N.Y.S. Constitution] permits Judge marks to require [UCS] employees to be vaccinated against the Covid-19 virus." NYSCEF Doc. 1, ¶91-92.

Respondents move to dismiss based on their contention that UCS is an independent branch of government with its own inherent constitutional authority, and that UCS has the authority to implement certain policies and procedures through its Administrative Chief Judge. Further, Respondents point out that agencies have been upheld in imposing mandates that were deemed necessary for public health and safety reasons.

In opposition to the motion, Petitioners aver that the New York State Judiciary Law applies to all personnel decisions, and that therefore, the policy at issue could not have properly been enacted by UCS without a public hearing. In reply, Respondents distinguish the vaccine policy at issue with other types of civil service and personnel policies as contemplated by section 211 of the Judiciary Law. Further, Respondents argue that the determination that a hearing was required with respect to this type of policy decision would lead to an untenable and, frankly, illogical result.

Pursuant to Article VI, Section 28, of the New York State Constitution, "[t]he chief judge, after consultation with the administrative board, shall establish standards and administrative policies for general application throughout the state…" N.Y.S. CONST., Art. VI, Sec. 28(c); *see also*, *Brignall*, *supra*, at 5. Indeed, it has never been doubted that "[s]upervision of the courts [is an] administrative function[] 'incidental to the performance of judicial duties' and may be intrusted [sic] to judicial officers." *Matter of Rosenthal v. McGoldrick*, 280 N.Y.11, 14, 19 N.E. 660 (1939) (internal citation omitted).

Judge Marks, as the current Chief Administrative Judge, is therefore expressly authorized to "supervise the administration and operation of the unified court system" and, therefore, he "shall have such powers and duties as may be delegated to him or her by the chief judge and such additional powers and duties as may be provided by law." N.Y.S. CONST., Art. VI, Sec.

28(b). It has been acknowledged time and again by the Court of Appeals that the administrative powers of the Administrative Chief Judge's powers are "complete" and may be employed to him or her "fully when and while and to the extent that they have been delegated to him." *Matter of Bellacosa v. Classification Review Bd. of Unified Ct. Sys. Of State of N.Y.*, 72 N.Y.2d 383, 388, 534 N.Y.S.2d 119 (1988). In accordance with this section of the New York State Constitution, 22 NYCRR § 80.1 delineates a list of specific powers that the Chief Administrator "*shall* supervise on behalf of the Chief Judge" that pertain to the "administration and operation of the unified court system[.]" 22 NYCRR § 80.1(a) (emphasis supplied). These powers are conspicuously broad and include "any additional powers and …duties" as assigned by the Chief Judge. 22 NYCRR § 80.1(b)(17).

This Court is aware that the Judiciary Law sets forth that "[s]tatewide standards and policies concerning personnel practices related to nonjudicial personnel shall be consistent with the civil service law, and shall be promulgated *after* a public hearing at which affected nonjudicial employees or their representatives shall have the opportunity to submit criticisms, objections and suggestions related to the proposed standards and policies." N.Y. Jud. Law §211(1)(d) (emphasis supplied). However, this section of the Judiciary Law appears to limit the types of personnel practices that require a public hearing specifically to "title structure, job definition, classification, qualifications, appointments, promotions, transfers, leaves of absence, resignation and reinstatements, performance ratings, removal, sick leaves, vacations." *Id.*

The Judiciary Law, like any other law, "must be read together with, and be applied consistently with, the Constitution." *Matter of Met. Council v. Crosson*, 84 N.Y.2d 328, 335, 618 N.Y.S.2d 617 (1994). Although the policy at issue may have negative employment consequences attached to it should there be non-compliance (i.e. removal), the policy itself is a *health and safety policy* intended to address the need to safely reopen the Courts during the pandemic. This Court agrees with Respondents that the policy is not of the sort that must go through the public comment process before implementation. This is especially true in light of the unprecedented and urgent situation the courts were faced with in its effort to safely restore as many in-person proceedings as possible. It bears repeating that courthouses are public buildings, and a significant number of people are required to enter each and every day. The Courts have an obligation to provide safe access to justice for everyone.

It would therefore seemingly undermine the intent of the New York State Constitution if the Chief Administrative Judge, who has such broad supervisory authority over the entirety of the UCS, had no authority to enact time sensitive health and safety policies for the purposes of restoring in person proceedings in our courthouses. The cases cited by Petitioners in their opposition papers do not convince this Court otherwise, as they all pertain to administrative agencies, and not UCS. The agency determinations that were challenged in those cases were not made by the Chief Administrative Judge. The Court is not, therefore, convinced of their applicability to the instant situation.

Therefore, based on the foregoing, the Court determines that Chief Administrative Judge, Judge Marks, did not exceed his broad grant of authority, and that UCS had had the legal authority to enact the policy at issue.

*D. Statute of Limitations*

One of the last points raised in Respondents' motion raises a statute of limitations issue. Respondents argue that since Petitioners were notified of the policy on (or around) September 27, 2021, the four (4) month statute of limitations lapsed, at the latest, on January 27, 2022. NYSCEF Doc. 45, p.20. Since the Petition was filed on April 5, 2022, Respondents contend this proceeding is time-barred.

In opposition, Petitioners contend that "the action does not challenge the vaccination policy itself, it challenges the practice of termination upon denial of religious exemption requests in an arbitrary manner." NYSCEF Doc. 58, p. 20 (emphasis in original). Petitioners point out that their causes of action did not accrue until they were aggrieved by the challenged agency action.

"An article 78 proceeding must be commenced within four months after the administrative determination to be reviewed becomes 'final and binding upon the petitioner'" *Yarbough v. Franco*, 95 N.Y.2d 342, 346, 717 N.Y.S.2d 79, 81 (2000) *referencing* CPLR § 217(1). "An administrative determination becomes 'final and binding' when the petitioner seeking review has been aggrieved by it." *Id.*; *see also, Matter of Village of Westbury v. Department of Transp. of State of N.Y.,* 75 N.Y.2d 62, 72, 550 N.Y.S.2d 604 (1989)). To the extent that there is any ambiguity or uncertainty caused by the public body or officer regarding whether a final and binding determination was render, courts should resolve that ambiguity

against the public body "in order to reach a determination on the merits and not deny a party his day in court[.]" *Rocco v. Kelly*, 20 A.D.3d 364, 366, 799 N.Y.S.2d 469, 471 (3d Dep't 2005).

The Court agrees with Petitioners on the statute of limitations argument. Though some of the arguments raised in the petition attack the policy itself, the crux of this proceeding turns on the fact that the policy resulted in Petitioners' termination from employment. Although the policy at issue was indeed intended to be final and binding upon UCS employees when it was issued, the application of the policy to those seeking a religious (or medical) exemption could not have been declared to be final and binding until such time as those who sought exemptions pursuant to the policy were notified their requests were denied. *See, e.g. Raffaele v. Town of Orangetown*, 224 A.D.2d 430, 431, 637 N.Y.S.2d 755 (2d Dep't 1996) (a determination cannot be deemed to be "binding" until the aggrieved party is notified of same). Had the Petitioners commenced this application *before* they were notified that their exemption requests were denied, it would technically not have been ripe for judicial determination. In any event, to the extent that there is any ambiguity or uncertainty as to when the determinations at issue became final and binding, this Court determines it appropriate to err on the side of the Petitioners and determine this case on its merits.

Therefore, the Court declines to dismiss the Petition on timeliness grounds, despite the fact that it is being dismissed on its merits, as set forth above.

## CONCLUSION

Accordingly, based on the foregoing, it is hereby

***ORDERED and ADJUDGED***, that Respondents' motion to dismiss the Petition is granted in its entirety, and Petitioners' Petition is dismissed.

Dated: New City, New York
August 2, 2022

Hon. Thomas P. Zugibe, J.S.C.

To: *All counsel of record with NYSCEF*

**STATE OF NEW YORK**
**SUPREME COURT: COUNTY OF STEUBEN**

---

**AMY BRIGNALL,**
**FRAN-MARIE CHERESNOWSKY,**
**PAUL DIPIERRO,**
**JAMIE HAWLEY,**
**GERARD KAELIN,**
**GWEN NANIA,**
**MEREDITH PRATT,**
**NYS COURT EMPLOYEES FOR MEDICAL FREEDOM, INC.,**

Petitioners,

v.

**NEW YORK STATE UNIFIED COURT SYSTEM,**
**OFFICE OF COURT ADMINISTRATION,**
**HON. LAWRENCE K. MARKS**
**CHIEF ADMINISTRATIVE JUDGE,**
**NEW YORK STATE UNIFIED COURT SYSTEM,**
**JUSTIN A. BARRY**
**CHIEF ADMINISTRATOR**
**NEW YORK STATE UNIFIED COURT SYSTEM,**
**NANCY J. BARRY**
**CHIEF OF OPERATIONS**
**NEW YORK STATE UNIFIED COURT SYSTEM,**

Respondents.

---

**DECISION, ORDER and JUDGMENT**

Index No. E2022-0241cv

Petitioners having filed an order to show cause on March 15, 2022, and upon reading and considering the affirmation of Corey J. Hogan, Esq. filed March 15, 2022, and exhibits A – B thereto; petitioners' Verified Petition and Complaint filed March 8, 2022, and exhibits A – L thereto; the expert affidavit of Clayton J. Baker, M.D., C.M. dated February 19, 2022, and exhibit A thereto; the expert affidavit of Paulette Niewczyk, MPH, PhD dated March 4, 2022, and exhibit A thereto; notice of cross-motion filed March 29, 2022, the affidavit of Justin A. Barry dated March 29, 2022, and exhibits 1 – 10 thereto; and this matter having come before this court for oral argument on April 4, 2022, the following constitutes the decision, order and judgment of this court.

## BACKGROUND

In September 2021, the Unified Court System ("UCS") issued a policy requiring all UCS employees to be vaccinated against COVID-19 ("Vaccination Policy"). The Vaccination Policy allowed employees to seek both medical and religious exemptions from the Vaccination Policy, which included a multilayered review by a committee. Petitioners seek to enjoin respondents from enforcing the Vaccination Policy. Petitioners filed the foregoing special proceeding pursuant to CPLR Article 78, 42 USC 1983, and 42 USC 1988 seeking: (i) injunctive relief for violations of petitioners' rights under the United States and New York State Constitutions; (ii) challenges to the constitutionality and applicability of the vaccine mandate for employees promulgated by respondents; and (iii) reimbursement of attorney's fees, costs, and expenses incurred by petitioners in seeking to protect against the violation of their rights. (NYSCEF Doc. No. 1).

Petitioners thereafter filed an order to show cause seeking a preliminary injunction pursuant to CPLR 6301, 6311, and 7805, enjoining respondents from enforcing the Vaccination Policy for UCS employees issued by way of memorandum dated September 10, 2021, on the grounds that: (i) the Vaccination Policy is arbitrary, capricious, irrational, unnecessary and an abuse of respondents' discretion in this matter; (ii) respondents have proceeded in excess of their jurisdiction; and (iii) the Vaccination Policy violates the Free Exercise Clause of the First Amendment and is void and unenforceable. In response, respondents filed a cross-motion to dismiss pursuant to CPLR 3211(a)(7), on the ground that the Verified Petition and Complaint fail to state a cause of action.

## DECISION

### I. Preliminary Injunction

Petitioners argue that they are entitled to a preliminary injunction because the vaccine mandate is arbitrary and capricious. Petitioners assert that the penalty for UCS employees who fail to comply with the Vaccination Policy is, in effect, termination.

To prevail on a motion for a preliminary injunction, the moving party has the burden of establishing by clear and convincing evidence: "(1) a likelihood of success on the merits; (2) irreparable injury in the absence of injunctive relief; and (3) a balance of equities in its favor." *Eastman Kodak Co. v. Carmosino*, 77 AD3d 1434, 1435 [4th Dept 2010], citing *Nobu Next Door, LLC. v. Fine Arts Hous., Inc.*, 4 NY3d 839, 840 [2005]; *Sutherland Global Servs., Inc. v. Stuewe*,

73 AD3d 1473, 1474 [4th Dept 2010]; *Marcone APW, LLC v. Servall Co.*, 85 AD3d 1693, 1695 [4th Dept 2011]; *Doe v. Axelrod*, 73 NY2d 748, 750 [1988]. A preliminary injunction is a drastic remedy and should be issued sparingly. *Eastman Kodak*, 77 AD3d at 1435, citing *Sutherland*, 73 AD3d at 1474. The decision to grant or deny a preliminary injunction is within the sound discretion of the court. *Nobu*, 4 NY3d at 840; *Masjid Usman, Inc. v. Beech 140, LLC*, 68 AD3d 942, 942 [2d Dept 2009]. However, if any one of the three requirements are not satisfied, the application for a preliminary injunction will be denied as a matter of law without the need to address the remaining prongs of the test. *Axelrod*, 73 NY2d at 751; *Matter of Rochester Police Locust Club, Inc. v. City of Rochester*, 176 AD3d 1646, 1647 [4th Dept 2019].

### A. Preliminary Injunction on Petitioners' CPLR Article 78 Cause of Action

#### i. Success on the Merits

Petitioners argue that they have made a *prima facie* showing of their right to relief. Petitioners argue that Article 78 of the CPLR allows petitioners to seek injunctive relief from "arbitrary and capricious" determinations made by the Unified Court System ("UCS"), Office of Court Administration ("OCA"), and their officers. Petitioners argue that the Vaccination Policy arbitrarily deemed petitioners, who are unvaccinated against COVID-19, as "unfit to work" and is without sound basis in reason, logic, law, or fact. Petitioners argue that the Vaccination Policy requires UCS employees, including those who have developed natural immunity from COVID-19, to be vaccinated, despite having at least equally as strong protection from the virus. Petitioners also argue that respondents proceeded without and/or in excess of their jurisdiction in adopting the Vaccination Policy, and failed to articulate the authority for such implementation.

The first prong of a preliminary injunction review is whether the moving party has established a likelihood of ultimate success on the merits. *Axelrod*, 73 NY2d at 750. The moving party need not demonstrate a certainty of success on the merits, only the likelihood of success. *Holdsworth v. Doherty*, 231 AD2d 930, 930 [4th Dept 1996]. However, "when the facts necessary to establish the cause of action are, as here, in sharp dispute," a preliminary injunction should not be issued. *Holdsworth*, 231 AD2d at 930, quoting *Sutton, DeLeeuw, Clark & Darcy v. Beck*, 155 AD2d 962, 963 [4th Dept 1989]. On judicial review of an administrative action under CPLR Article 78, courts must uphold the administrative exercise of discretion unless it has "no rational basis" or the action is "arbitrary and capricious." *Pell v. Bd. of Educ. Union Free Sch. Dist.*, 34

NY2d 222, 230-231 [1974]. Judicial review of an administrative determination under CPLR Article 78 is limited to the "evaluation of whether the determination is consistent with lawful procedure, whether it is arbitrary or capricious, and whether it is a reasonable exercise of the agency's discretion." *Dist. Council 37, Am. Fedn. of State, County & Mun. Empl., AFL-CIO v. City of New York*, 804 NYS2d 10, 14 [1st Dept 2005]; citing *Pell*, 34 NY2d at 230-231. Where the administrative interpretation is founded on a rational basis, the interpretation should be affirmed. *Mid-State Mgt. Corp. v. New York City Conciliation and Appeals Bd.*, 112 AD2d 72, 76 [1st Dept 1985]. A court may not substitute its judgment for that the of the agency. *Mid-State Mgt. Corp.*, 112 AD2d at 76; *Matter of Ignizio v. City of New York*, 85 AD3d 1171, 1174 [2d Dept 2011].

Throughout the COVID-19 pandemic, UCS followed the guidance of public health authorities at the federal, state, and local levels, in order to take what it deemed appropriate steps to provide the safest and healthiest environment possible for individuals who need to access the legal system, as well as for judicial and non-judicial employees of UCS. (NYSCEF Doc. Nos. 39, ¶3-4, ¶31; 41, pg. 21, ¶26). As UCS's constitutionally mandated mission is to provide an accessible forum for justice for litigants who use the court system, UCS determined that the most important element to restart in-person operations and to maintain a safe environment for judges, non-judicial employees, and court users, was the widespread vaccination of its employees against COVID-19. (NYSCEF Doc. No. 39, ¶3-5). UCS implemented the Vaccination Policy as a means of minimizing the spread of COVID-19 throughout the UCS courtrooms, protecting the safety of UCS employees and the public, avoiding shortages of essential staff members, and enabling UCS to maintain an accessible forum for justice. (NYSCEF Doc. No. 39, ¶5). While petitioners do not agree with the appropriateness of the Vaccination Policy, such is not a basis to disturb the determination. UCS had a rational basis for implementing the Vaccination Policy as a means for achieving its goal of minimizing the spread of COVID-19 through the UCS facilities and maintaining an accessible forum for justice. *Ferrelli v. State of New York Unified Ct. Sys.*, 2022 US Dist LEXIS 39929, *19, 2022 WL 673863, *6 [ND NY March 7, 2022, No. 1:22-CV-0068].

Petitioners' argument regarding respondents' authority to impose the Vaccination Policy is also without merit. Access to the legal system is an inherent right of citizenship guaranteed by the First, Fifth, and Fourteenth Amendments. *Matter of Lippman v. Pub. Empl. Relations Bd.*,746 NYS2d 77, 81 [3d Dept 2002]. UCS issued the Vaccination Policy pursuant to its constitutionally delegated authority to enact policies that enable it to meet its constitutional obligations of

facilitating public access to the courts. The New York State Constitution specifically states that there shall be a unified court system for the state. NY Const, art VI § 1 (a). The New York State Constitution further provides that the chief judge of the court of appeals shall be the chief judge of the state of New York and shall be the chief judicial officer of the unified court system, and shall appoint a chief administrator of the courts. NY Const, art VI § 28 (a). The chief judge, after consultation with the administrative board, shall establish standards and administrative policies for general application throughout the state. NY Const, art VI § 28 (c). The Court of Appeals has recognized that there is some overlap between the three separate branches of power which does not violate the constitutional principal of separation of powers. *Clark v. Cuomo*, 66 NY2d 185, 189 [1985], citing *County of Oneida v. Berle*, 49 NY2d 515, 523 [1980]. Further, some administrative functions may be entrusted to judicial officers, such as supervision of the courts. *Rosenthal v. McGoldrick*, 280 NY 11, 14 [1939]; Judiciary Law § 211.

While petitioners argue that there is no rational basis for requiring persons with natural immunity from COVID-19 to vaccinate against the virus, this issue was, in fact, considered. (NYSCEF Doc. Nos. 7 and 39, ¶21). Petitioners' own submission demonstrates that after having tested positive for COVID-19, based upon CDC guidance, immunity to COVID-19 is presumed for the next 90 days. (NYSCEF Doc. No. 7). This document produced by UR Medicine[1] did not indicate that natural immunity was presumed for longer than 90 days or that it is deemed an underlying medical condition that would make receiving the COVID-19 vaccine unsafe. In fact, petitioners' argument of natural immunity as a basis for an injunction has repeatedly been rejected by the courts. *Broecker v. New York City Dept. of Educ.*, 2022 US Dist LEXIS 25104, 2022 WL 426113 [ED NY February 11, 2022, No. 21-CV-6387]; *Marciano v. De Blasio*, 2022 US Dist LEXIS 41151, 2022 WL 678779 [SD NY March 8, 2022, No. 21-CV-10752]; *Strong v. Zucker*, 2022 US Dist LEXIS 15037, 2022 WL 245351 [WD NY January 27, 2022, No. 21-CV-6532L]; *Abadi v. City of New York*, 2022 US Dist LEXIS 21815, 2022 WL 347632 [SD NY February 4, 2022, No. 21 Civ. 8071]. "An agency's decision to rely on the conclusions of its experts, rather than conflicting conclusions of challenger's experts, does not render its determination arbitrary, capricious, or lacking in a rational basis." *C.F. v. New York City Dept. of Health & Mental Hygiene*,

[1] The document provided by UR Medicine [NYSCEF Doc. No. 7] was redacted by petitioners so that the individual who electronically signed the letter is unknown. Accordingly, it is unknown whether the document was signed by a doctor, nurse, physician assistant, or secretary.

191 AD3d 52, 69 [2d Dept 2020], citing *Matter of 278, LLC v. Zoning Bd. of Appeals of the Town of E. Hampton*, 159 AD3d 891, 894 [2d Dept 2018].

Petitioners have failed to demonstrate that UCS acted arbitrarily and capriciously, or without legal authority to require the Vaccination Policy as a condition of employment during the ongoing COVID-19 pandemic. Consequently, petitioners have failed to demonstrate a likelihood of success on the merits of their CPLR Article 78 cause of action.

**ii. Irreparable Harm**

Petitioners argue that as UCS employees are obligated to comply with the Vaccination Policy, they will suffer irreparable harm if the preliminary injunctive relief is not granted.

The second prong of the preliminary injunction test is whether there will be irreparable injury if the provisional relief is withheld. *Axelrod*, 73 NY2d at 750. The irreparable harm prong of the preliminary injunction test requires a clear showing that the claimed harm is imminent. *New York State Inspection, Sec. & Law Enforcement Empl., Dist. Council 82 v. Cuomo*, 64 NY2d 233, 240 [1984]; *Matter of Civil Serv. Empl. Assn., Inc., Local 1000, AFSCME, AFL-CIO v. County of Erie*, 43 AD3d 1341, 1342 [4th Dept 2007]. Conclusory allegations that the moving party will suffer irreparable harm if the preliminary injunction is not granted are insufficient. *Sutton*, 155 AD2d at 963; *Falls St. Leasing Corp. v. City of Niagara Falls*, 295 AD2d 1005, 1006 [4th Dept 2002].

**a. Irreparable Harm Due to Loss of Employment**

Petitioners aver that they, as UCS employees, have been deemed "unfit to work" and are facing termination from their current positions and will be unable to obtain similar employment at other UCS facilities for an indefinite amount of time.

A request for a preliminary injunction may be sought in the context of a CPLR Article 78 proceeding. *Matter of Riccelli Enter., Inc. v. State of New York Workers' Compensation Bd.*, 117 AD3d 1438, 1439 [4th Dept 2014]. However, the loss of employment, although most likely to cause severe hardship, does not constitute irreparable harm. *Armitage v. Carey*, 49 AD2d 496, 498 [3d Dept 1975]; *Dhillon v. Healthnow New York, Inc.*, 32 AD3d 1197, 1198 [4th Dept 2006]; *Abramo v. Healthnow New York*, 305 AD2d 1009, 1010 [4th Dept 2003]; *Suffolk County Assn. of Mun. Empl. v. County of Suffolk*, 163 AD2d 469, 471 [2d Dept 1990]; *Cohen v. Dept. of Social Servs. of State of New York*, 323 NYS2d 603, 605 [2d Dept 1971]. Injunctive relief is both

unnecessary and unwarranted where the moving party has an adequate remedy in the form of monetary damages. *Mangovski v. DiMarco*, 175 AD3d 947, 948 [4th Dept 2019]. Accordingly, a preliminary injunction is not warranted where the affected workers would be entitled to reinstatement and back pay in the event they ultimately prevail.

Petitioners aver that they have been deemed "unfit to work" and are facing termination from their current positions. Petitioners further allege that they will be barred from seeking similar employment at other UCS facilities for an indefinite amount of time, and therefore will suffer not only economic loss, but have their careers interrupted or ended. Petitioners' allegations of potential loss of employment from being deemed "unfit to work" does not constitute an irreparable harm. Petitioners' conclusory allegations that their positions are increasingly likely to be filled during the pendency of this action and therefore, they will be precluded from seeking reinstatement if they ultimately prevail is insufficient. Accordingly, the alleged harm of the loss of employment does not constitute irreparable harm.

**b. Irreparable Harm to Constitutional Rights**

Petitioners further assert that they have protected rights under the New York State Constitution, which justify injunctive relief. Petitioners allege in their Verified Petition and Complaint that the Vaccination Policy is a compulsory vaccination requirement and that an employee who wishes to continue his employment with UCS has no option but to get the COVID-19 vaccine, terminate their employment, or retire. (NYSCEF Doc. No. 1, pg. 37). Respondents in opposition argue that the presumption of irreparable harm arises only when a party alleges injury from a rule or regulation that directly limits a First Amendment right. Respondents further argue that petitioners are not required to perform or abstain from any action that violates their religious beliefs.

The Vaccination Policy does not force UCS employees to be vaccinated. (NYSCEF Doc. Nos. 6; 41, pg. 26). "The choice between accepting a vaccination that one is strongly against on the one hand and the loss of employment on the other, may appear to have no choice at all. But in reality, it is just that. Nobody under the challenged policy will be forced to accept a vaccination against his or her will." *Civil Serv. Empl. Assn. v. New York State (Unified Ct. Sys.)*, 73 Misc3d 874, 894 [Sup Ct, Albany County 2021, Silverman, J.]. Moreover, UCS employees are not forced to abstain from any action that violates his or her religious beliefs. The Vaccination Policy allows

for UCS employees with valid bases to seek religious and medical exemptions. (NYSCEF Doc. Nos. 6; 41, pg. 26). While UCS employees who choose not to comply with the Vaccination Policy do face the possibility of termination, that termination does not result in irreparable harm necessary to justify injunctive relief.

**iii. Balance of Equities**

Petitioners allege that the balance of equities clearly favor petitioners. Petitioners argue that the harm to petitioners without the injunction will be greater than the harm to respondents if the injunction is granted.

The third prong of the preliminary injunction review is a balancing of the equities. *Axelrod*, 73 NY2d at 750. The courts must weigh the interests of the general public and the parties to the litigation. *Destiny USA Holdings, LLC v. Citigroup Global Mkts. Realty Corp.*, 69 AD3d 212, 223 [4th Dept 2009].

Petitioners allege that during the COVID-19 epidemic, petitioners continued to work in their capacity as UCS employees despite having been unvaccinated. Petitioners aver the Vaccination Policy will result in the termination of hundreds of UCS employees. "The defining mission of UCS is to provide an accessible forum to every litigant seeking redress of grievances", as guaranteed by the First, Fifth and Fourteenth Amendments of the United States Constitution. *Lippman*, 296 AD2d at 204. The balance of the equities favors the Vaccination Policy, as the hardships faced by petitioners are outweighed by the court system's interest in preventing the spread of COVID-19 within the state court system, its interest in protecting the health of the many individuals who use the court system,[2] promoting efficient access to justice, and maintaining a safe and operational court system while minimizing health risks to individuals accessing the court system and its facilities. Accordingly, petitioners have failed to demonstrate that the balance of the equities clearly favors petitioners.

---

[2] Including but not limited to judges, staff, attorneys, litigants, witnesses, juror, journalists, members of the public, and criminal defendants. (NYSCEF Doc. No. 41, pg 5).

**B. Preliminary Injunction on Petitioners' Free Exercise Clause Cause of Action**

**i. Success on the Merits**

Petitioners assert that the evaluation of applications for religious exemptions are not neutral or generally applicable. Petitioners additionally assert that the Vaccination Policy violates the Free Exercise Clause of the First Amendment and is void and unenforceable. Petitioners state that they have applied for religious exemptions under the Vaccination Policy and those requests have all been denied.

As stated above, the first prong of a preliminary injunction review is whether the moving party has established a likelihood of ultimate success on the merits. *Axelrod*, 73 NY2d at 750. The moving party need not demonstrate a certainty of success on the merits, only the likelihood of success. *Holdsworth*, 231 AD2d at 930. However, "when the facts necessary to establish the cause of action are, as here, in sharp dispute," a preliminary injunction should not be issued. *Holdsworth*, 231 AD2d at 930, quoting *Sutton*, 155 AD2d at 963.

The Free Exercise Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof…" US Const Amend I; *Cantwell v. Connecticut*, 310 US 296, 303 [1940]; *Kane v. De Blasio*, 19 F4th 152, 163 [2d Cir 2021]. The Free Exercise Clause protects an individual's private right to religious belief, as well as "the performance of (or abstention from) physical acts that constitute the free exercise of religion." *Kane*, 19 F4th at 163-164, quoting *Cent. Rabbinical Cong. of the United States v. New York City Dept. of Health & Mental Hygiene*, 763 F3d 183, 193 [2d Cir 2014]. However, the Free Exercise Clause "does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes)." *Ferrelli*, 2022 US Dist LEXIS 39929 at *15, 2022 WL 673863 at *5, quoting *Cent. Rabbinical*, 763 F3d at 193, quoting *Empl. Div. v. Smith*, 494 US 872, 879 [1990]. "Such laws are subject to a rational basis review." *Id.* Where challenged restrictions are not neutral and of general applicability, they must satisfy strict scrutiny, and must be narrowly tailored to serve a compelling state interest. *Ferrelli*, 2022 US Dist LEXIS 39929 at *15-16, 2022 WL 673863 at *5, *R.C. Diocese v. Cuomo*, 141 SCt 63, 67 [2020].

**a. Neutrality**

Petitioners argue that although the Vaccination Policy permits both medical and religious exemptions, the requests for religious exemptions made by petitioners have all been denied. Petitioners argue that the state fails to act neutrally when it proceeds in a manner intolerant of religious beliefs or restricts practices because of their religious nature.

In evaluating whether a mandate is neutral, the court first considers whether the mandate is facially discriminatory. *Kane*, 19 F4th at 160. While facial neutrality alone is not determinative, the court also considers whether there are "'subtle departures' from religious neutrality, as well as 'the historical background of the decision under challenge, the specific events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decision-making body.'" *Kane*, 19 F4th at 164. A law is not neutral if it is "specifically directed at [a] religious practice." *Cent. Rabbinical Cong*. 763 F3d at 193.

The Vaccination Policy requires that "all judges and non-judicial personnel" be "vaccinated by September 27, 2021, unless otherwise approved for an exemption due to medical reasons or sincerely held religious beliefs." (NYSCEF Doc. No. 6). Accordingly, as indicated in the September 10, 2021 Memorandum sent to all non-judicial personnel,[3] the Vaccination Policy applies to all judicial and non-judicial UCS employees. The Vaccination Policy does not single out employees who decline the vaccination on religious grounds. Nor do petitioners allege or cite to any statements by the respondents which would render the Vaccination Policy non-neutral. Accordingly, this court finds that the Vaccination Policy is neutral.

**b. General Applicability**

In arguing that the Vaccination Policy is not neutral, petitioners assert that the Vaccination Policy must therefore satisfy the strict scrutiny test, without discussing the general applicability of the Vaccination Policy.

"A law is not generally applicable if either 'it invites the government to consider the particular reasons for a person's conduct by providing a mechanism for individualized

[3] According to the Memorandum, the Chief Administrative Judge outlined the program for judges in a separate document.

exemptions;' or 'it prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way.'" *Ferrelli*, 2022 US Dist LEXIS 39929 at *17, 2022 WL 673863 at *6, quoting *Kane*, 19 F4th at 165. To demonstrate that a law is not generally applicable, "there must be some showing that the exemption procedures allow secularly motivated conduct to be favored over religiously motivated conduct." *Ferrelli*, 2022 US Dist LEXIS 39929 at *17-18, 2022 WL 673863 at *6, quoting *Kane*, 19 F4th at 165.

UCS allowed employees to seek medical or religious exemptions from the Vaccination Policy. Petitioners have not demonstrated that respondents have created a system of individualized exemptions and refused to extend it to religious hardships. Nor have petitioners made a showing that the medical exemption has been favored over the religious exemption. Particularly, as of March 21, 2022, UCS has granted 549 religious exemptions (59.4%), while denying 375 religious exemptions (40.6%), and has granted 94 medical exemptions (32.3%), and denied 197 medical exemptions (67.7%). (NYSCEF Doc. No. 39, ¶15). Accordingly, this court finds that the Vaccination Policy constitutes one of general applicability.

**c. Application of the Religious Exemption Procedure to Petitioners**

Petitioners argue that UCS evaluated applications for religious exemptions in a way specifically designed to pass judgment on the legitimacy of the exemption applicants' professed religious beliefs, and therefore invited UCS to decide which professed religious belief is "worthy of solicitude."

Applications for religious exemptions to the Vaccination Policy were considered to determine if UCS employees had sincerely held religious beliefs and practices that prohibited them from receiving a COVID-19 vaccine. (NYSCEF Doc. No. 6). UCS employees seeking a religious exemption were to "submit their request by 5:00 p.m. on September 27, 2021, using the appropriate exemption form." (NYSCEF Doc. No. 6). The exemption request form was to be uploaded through the UCS Employee Web Portal. (NYSCEF Doc. No. 6). The Memorandum clearly stated that "[n]o exemption requests will be considered unless they are fully completed on the appropriate form and filed through the Portal." (NYSCEF Doc. No. 6). "Applications for religious exemption must contain the employee's written, signed and notarized statement detailing the religious basis for his/her objection to COVD-19 vaccination and the religious principle(s) that guild the objections to COVID-19 vaccination." (NYSCEF Doc. No. 6). Further, upon submitting an exemption

application, some employees were asked to fill out Supplemental Forms. (NYSCEF Doc. No. 6). Upon receipt of the supplemental form, employees were to upload the form to the UCS Employee Web Portal within 10 days. (NYSCEF Doc. No. 8). Employees were warned that "[f]ailure to submit this completed notarized supplemental form within the ten-day timeframe may result in your request for an exemption to be rejected." (NYSCEF Doc. No. 8). Furthermore, any judge or UCS employee who refuses to provide the requested information in the supplemental form is required to comply with the Vaccination Policy. (NYSCEF Doc. No. 8).

This court finds unavailing petitioners' argument that UCS's evaluation of religious exemptions is designed to pass judgment on the legitimacy of the exemption and invites UCS to decide which religious belief is "worthy of solicitude". "While a state.is not entitled to evaluate the legitimacy of religious beliefs, courts have made clear that the state is permitted to assess whether a belief is sincerely held and religious in nature." *Ferrelli*, 2022 US Dist LEXIS 39929 at *26, 2022 WL 673863 at *8, citing *United States v. Seeger*, 380 US 163, 185 [1965]; *Kane v. De Blasio*, 2021 US Dist LEXIS 239124, *13-14, 2021 WL 5909134, *5 [SD NY December 14, 2021 No. 21-CV-7863; 21-CV-8773].

Petitioners were not extended the religious exemptions based upon the following:

1) Petitioner Brignall did not answer the questions on the Supplemental Form and indicated that she had previously obtained vaccinations. (NYSCEF Doc. Nos. 1, ¶115; 7 and 39, ¶21).
2) Petitioner Cherenowsky submitted a late request for a religious exemption on October 18, 2021, and only partially completed the Supplemental Form. (NYSCEF Doc. Nos. 1, ¶127; 8 and 39, ¶22).
3) Petitioner DiPierro failed to state any nexus between his refusal to get the COVID-19 vaccine and his religious beliefs. (NYSCEF Doc. Nos. 1, ¶140; 9 and 39, ¶23).
4) Petitioner Hawley failed to include any discussion of her religious beliefs, and her post-denial untimely supplemental submissions dated November 22, 2021, failed to comply with the procedures established for the review process. (NYSCEF Doc. Nos. 1, ¶153; 10 and 39, ¶24).
5) Petitioner Kaelin submitted only a partially completed Supplemental Form. (NYSCEF Doc. Nos. 1, ¶164; 11 and 39, ¶25).

6) Petitioner Nania refused to complete the Supplemental Form requested by the Committee. (NYSCEF Doc. Nos. 1, ¶179; 12 and 39, ¶26).

7) Petitioner Pratt's untimely exemption request dated October 29, 2021, and supplemental submission dated December 6, 2021, failed to provide any information about what religious beliefs she held, as well as failed to comply with the procedures established for the review process. (NYSCEF Doc. Nos. 1, ¶192; 13 and 39, ¶27).

While petitioners raise concerns over the religious exemption process, in that the review process included consideration of: (i) whether the expressed belief was religious; (ii) whether the express belief was sincerely held; (iii) whether there was a nexus between the employee's religious belief and the decision to abstain from the COVID-19 vaccination; and (iv) whether the expressed beliefs were personal feelings against vaccination akin to a secular philosophy, such review falls within UCS's authority to determine whether a belief is sincerely held and religious in nature. *Seeger*, 380 US at 185. Accordingly, this court finds that the UCS Vaccination Policy exemption as applied to petitioners was neutral and generally applicable.

**d. Rational Basis Standard**

In arguing that the Vaccination Policy is not neutral, petitioners assert that the Vaccination Policy must therefore satisfy the strict scrutiny test, without discussing the rational basis standard. Respondents argue that the Vaccination Policy easily meets the rational basis standard in that UCS has chosen a means for addressing a legitimate goal that is rationally related to achieving the goal.

Where a mandate is deemed neutral and generally applicable, only a rational basis review is warranted. *Ferrelli*, 2022 US Dist LEXIS 39929 at *18, 2022 WL 673863 at *6. The rational basis standard "requires only that Defendants have chosen a 'means for addressing a legitimate goal that is rationally related to achieving that goal.'" *Ferrelli*, 2022 US Dist LEXIS 39929 at *19, 2022 WL 673863 at *6, quoting *Kane*, 19 F14th at 166.

As this court has found that the Vaccination Policy is neutral and generally applicable, the rational basis standard applies. UCS determined that to restart in-person operations and to maintain a safe environment for judges, non-judicial employees, and court users, it was necessary to implement the widespread use of vaccinations among its employees. (NYSCEF Doc. No. 39, ¶4-5). UCS deemed the Vaccination Policy essential to minimize the spread of COVID-19 throughout

UCS courtrooms and facilities, thereby protecting the safety of UCS employees and the public, avoiding shortages of essential staff members due to COVID-19 related illness and isolation periods, and enabling UCS to maintain an accessible forum for the administration of justice in accordance with its core mission. (NYSCEF Doc. No. 39, ¶5). Accordingly, implementing the Vaccination Policy for all judicial and non-judicial UCS employees is rationally related to achieving the goal of protecting the safety and health of UCS employees and the public, as well as maintaining an accessible forum for the administration of justice. *Ferrelli*, 2022 US Dist LEXIS 39929 at *19, 2022 WL 673863 at *6 [ND NY 2022], quoting *Kane*, 19 F14th at 166. Accordingly, the Vaccination Policy satisfies the rational basis standard. Petitioners have therefore failed to demonstrate a likelihood of success on the merits of their freedom of expression cause of action.[4]

**ii. Irreparable Harm**

Here, petitioners argue that they are entitled to injunctive relief due to the loss of constitutional freedoms.

The second prong of the preliminary injunction test is whether there will be irreparable harm if the provisional relief is withheld. *Axelrod*, 73 NY2d at 750. "A presumption of irreparable injury flows from a violation of constitutional rights." *We the Patriots USA, Inc. v. Hochul*, 17 F4th 266, 294 [2d Cir 2021], quoting *Agudath Isr. v. Cuomo*, 983 F3d 620, 636 [2d Cir 2020]. Moreover, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Agudath*, 983 F3d at 636.

As discussed above, petitioners have failed to demonstrate that they are likely to succeed on their claim that the manner in which respondents considered their applications for religious exemptions violate the Free Exercise Clause. Accordingly, petitioners are not entitled to a presumption of irreparable injury which would entitle them to injunctive relief. Furthermore, as the court has not found a likelihood of success on the merits, it need not consider whether

---

[4] Even assuming strict scrutiny applies, the Court finds that the religious exemption process utilized by UCS satisfies that rigorous test. *Ferrelli*, 2022 US Dist LEXIS 39929 at *25-26, 2022 WL 673863 at *8. Minimizing the spread of COVID-19 in UCS facilities is a compelling interest. *Id.* Moreover, UCS's religious exemption process, including a limited factual inquiry, is narrowly tailored to grant exemptions only to those UCS employees with sincerely held religious objections. *Id.*

petitioners have shown irreparable harm. *Ferrelli*, 2022 US Dist LEXIS 39929 at *27-28, 2022 WL 673863 at *9.

**iii. Balance of Equities**

Petitioners allege that it is never in the public interest to enforce a policy which violates the constitution. Petitioners further allege that UCS will not be harmed by permitting petitioners to return to work.

The third prong of the preliminary injunction review is a balancing of the equities. *Axelrod*, 73 NY2d at 750. The courts must weigh the interests of the general public and the interest of the parties to the litigation. *Destiny USA Holdings*, 69 AD3d at 223.

However, as the court has not found a likelihood of success on the merits or irreparable harm, it need not consider whether the balance of equities weigh in favor of granting an injunction. *Ferrelli*, 2022 US Dist LEXIS 39929 at *27-28, 2022 WL 673863 at *9.

**II. Motion to Dismiss**

Respondents in opposition to petitioners' order to show cause, filed a cross-motion to dismiss petitioners' Verified Petition and Complaint on the basis that it fails to state viable causes of action or allege the required elements of each cause of action. Petitioners, in opposition, assert that their Verified Petition and Complaint does assert detailed factual allegations in support of their cause of action, and that essential facts may be discovered and utilized to supplement opposition to a CPLR Rule 3211 motion to dismiss.

"A party may move for judgment dismissing one or more causes of action asserted against him on the ground that…the pleading fails to state a cause of action." CPLR 3211(a)(7). On a motion to dismiss pursuant to CPLR 3211, the court must accept each and every allegation as true, and liberally construe the allegations in the light most favorable to the pleading party and determine only whether the facts as alleged fit any cognizable legal theory. *Godino v. Premier Salons, Ltd*, 140 AD3d 1118, 1119 [2d Dept 2016]; *Leon v. Martinez*, 84 NY2d 83, 87-88 [1994]; *Nenno v. Blue Cross & Blue Shield*, 303 AD2d 930, 932 [4th Dept 2003]. However, bare legal conclusions which lack factual specificity and factual claims which are flatly contradicted by the evidence are not sufficient to withstand a motion to dismiss. *Vanscoy v. Namic USA Corp.*, 234 AD2d 680, 682 [3d Dept 1996]; *Scarfone v. Village of Ossining*, 23 AD3d 540, 541 [2d Dept 2005]; *Olszewski v. Waters of Orchard Park*, 303 AD2d 995, 995 [4th Dept 2003]. Even if the

facts as alleged in a complaint are accepted by the court as true, a complaint may still be dismissed if those allegations fail to give rise to a cause of action cognizable under the law. *Rosner v. Paley*, 65 NY2d 736, 738 [1985]. Additionally, failure to oppose an argument seeking to dismiss a claim constitutes abandonment of such claim. *Ellis v. Emerson*, 34 AD3d 1334, 1335 [4th Dept 2006]; *Kronick v. L.P. Thebault Co., Inc.*, 70 AD3d 648, 649 [2d Dept 2010]; *Genovese v. Gambino*, 309 AD2d 832, 833 [2d Dept 2003].

**A. Fourteenth Amendment – 42 USC 1983 Claims**

Respondents move to dismiss petitioners' claims that the Vaccination Policy violated their Fourteenth Amendment rights.

**i. Dismissal of Petitioners' 42 USC 1983 Claim against Respondent Unified Court System**

Respondents argue that petitioners' Section 1983 claim against respondent UCS should be dismissed as it is not a "person" within the meaning of the statute.

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory….or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…" 42 USC 1983.

UCS is not a "person" within the meaning of 42 USC 1983. *Brown v. New York State Unified Ct. Sys.*, 261 Fed Appx 307, 307-308 [2d Cir 2008]; *Zuckerman v. Appellate Div., Second Dept., Supreme Ct. of New York*, 421 F2d 625, 626 [2d Cir 1970]. Consequently, petitioners' Verified Petition and Complaint fails to state a 42 USC 1983 claim for relief against respondent UCS. Moreover, petitioners failed to specifically oppose respondents' motion to dismiss as it relates to respondent UCS. Accordingly, respondents' motion to dismiss petitioners' 42 USC 1983 claim against respondent UCS is granted.

**ii. Dismissal of Petitioners 42 USC 1983 Claim against Respondents Justin A. Barry and Nancy J. Barry**

Respondents further argue that petitioners' 42 USC 1983 claim against respondents Justin A. Barry and Nancy J. Barry should also be dismissed. Respondents argue that in order to obtain any prospective injunctive relief, petitioners must show that respondents Justin A. Barry and Nancy J. Barry have a particular duty to enforce the Vaccination Policy and demonstrated a willingness to exercise that duty.

Where the moving party is seeking injunctive relief, there must be "both a particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." *Roberson v. Cuomo*, 524 FSupp3d 196, 223 [SD NY 2021].

Petitioners' Verified Petition and Complaint alleges, in part, that respondents Nancy J. Barry and Justin A. Barry "had a duty to enforce the Vaccine Mandate as promulgated by Judge Marks" and further "demonstrated willingness to exercise their duty by ordering the termination of unvaccinated UCS employees." (NYSCEF Doc. No. 1, pg. 23). In support of their cross-motion, respondents submitted the affidavit of Justin A. Barry dated March 29, 2022, in which he asserts that neither he nor Nancy J. Barry have authority to unilaterally enforce the Vaccination Policy or to cause UCS to refrain from enforcing it, or to implement employment consequences which may flow from an employee's non-compliance with the Vaccination Policy. (NYSCEF Doc. No. 39, ¶7). Petitioners' bare legal conclusions as stated in their Verified Petition and Complaint are insufficient to state a cause of action. *Vanscoy*, 234 AD2d at 682; *Scarfone*, 23 AD3d at 541. Additionally, petitioners failed to specifically oppose respondents' motion to dismiss as it relates to respondents Justin A. Barry and Nancy J. Barry. Accordingly, respondents' cross-motion to dismiss petitioners' 42 USC 1983 claim against Justin A. Barry and Nancy J. Barry is granted.

**iii. Right to Privacy**

Respondents argue that petitioners' right to privacy claim should be dismissed, as such claims are analyzed within the due process framework. Respondents argue that petitioners cannot show that a protected interest is at issue.

Petitioners allege in their Verified Petition and Complaint that they are guaranteed the right to privacy, personal dignity, and individual autonomy which "are central to the liberty protected by the Fourteenth Amendment." (NYSCEF Doc. No. 1, pg. 37). Petitioners' Verified Petition and

Complaint alleges that respondents have forced petitioners to choose between continued employment and their constitutional right to privacy and personal autonomy in violation of the Fourteenth Amendment. (NYSCEF Doc. No. 1, pg. 38). However, the right to privacy is not absolute, and a constitutional violation will only be found when "the individual's interest in privacy outweighs the government's interest in breaching it." *Braden v. Sturges*, 139 NYS3d 400, 402 [3d Dept 2020]. Petitioners have failed to state a basis for concluding that the Vaccination Policy violates a fundamental constitutional right that is outweighed by UCS's interest in curbing COVID-19 in UCS facilities. "The Constitution embodies no fundamental right that in and of itself would render vaccine requirements imposed in the public interest, in the face of a public health emergency unconstitutional", including 'medical freedom' and 'bodily autonomy.' *We The Patriots*, 17 F4th at 293; *Donohue v. Hochul*, 2022 US Dist LEXIS 40138, *26, 2022 WL 673636, *9 [SD NY March 7, 2022, No. 21-CV-8463]; *Jacobson v. Massachusetts*, 197 US 11, 25-31, 37 [1905]; *Phillips v. City of New York*, 775 F3d 538, 542-543 [2d Cir 2015]. Consequently, respondents' motion to dismiss petitioners' right to privacy claim is granted.

**iv. Substantive Due Process**

Respondents argue that petitioners' substantive due process claims should be dismissed, as such claim requires a deprivation of a constitutionally protected right, and that property interests related to employment are not among protected fundamental rights.

"Substantive due process rights safeguard persons against the government's exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Guettlein v. United States Merchant Marine Academy*, 2021 US Dist LEXIS 244966, *10, 2021 WL 6015192, *4 [ED NY December 20, 2021, No. 21-CV-6443], quoting *Southerland v. City of New York*, 680 F3d 127, 151 [2d Cir 2012]. In analyzing a substantive due process claim, the constitutional right at stake must be identified and the moving party "'must demonstrate that the state action was so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience' such that the Due Process Clause 'would not countenance it even were it accompanied by full procedural protection.'" *Guettlein*, 2021 US Dist LEXIS 244966 at *10-11, 2021 WL 6015192 at *4, quoting *Hurd v. Fredenburgh*, 984 F3d 1075, 1087 [2d Cir 2021]. However, "not all rights are entitled to protection. Only rights that are fundamental or implicit in the concept of ordered liberty are accorded protection under substantive due process." *Maniscalco v. New York*

*City Dept. of Educ.*, 2021 US Dist LEXIS 184971, *5, 2021 WL 4344267, *2 [ED NY September 23, 2021, No. 21-CV-5055], citing *Washington v. Glucksberg*, 521 US 702, 720-721 [1997].

Petitioners allege in their Verified Petition and Complaint that they have a liberty and/or property interest in continuing their employment while maintaining bodily autonomy free from "arbitrary deprivation from the state." (NYSCEF Doc. No. 1, pg. 39). The Memorandum distributed to non-judicial UCS employees, including petitioners, stated that "employees who fail to comply with the provisions of this Policy are prohibited from reporting to work and may be considered absent without authorization…Continued failure to comply may result in disciplinary action, up to and including termination." (NYSCEF Doc. No. 6). The Due Process Clause "secures the liberty to pursue a calling or occupation, and not the right to a specific job." *Maniscalco*, 2021 US Dist LEXIS 184971 at *6, 2021 WL 4344267 at *3. Although petitioners make an argument that the Vaccination Policy may end their careers, the Vaccination Policy does not completely prohibit petitioners from engaging in their chosen profession. Petitioners were given a choice, get vaccinated, request an exemption, or pursue similar employment at another public entity or a private entity without such mandates. Accordingly, any liberty and/or property interest in petitioner's continue public employment does not rise to the level of a fundamental right protected by substantive due process. *Guettlein*, 2021 US Dist LEXIS 244966 at *13-14, 2021 WL 6015192 at *5; *Maniscalco*, 2021 US Dist LEXIS 184971 at *5-6, 2021 WL 4344267 at *2. Moreover, mandating vaccination after the vaccine was given FDA approval in order to minimize the spread of COVID-19 throughout the UCS courtrooms and its facilities, during a public health crisis, is not so outrageous that it would violate petitioners' substantive due process rights. *Maniscalco*, 2021 US Dist LEXIS 184971 at *7-9, 2021 WL 4344267 at *3. Although petitioners assert that there are other less restrictive means for protecting UCS employees' health and welfare, it does not shock the conscience for UCS to conclude that vaccination was the best course of action, especially in light of the emergence of new COVID-19 variants at that time. *Maniscalco*, 2021 US Dist LEXIS 184971 at *8-9, 2021 WL 4344267 at *3. "A State may mandate vaccinations without violating the liberty secured by the Fourteenth Amendment of the United States Constitution." *C.F.*, 191 AD3d at 71, citing *Jacobson*, 197 US at 29-30; *New York City Mun. Labor Comm. v. City of New York*, 73 Misc3d 621, 626 [Sup Ct, New York County 2021, Laurence, J.]; *Phillips*, 775 F3d at 542. Consequently, respondents' motion to dismiss petitioners' substantive due process claim is granted.

**v. Procedural Due Process**

Respondents argue that petitioners' procedural due process claims should be dismissed, as such claims require a deprivation of a constitutionally protected right. Respondents argue that property interests related to employment are not among protected fundamental rights, and that constitutional rights may be reasonably restrained to protect public health.

A claim under procedural due process requires petitioners to establish the possession of a protected liberty or property interest, and a deprivation of that interest without constitutionally adequate process. *Broecker*, 2022 US Dist LEXIS 25104 at *14, 2022 WL 426113 at *5; citing *O'Connor v. Pierson*, 426 F3d 187, 195-196 [2d Cir 2005]. Petitioners allege in their Verified Petition and Complaint that they are public employees of UCS and have a liberty and/or property interest in their continued employment. (NYSCEF Doc. No. 1, pg. 41). Petitioners allege that by way of the Vaccination Policy, petitioners were given an ultimatum to submit to the vaccination or lose their employment. The right to Due Process protection arises when the moving party is "completely prohibited from engaging in his or her chosen profession." *Maniscalco*, 2021 US Dist. LEXIS 184971 at *6, 2021 WL 4344267 at *2, citing *Hu v. City of New York*, 927 F3d 81, 102 [2d Cir 2019]. Petitioners arguably have a protected property interest in their continued employment if the employee is guaranteed continued employment subject to discharge only for cause. *Marciano*, 2022 US Dist LEXIS 41151 at *25, 2022 WL 678779 at *9; *O'Connor*, 426 F3d at 196; *Broecker*, 2022 US Dist LEXIS 25104, *14, 2022 WL 426113 at *5. However, petitioners fail assert that they possess guaranteed continued employment subject to discharge only for cause. Accordingly, petitioners have failed to sufficiently assert that they have a protected property interest in their continued public employment in support of their procedural due process claim.

Petitioners additionally argue that they were not given fair notice of the Vaccination Policy because the Vaccination Policy failed to specify the need for all UCS employees to be vaccinated from COVID-19 and was therefore defective. However, only upon the finding of a protected property interest, must the court determine whether available processes are adequate. *Broecker*, 2022 US Dist LEXIS 25104 at *14, 2022 WL 426113 at *5. Nevertheless, petitioners' own exhibit (NYSCEF Doc. No. 6) demonstrates that a Memorandum was sent to all non-judicial personnel, including petitioners, providing them ample notice. The Vaccination Policy Memorandum formalized the requirement that all judges and non-judicial personnel were to be vaccinated by September 27, 2021. (NYSCEF Doc. No. 6). The Vaccination Policy Memorandum further

advised UCS employees of their ability to seek an exemption for medical reasons or sincerely held religious beliefs, with the exemption request submission due by September 27, 2021, at 5:00 p.m. (NYSCEF Doc. No. 6). The Vaccination Policy Memorandum additionally advised UCS employees that failure to comply with the Vaccination Policy prohibits that employee from reporting to work and that continued failure to comply may result in disciplinary action, up to and including termination. Accordingly, this court finds that "petitioners were provided sufficient notice and afforded an opportunity to be heard through the exemption process. The Constitution mandates only that such a process include, at a minimum, notice and opportunity to respond." *Marciano*, 2022 US Dist LEXIS 41151 at *27, 2022 WL 678779 at *10, quoting *O'Connor*, 426 F3d at 198. Petitioners fail to articulate how such a process was constitutionally inadequate. Consequently, this court finds that the Vaccination Policy provided notice and an opportunity to respond, and grants respondents' motion to dismiss petitioners' procedural due process cause of action.

**vi. Violation of the Equal Protection Clause**

Respondents aver that petitioners' equal protection claims fail as a matter of law since the assertion that vaccination status is a suspect class is without merit. Respondents further assert that the Vaccination Policy satisfies the rational basis standard as it is rationally related to preserving public health and safety.

The Equal Protection Clause of the Fourteenth Amendment provides that a state may not "deny to any person within its jurisdiction the equal protection of the laws." US Const. amend XIV, § 1. "To establish an equal protection violation, a § 1983 plaintiff must prove '(1) [that he], compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Abadi*, 2022 US Dist LEXIS 21815 at *15-16, 2022 WL 347632 at *7; quoting *Freedom Holdings, Inc. v. Spitzer*, 357 F3d 205, 234 [2d Cir 2004]. "Where the law at issue 'neither burdens a fundamental right nor targets a suspect class,' the Court will uphold a 'classification so long as it bears a rational relation to some legitimate end.'" *Andre-Rodney v. Hochul*, 2021 US Dist. LEXIS 210105, *8, 2021 WL 5050067, *3 [ND NY November 1, 2021, No. 1:21-CV-1053]; quoting *Winston v. City of Syracuse*, 887 F3d 553, 560 [2d Cir 2018].

Petitioners' Verified Petition and Complaint alleges that the Vaccination Policy violates their rights under the Equal Protection Clause. (NYSCEF Doc. No. 1, pgs. 42-45). Petitioners, in their Verified Petition and Complaint, allege that the Vaccination Policy is solely directed at unvaccinated employees and discriminates against them on the basis of their immunity status. (NYSCEF Doc. No.1, pg. 43). Petitioners allege that respondents deprived unvaccinated, naturally immune UCS employees' access to their chosen careers and professions, while permitting vaccinated UCS employees to maintain their respective job positions and careers. (NYSCEF Doc. No. 1, pg. 43). Petitioners allege that such discrimination against identically situated individuals is without any rational basis. (NYSCEF Doc. No. 1, pg. 43). Although petitioners assert that the Vaccination Policy discriminates against them on the basis of their immunity status, petitioners do not allege that the Vaccination Policy discriminates against a protected class. The Vaccination Policy applies to all UCS employees. And as previously discussed, petitioners' asserted interest in continued public employment does not rise to the level of a fundamental right. Accordingly, "[w]here the law at issue 'neither burdens a fundamental right nor targets a suspect class,' the Court will uphold a 'classification so long as it bears a rational relation to some legitimate end.'" *Andre-Rodney*, 2021 US Dist LEXIS 210105 at *8, 2021 WL 5050067 at *3, quoting *Winston*, 887 F3d at 560; *Maniscalco*, 2021 US Dist LEXIS 184971 at *12, 2021 WL 4344267 at *5. As discussed above, the Vaccination Policy has a rational relation to the legitimate goal of curbing COVID-19 in UCS facilities. *Kane*, 19 F4th at 166; *Ferrelli*, 2022 US Dist LEXIS 39929 at *19, 2022 WL 673863 at *6. Consequently, respondents' motion to dismiss petitioners' equal protection clause cause of action is granted.

**B. Dismissal of Petitioner NYS Court Employees for Medical Freedom, Inc.**

Respondents assert that the claims by petitioner NYS Court Employees for Medical Freedom, Inc. should be dismissed for the independent reason that it has no standing to assert them. Based upon the foregoing decision of this court, respondents' motion relating to the dismissal of petitioner NYS Court Employees for Medical Freedom, Inc. is rendered moot.

**C. Attorneys' Fees**

Based upon the foregoing, petitioners' request for attorneys' fees pursuant to 42 USC § 1988(b), is denied, as their Verified Petition and Complaint is dismissed.

**ORDER AND JUDGMENT**

Accordingly, it is hereby:

**ORDERED and ADJUDGED** that petitioners' request for a preliminary injunction on their CPLR Article 78 cause of action is **DENIED**; and it is further

**ORDERED and ADJUDGED** that petitioners' request for a preliminary injunction on their Free Exercise Clause cause of action is **DENIED**; and it is further

**ORDERED and ADJUDGED** that respondents' cross-motion to dismiss petitioners' Verified Petition and Complaint pursuant to CPLR 3211 (a)(7) is **GRANTED**. Petitioners' Order to Show Cause and Verified Petition and Complaint are **DISMISSED**.

Dated: April 13, 2022

[signature]

**HON. KEVIN M. NASCA**
**Supreme Court Justice**

GERALDINE A. REILLY
CHAIRMAN
MICHAEL T. GREASON
RANDALL T. DOUGLAS
JUNE F. O'NEILL
MARILYN P. O'MARA
MEMBERS

STATE OF NEW YORK
UNEMPLOYMENT INSURANCE APPEAL BOARD
PO Box 15126
Albany NY 12212-5126
(518) 402-0205
FAX:(518) 402-6208

EXECUTIVE DIRECTOR
TRACIE L. COVEY
CHIEF ADMINISTRATIVE LAW JUDGE
CHRISTOPHER M. TATE
JUSTIN DENTON
MARK SOKOLOWSKI
PRINCIPAL ADMINISTRATIVE LAW JUDGE

# *DECISION OF THE BOARD*
# *DECISIÓN DE LA JUNTA*

**Mailed and Filed: January 13, 2023**

**IN THE MATTER OF:**

**Appeal Board No. 626048**

**DONNA CICHON**
**40 CONCORD BLVD.**
**CLINTON NY 13323-0000**

**REBECCA L. WITTMAN, ESQ.**
**340 MAIN STREET**
**ONEIDA NY 13421-**

**OFFICE OF COURT ADMINISTRA**
**FOURTH JUDICIAL DEPT**
**200 ELIAZBETH STREET**
**UTICA NY 13502-0000**

**NYS OFFICE OF COURT ADMIN**
**MINDY M JENG ESQ**
**25 BEAVER ST 10TH FL**
**NEW YORK NY 10004**

**OFFICE OF COURT ADMINISTR**
**FOURTH JUCIDIAL DEPT**
**4 EMPIRE STATE PLZ STE 2001**
**ALBANY NY 12223-1400**

**A.S.O. - Appeals Section**
**Department of Labor Office: 801**

**A.L.J. Case No. 122-06155**

PLEASE TAKE NOTICE that the commissioner, or any other party affected by this decision who appeared before the Appeal Board, may appeal questions of law involved in such decision to the Appellate Division of the Supreme Court, Third Department, by written notice mailed to the Unemployment Insurance Appeal Board, PO Box 15126, Albany, New York 12212-5126 within **THIRTY DAYS** from the date this decision was mailed.

POR FAVOR TOME NOTA que el comisionado o cualquier otra parte afectada por esta decision que haya comparecido ante la Junta de Apelaciones puede apelar aspectos legales de dicha decision a Appellate Division of the Supreme Court, Third Department, enviando un aviso escrito a Unemployment Insurance Appeal Board, PO Box 15126, Albany, New York 12212-5126 dentro de los **TREINTA DIAS** a partir de la fecha en que esta decision fue enviada por correo.

**DOCUMENTO IMPORTANTE. PUEDE OBTENER UNA TRADUCCIÓN DEL MISMO LLAMANDO AL 1-888-209-8124 (FUERA DEL ESTADO DE NUEVA YORK 1-877-358-5306)**

PRESENT: RANDALL T. DOUGLAS, MEMBER

The Department of Labor issued the initial determinations disqualifying the claimant from receiving benefits, effective April 8, 2022, on the basis that the claimant voluntarily separated from employment without good cause; and in the alternative, on the basis that the claimant lost employment through misconduct in connection with that employment and

AB 2 (10/06)

holding that the wages paid to the claimant by OFFICE OF COURT ADMINISTRATION prior to April 8, 2022 cannot be used toward the establishment of a claim for benefits. The claimant requested a hearing.

The Administrative Law Judge held a telephone conference hearing at which all parties were accorded a full opportunity to be heard and at which testimony was taken. There were appearances on behalf of the claimant and the employer. By decision filed September 20, 2022 (A.L.J. Case No. 122-06155), the Administrative Law Judge sustained the misconduct determination and did not rule on the issue of voluntary separation from employment without good cause.

The claimant appealed the Judge's decision to the Appeal Board. The Board considered the arguments contained in the written statements submitted on behalf of the claimant and the employer.

Based on the record and testimony in this case, the Board makes the following

FINDINGS OF FACT: The claimant was employed by the Office of Court Administration (OCA) as a court clerk for six years until January 12, 2022. Her duties required her to work in the courthouse, where she interacted with staff and the public.

On September 10, 2021, the employer informed court staff that they were required to be vaccinated against COVID-19 by September 27, 2021, unless they received approval for a medical or religious exemption. The policy provided that employees who failed to comply would be prohibited from reporting to work and could be subject to disciplinary action up to and including termination of employment. The claimant did not apply for a medical exemption but did apply for a religious exemption on October 18, 2021. The application instructed her to "provide a personal written and signed statement detailing the religious basis for your vaccination objection ... the religious principles that guide your objections to vaccination, and the religious basis that prohibits the COVID-19 vaccination." The claimant indicating that although she is a Catholic, she is not following the recommendations of the Pope to become vaccinated and instead was adhering to "religious doctrine." She stated that her true and sincere beliefs prohibited her from receiving the Covid-19 vaccine because it potentially would change her body from how God had created it by altering her cells, which God prohibits; that she believes that abortion is a sin and that because all three covid-19 vaccinations were tested using aborted fetal cells, the vaccine would break her bond with God; and that God had provided her with the antibodies she needs for protection from the virus when she contracted COVID-19 in January 2021. The claimant also asserted that she was protected from discrimination by the employer for her sincerely held religious beliefs, practices and observances under Title VII of the Civil Rights Act of 1964.

On November 18, 2021 the employer requested additional information from the claimant to support her reasons for requesting the exemption. The claimant submitted the requested information on December 2, 2022. In it, she stated that she believed that her body could heal itself although she also indicated that she had undergone four separate surgeries to repair her knee. The claimant also admitted that she takes at least three medications that had been tested using fetal cells and that she has been vaccinated against the flu. After reviewing this additional information, the employer concluded that the claimant's responses were inconsistent with her stated religious beliefs and, on January 3, 2022, denied her request for an exemption. The claimant was notified of the denial and given 10 days to provide proof that she had received the first dose of a COVID-19 vaccination.

The employer subsequently extended the January 13, 2022 vaccination deadline to April 4, 2022. The claimant's employment was terminated on April 7, 2022 because she remained unvaccinated, in violation of the employer's policy.

OPINION: The credible evidence establishes that the claimant's employment ended on April 7, 2022, because she refused to become vaccinated in accordance with the employer's COVID-19 vaccination policy. The claimant knew that she needed to become vaccinated in order to continue her employment. Although she asserts that she has a religious objection to the vaccine, the reasons she provided to the employer in support of her objection were substantially undermined when she acknowledged engaging in health practices that

directly contravene her stated beliefs. In light of this, the employer's denial of her request was not unreasonable.

Further, even where a claimant states a compelling religious reason for not receiving the COVID-19 vaccine, we have previously held that this does not excuse a failure to comply with an employer's vaccine requirement. In Appeal Board No. 622828, the Board applied a compelling interest test (*citing Sherbert v. Verner,* 374 U.S. 398 [1963]) and found that the employer's vaccine policy, which furthered the compelling governmental interest of combatting the virus and protecting the health and safety of its employees and the public, was justified and reasonable. In finding that the claimant's refusal to get vaccinated constituted a voluntary quit without good cause, the Board noted that "the Supreme Court of the United States has held that '... an individual's religious beliefs [do not] excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate' (see *Employment Div. v. Smith*, 494 U.S. 872, 879 [1990])." The same is true here. Given the neutrality of the employer's vaccine requirement and the compelling governmental interest behind it, it was not improper for the employer to enforce this general health requirement.

Under these circumstances, the claimant's decision to not get vaccinated was a voluntary act that caused her separation from employment. Even if based on religious grounds, that choice does not provide her with good cause to end continuing work for unemployment insurance purposes. Accordingly, we conclude that the claimant's employment ended under disqualifying conditions. In view of our decision, it is not necessary to rule on the alternate determination of misconduct.

DECISION: The decision of the Administrative Law Judge is modified as follows and, as so modified, is affirmed.

The initial determination, disqualifying the claimant from receiving benefits, effective April 8, 2022, on the basis that the claimant voluntarily separated from employment without good cause, is sustained.

The claimant is denied benefits with respect to the issues decided herein.

HP:PN

RANDALL T. DOUGLAS, MEMBER

STATE OF NEW YORK
UNEMPLOYMENT INSURANCE APPEAL BOARD
PO Box 15126
Albany NY 12212-5126
(518) 402-0205
FAX:(518) 402-6208

GERALDINE A. REILLY
CHAIRMAN
MICHAEL T. GREASON
RANDALL T. DOUGLAS
JUNE F. O'NEILL
MARILYN P. O'MARA
MEMBERS

EXECUTIVE DIRECTOR
TRACIE L. COVEY
CHIEF ADMINISTRATIVE LAW JUDGE
CHRISTOPHER M. TATE
JUSTIN DENTON
MARK SOKOLOWSKI
PRINCIPAL ADMINISTRATIVE LAW JUDGE

## *DECISION OF THE BOARD*
## *DECISIÓN DE LA JUNTA*

Mailed and Filed: October 12, 2022

IN THE MATTER OF:

Appeal Board No. 624691

MARIE ZWEIG
5 HICKORY CT
MANHASSET NY 11030-3924

APPELLATE DIV - SECOND DEP
TRANSITION PAYROLL
45 MONROE PL
BROOKLYN NY 11201-2694

A.S.O. - Appeals Section
Department of Labor Office: 831

A.L.J. Case No. 022-13908

PLEASE TAKE NOTICE that the commissioner, or any other party affected by this decision who appeared before the Appeal Board, may appeal questions of law involved in such decision to the Appellate Division of the Supreme Court, Third Department, by written notice mailed to the Unemployment Insurance Appeal Board, PO Box 15126, Albany, New York 12212-5126 within THIRTY DAYS from the date this decision was mailed.

POR FAVOR TOME NOTA que el comisionado o cualquier otra parte afectada por esta decision que haya comparecido ante la Junta de Apelaciones puede apelar aspectos legales de dicha decision a Appellate Division of the Supreme Court, Third Department, enviando un aviso escrito a Unemployment Insurance Appeal Board, PO Box 15126, Albany, New York 12212-5126 dentro de los TREINTA DIAS a partir de la fecha en que esta decision fue enviada por correo.

DOCUMENTO IMPORTANTE. PUEDE OBTENER UNA TRADUCCIÓN DEL MISMO LLAMANDO AL 1-888-209-8124 (FUERA DEL ESTADO DE NUEVA YORK 1-877-358-5306)

PRESENT: MICHAEL T. GREASON, MEMBER

The Department of Labor issued the initial determinations disqualifying the claimant from receiving benefits, effective April 7, 2022, on the basis that the claimant voluntarily separated from employment without good cause; and in the alternative, disqualifying the claimant from receiving benefits, effective April 7, 2022, on the basis that the claimant lost employment through misconduct in connection with that employment and holding that the wages paid to the claimant by APPELLATE DIV - SECOND DEP prior to April 7, 2022 cannot be used toward the establishment of a claim for benefits. The claimant requested a hearing.

The Administrative Law Judge held a telephone conference hearing at which all parties were accorded a full opportunity to be heard and at which testimony was taken. There were appearances by the claimant and on behalf of the employer. By decision filed June 27, 2022 (A.L.J. Case No. 022-13908), the Administrative Law Judge sustained the initial determination of voluntary leaving of employment without good cause and found the issue of misconduct academic.

The claimant appealed the Judge's decision to the Appeal Board, insofar as it sustained the initial determination of voluntary leaving of employment without good cause. The Board considered the arguments contained in the written statements submitted by the claimant and on behalf of the employer.

We have reviewed the entire record and have considered the testimony and other evidence. It appears that no errors of fact or law have been made. The findings of fact and the opinion of the Administrative Law Judge are fully supported by the record and, therefore, are adopted as the findings of fact and the opinion of the Board.

DECISION: The decision of the Administrative Law Judge, insofar as appealed from, is affirmed.

The initial determination, disqualifying the claimant from receiving benefits, effective April 7, 2022, on the basis that the claimant voluntarily separated from employment without good cause, is sustained.

The claimant is denied benefits with respect to the issues decided herein.

PW:PN MICHAEL T. GREASON, MEMBER

**Maj. Paul Arcati**

**From:** Mindy Jeng
**Sent:** Tuesday, January 4, 2022 10:17 AM
**To:** Maj. Paul Arcati; Antonio Diaz
**Subject:** Jessica Bergin

Hello,
Jessica Bergin submitted a religious exemption request that was denied, and she is due to submit proof of vaccination by January 10. She filed a new religious exemption request yesterday. The Committee's decisions are final, and the new request will not be considered. I am deactivating her latest request.

Thank you,
Mindy

Mindy M. Jeng, Esq.
Administrative Counsel
New York State Office of Court Administration
25 Beaver Street, 11th Floor
New York, NY 10004
(212) 428-2140
mjeng@nycourts.gov
Pronouns: she/her/hers

Please be CAREFUL when clicking links or opening attachments.

J. Barry
A We were looking for really just yes-or-no answers in the questions to number one, two and three. We were looking for an explanation if the answers were yes in the subsequent question.
Again, we were looking for yes-or-no answers in four, five, six, seven and eight, and if the answer to eight was no, we were looking for an explanation as to how she would square her taking one vaccine or these vaccines rather than COVID-19 vaccines.
In Section B, we were looking for answers to those specific questions. She referred us to her statement which did not address any of those particular questions, and it's a fine statement that we would have taken no objection to as an attachment to the supplemental form, but we were specifically looking for direct answers to all the questions in A and B.
Q Why didn't anybody from UCS respond to Ms. Bergin and tell her that the committee was looking for specific answers to the questions in Section A and Section B and that what she gave, while fine in and of itself, was not the information you needed to make a final decision on her



J. Barry
application?
A Again, it was part of the process that we developed for the large amounts of applications that were made. We felt that the information and instructions on each of the forms that we asked the individuals to submit were very specific and clear, and if an individual refused to answer them, it was clear to us that they didn't want to answer them and that's fine, but it went to whether the individual was sincere in their explanation -- their religious beliefs and that's what we were trying to gauge.
Q Would it therefore have been the committee's assessment that Ms. Bergin was not sincere in her objection to the -- in her religious objection to the COVID-19 vaccination, or rather that the committee didn't have enough information to make that decision?
MR. SIUDZINSKI: Objection. You can answer.
A I can't get into the head of each committee member. It could be one or both.
Q Either way, ultimately this submission was considered insufficient in order to grant her an approval for her religious exemption?



J. Barry
A Correct.
Q Are you aware of any other reason besides the nonresponsiveness of her supplemental form for why her religious exemption application was denied?
A No.
Q If we can take a look please at Exhibit 12.
(Plaintiff's Exhibit 13, Marked for Identification.)
BY MR. WARSHAWSKY:
Q Strike that. Exhibit 13. Exhibit 13, I will describe for the record. This is a six-page document. It's not Bates-stamped. It is another supplemental affidavit form from Ms. Bergin, and this one for identification purposes was notarized on the 3rd of January 2022.
Do you have Plaintiff's Exhibit 13 in front of you?
A I do.
Q Do you know whether or not this copy of Ms. Bergin's supplemental form was ever submitted to any members of the committee to review?
A I have no direct knowledge of it, but I would doubt it.
Q Why would you doubt it?



J. Barry
A It looks like a second submission, which we did not entertain.
Q Did you entertain any second submissions from any employees during this process?
A Not to my knowledge, no.
Q Now, granted this is a hypothetical question, but had Ms. Bergin submitted the answers to the supplemental form that we see in Exhibit 13 as part of her original submission in response to the committee's query, would her application have been approved?
A I would have --
MR. SIUDZINSKI: Objection. You can answer.
A I would have voted for the application to be approved.
Q Thank you very much. I have a few wrap-up questions.
Mr. Barry, during today's deposition, have you testified truthfully and to the best of your knowledge in preparation as a 30(b)(6) witness?
A Yes.
Q Did you understand my questions today?
A Yes.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
JESSICA BERGIN,

Ind. No. 22-CV-5264 (BMC)

Plaintiff,

-against-

**AFFIDAVIT OF JUSTIN BARRY**

NEW YORK STATE UNIFIED COURT SYSTEM,

Defendant.
-------------------------------------------------------------------X

STATE OF NEW YORK )
)ss:
COUNTY OF NEW YORK )

JUSTIN A. BARRY, being duly sworn, deposes and says:

1. I am employed as Chief of Administration by the State of New York – Unified Court System (the "UCS") and have held that position since July 8, 2021.

2. In my role as Chief of Administration, I assist New York State Chief Judge Rowan Wilson, Chief Administrative Judge Joseph A. Zayas, and First Deputy Chief Administrative Judge Norman St. George in the operation of UCS. My responsibilities include developing protocols and procedures to ensure that the UCS is a safe and accessible forum to both the public and UCS employees all over New York State.

3. These responsibilities directly support UCS's core mission of ensuring meaningful access to justice for the millions of litigants who use the court system. Many, if not most, public users of the court system--criminal defendants, civil litigants, and prospective jurors--are there involuntarily and, in many cases, under direct compulsion by the State. Our commitment to make the court system accessible requires that we take all appropriate steps to ensure the safest and healthiest environment possible for the many individuals who need to access the legal system, as

well as the judicial and non-judicial employees of UCS.

4. The UCS is comprised of approximately 220 buildings spread throughout each of New York's 62 counties and currently employs approximately 16,200 judicial and non-judicial staff with a statewide annual budget of $3.4 billion for the fiscal year of 2023-2024.

5. I am submitting this affidavit in support of UCS's motion for summary judgment and in opposition to plaintiff's proposed motion for summary judgment. I have personal knowledge of the facts set forth in this affidavit.

***My Prior Affirmations Regarding UCS and UCS's Former Vaccination Policy***

6. In October 2021, in an action brought by various UCS employee unions in the Supreme Court of the State of New York, County of Albany, challenging UCS's mandatory COVID-19 vaccination policy (the "Vaccination Policy"), I submitted an Affirmation and Supplemental Affirmation that described: (i) UCS; (ii) UCS's return to in-person operations after such operations were suspended due to COVID-19; (iii) UCS's efforts to respond to COVID-19; (iv) the implementation of UCS's Vaccination Policy; and (v) the significant strides that the Vaccination Policy has enabled UCS to make in returning full operational capacity.

7. In February 2022, in an action brought by various UCS employees in the United States District Court, Northern District of New York, challenging UCS's mandatory COVID-19 vaccination policy (the "Vaccination Policy"), I submitted a Declaration that described: (i) UCS; (ii) UCS's return to in-person operations after such operations were suspended due to COVID-19; (iii) UCS's efforts to respond to COVID-19; (iv) the implementation of UCS's Vaccination Policy; and (v) the significant strides that the Vaccination Policy has enabled UCS to make in returning full operational capacity.

8. In March 2022, in an action brought by various UCS employees inthe Supreme

Court of the State of New York, County of Steuben, challenging UCS's mandatory COVID-19 vaccination policy (the "Vaccination Policy"), I submitted an Affirmation that described: (i) UCS; (ii) UCS's return to in-person operations after such operations were suspended due to COVID-19; (iii) UCS's efforts to respond to COVID-19; (iv) the implementation of UCS's Vaccination Policy; and (v) the significant strides that the Vaccination Policy has enabled UCS to make in returning full operational capacity.

9. In April 2022, in an action brought by various UCS employees inthe Supreme Court of the State of New York, County of Rockland, challenging UCS's mandatory COVID-19 vaccination policy , I submitted an Affirmation that described: (i) UCS; (ii) UCS's return to in-person operations after such operations were suspended due to COVID-19; (iii) UCS's efforts to respond to COVID-19; (iv) the implementation of UCS's Vaccination Policy; and (v) the significant strides that the Vaccination Policy has enabled UCS to make in returning full operational capacity.

10. On June 1, 2023, I provided testimony in the present action pertaining to (i) UCS; (ii) UCS's efforts to respond to COVID-19; (iii) the implementation of UCS's COVID-19 Vaccination Policy; (iv) the process by which medical and religious exemption requests to UCS's COVID-19 Vaccination Policy was developed; (v) the process by which religious exemption requests to UCS's COVID-19 Vaccination Policy were reviewed and determined; and (vi) a review of plaintiff's religious exemption submissions and submissions of other religious exemption requests that were granted exemptions.

11. I reaffirm my statements in those affirmations and incorporate them by reference as if fully set forth below.

***The COVID-19 Pandemic and the Impact on UCS Operations***

12. Over the course of the COVID-19 pandemic, UCS had taken a series of carefully considered steps designed to protect the health and safety of court employees and the public. On March 11, 2020, then-Chief Judge Janet DiFiore, after considering the substantial adverse health consequences caused by the outbreak of COVID-19, and in consultation with senior UCS executives in light of guidance issued by governmental and other health experts, promulgated an Administrative Order that instituted restrictions on who could enter any UCS courthouse in certain counties until further notice.

13. In the days that followed, Judge DiFiore issued successively more restrictive orders to combat the spread of COVID-19 and to protect the health and safety of UCS workforce and court users. On March 13, 2020, then Chief Administrative Judge Lawrence K. Marks, with the approval of Chief Judge DiFiore, postponed jury trial matters until further notice and, effective March 16, 2020, suspended in-person operations of high traffic civil parts, and ordered all conferences, meetings, and other proceedings to occur telephonically or over videoconference. Effective March 16, 2020, UCS postponed all non-essential functions of the courts until further notice and limited and consolidated its essential functions in every court within UCS. Throughout March 2020, the courts began conducting proceedings by video whenever possible.

14. On March 23, 2020, Judge Marks, with the approval of Chief Judge DiFiore, issued another order directing that non-essential filings would no longer be accepted by UCS, consistent with former Governor Andrew Cuomo's executive order suspending statutes of limitation in legal matters. On March 25, 2020, New York City Criminal Courts began to hold all arraignments by videoconference. The next day, New York City Family Court began conducting all essential matters by telephone and videoconference in order to mitigate and contain the ongoing spread of

COVID-19, while at the same time continuing to provide critical emergency relief to families children seeking court services.

15. UCS, as the judicial branch of New York State's government, has obligations under the United States Constitution and New York State Constitution to provide open and accessible public forums for citizens to resolve legal disputes and to protect their legal and civil rights. UCS takes these obligations seriously and endeavored at all times during the COVID-19 pandemic to maintain, to the greatest extent possible, full court operations.

16. While UCS endeavored to limit in-person activities as much as possible, it had to maintain some essential operations in person. For instance, the State's Special Response Team, working with officers from its Department of Public Safety, distributed protective gear to courthouses throughout UCS to protect court personnel and staff including judges and non-judicial personnel of UCS, who continued to work in the courthouses and keep the State's judicial system operational during the pandemic.

17. UCS continued to institute a variety of temporary emergency measures to deliver essential justice services through the pandemic while keeping court personnel and litigants safe. To ensure continued access to the courts while prioritizing the health and safety of UCS judges and staff, court users, and the public, UCS implemented a series of unprecedented temporary measures. We placed restrictions on courthouse entry by at-risk persons, consolidated essential matters in a limited number of designated court parts, and implemented a statewide transition to virtual court operations in order to eliminate person-to-person contact in court proceedings and to minimize courthouse traffic.

18. By April 13, 2020, UCS had virtual courts up and running statewide allowing essential and emergency court proceedings to be conducted remotely. A very small number of

court clerks and court officers continued to staff virtual court parts to process critical paperwork and provide essential security.

19. Although necessary to alleviate pressures created by the pandemic, moving court proceedings online presented serious challenges, affecting the public's access to justice and particularly criminal defendants' access to counsel, creating a potential for constitutional violations and worse outcomes for defendants. The complete halt of jury trials also had negative consequences, particularly in criminal matters but also in civil matters with jury trial rights.

20. The judicial and non-judicial personnel of UCS had to implement regulatory, structural, technological, and other innovations, and propose practical reforms to deliver justice through these new formats, facing issues such as how to allow counsel to confer confidentially with their clients or have sidebars with judges and also how to ensure that criminal defendants understood the proceedings and implications of any plea or other case development to protect their due process rights. UCS had to figure out a way to ensure that the most marginalized users of the court system—whether criminal defendants, disabled persons, litigants requiring interpretative services, plaintiffs in lawsuits, litigants in family court, or renters fighting eviction—had access to virtual proceedings.

21. UCS began to handle an increasing volume of essential and emergency matters remotely and added virtual courtrooms to manage the growing demand and needs of the public. Between April 13 and April 30 alone, the court conducted conference and other court proceedings in over 25,000 cases, one third of which were settled or otherwise disposed. UCS was awash in a backlog of undecided matters and braced for what promised to be a surge of new litigation once the court system started allowing new filings and returned to more normal operations. To date, more than three years later, the backlog of matters has not been fully alleviated.

22. In May 2020, then Chief Judge DiFiore and Chief Administrative Judge Marks announced that courthouses in New York State would return to modified in-person staffing in anticipation of a return to expanded in-person operations.

23. Returning UCS to in-person service presented extraordinary challenges. UCS's infrastructure, a total of 220 buildings, ranges from buildings erected as early as 1903 to those built in the last few years. Because UCS is merely a tenant in all the buildings it occupies, overseeing the upgrade of the HVAC systems to the ratings necessary to protect court employees and users took time and much effort. Additionally, the pandemic created ongoing staffing difficulties due to employees' reasonable fears of returning to in-person operations when, at the time, no proven guidelines existed on limiting the spread and their need to stay home for extended absences to care for themselves and family members after contracting or being exposed to COVID-19.

24. We nonetheless worked diligently to address these issues and to keep everyone as safe as possible when working in or visiting the numerous UCS buildings throughout the State. In planning for a return to in-person operations, UCS closely followed and heavily relied on guidance issued by the CDC and the New York State Department of Health (the "DOH"), and implemented protocols designed to mitigate the risk of COVID-19 transmission. To that end, UCS mandated mask-wearing, imposed social distancing rules, regularly disinfected surfaces, and accommodated requests for remote proceedings when possible. UCS also implemented a reporting system that inventoried that number of individuals who either worked in or had recently visited UCS court facilities and tested positive for COVID-19.

25. With progress having been made in the wide distribution of COVID-19 vaccinations and a downturn in infection rates, then Chief Judge DiFiore announced on May 13, 2021 that UCS would implement a return to 100% on-site staffing.

26. With the return of on-site staffing UCS made a commitment to increase the amount of in-person court appearances, particularly trials. UCS went from conducting three criminal jury trials in January of 2021 to 108 in May of 2021. There was also a renewed focus on addressing pending caseloads and reducing case backlogs. For instance, superior criminal courts throughout the State pending caseloads rose from 13,228 at the beginning of the pandemic to 19,832 in Term 9 of 2021. With the uptick in jury trials being conducted, these numbers were only a fraction of the number of trials that UCS conducted in 2019. UCS found that it was becoming extremely difficult to impanel juries due to social distancing guidelines and jurors who refused to be seated due to the potential risk of contracting COVID-19.

27. Despite UCS's best efforts, we obviously could not eliminate all COVID-19 associated risks. Based on the CDC's and the DOH's guidance, we concluded that our best hope for return to a safe and near-normal state of operations was the development and widespread use of safe and effective vaccines.

28. With the rollout of the COVID-19 vaccine in early 2021, UCS began implementing new policies to encourage its employees to get vaccinated. A policy we initially developed on August 18, 2021, the Revised Mask Policy Program, enabled UCS employees who were vaccinated to stop wearing their masks inside buildings. Before that policy was implemented, UCS had no way of determining or tracking how many judges and employees were vaccinated. Shortly after its implementation and, with it, the start of our ability to track the number of vaccinated judges and employees, the percentage of judges and employees reporting vaccination through the system was only about 30%. With encouragement from administrators and incentives for employees such as compensatory time offered for vaccinations, the percentage increased significantly, but there was still a significant percentage of judges and employees who did not

report vaccination.

29. In early 2021 we hoped that the pandemic was beginning to run its course and that "regular life" would resume in short order. In the spring and early summer 2021, we saw few, if any, cases and the news we were seeing from the CDC, DOH, and other governmental authorities was strongly encouraging.

30. Unfortunately, by July 2021 infection rates increased dramatically as a result of the "Delta" variant which was reflected in the amount of positive cases among judges, employees, and other court users that we were tracking. We went from week-long periods in June 2021 of no positive cases each day to periods where we were seeing between six and ten cases a days. Although some vaccinated individuals did contract COVID-19, they routinely had better outcomes than those who were not vaccinated, consistent with what public health experts have stated is ordinarily the case.

31. In light of this, we decided further steps were critical to ensure the health and safety of UCS employees and the many members of the public who needed access to the courts especially those who themselves could not be vaccinated. At the same time, UCS was seeking to increase operations to achieve pre-COVID-19 capacity for criminal trials while also complying with guidance from the CDC and DOH.

***UCS's COVID-19 Vaccination Policy***

32. Throughout the COVID-19 pandemic, UCS had sought to follow the guidance of trusted public health authorities in order to fulfill its mission of providing safe court operations under unprecedented, difficult, and variable circumstances. To that end, and consistent with public health authority guidance, from January 2021 until February 2023. When the vaccines became available to UCS employees in January 2021, UCS had consistently encouraged its

employees to receive the vaccinations in order to restart in-person operations and maintain a safe environment for judges, non-judicial employees, and court users.

33. After careful consideration of the available public health guidance at the time, including information about the safety of the vaccines, UCS determined that the most important element of its strategy to restart in-person operations while maintaining a safe environment for judges, non-judicial employees and court users was to implement the widespread use of what public health authorities and medical experts have determined are safe and effective vaccines among all of its employees.

34. Developing the policy was a monumental task that required consultation with UCS administrators, judges, in-house counsel, administrative staff, and outside counsel (Paul, Weiss, Rifkind, Wharton, & Garrison, LLP) hired to consult in the creation of the policy itself, and developing exemption forms that needed to contain simple and easy-to-understand instructions for the applications. The hiring of Paul Weiss was a significant financial burden.

35. After extensive preparation in the weeks leading up to the announcement of the policy, on September 10, 2021, UCS announced that it would implement a COVID-19 vaccination policy requiring all Judges and non-judicial personnel to receive a vaccination against COVID-19 unless they applied for and were granted a medical or religious exemption. The memorandum announcing the Vaccination Policy that was sent to all Judges and non-judicial personnel provided a copy of a blank religious or medical exemption request. For religious exemption requests, the memorandum provided an initial submission deadline of September 27, 2021. That deadline was then extended to October 18, 2021 due to litigation commenced by the Civil Service Employees Association challenging the policy. In addition to the creation of the Vaccination Policy itself, UCS created and implemented the process by which in UCS was to review medical and religious

exemption requests. In consultation with outside counsel, the UCS developed the Vaccine Exemption Review Committee ("VEC") which was comprised of 11 senior administrators who were tasked with reviewing the submissions.

36. The VEC had 11 voting members, comprised of UCS executive staff. In addition to myself, the VEC included the following individuals:

a. Nancy Barry, UCS Chief of Operations. As Chief of Operations for UCS, Ms. Barry is responsible for the oversight, management, and policy development and implementation for the Office of Court Administration and its divisions.

b. Dan Weitz, Director, OCA Division of Professional and Court Services ("DPCS"). As Director of OCA's Division of Professional and Court Services, Mr. Weitz is responsible for the oversight, management, and policy development and implementation pertaining to various offices within DPCS such as, grants and contracts, the ADA unit, the Children's Centers Program, Continuing Legal Education, Guardian Assistance Network, Language Access, Legal Information, Parent Education and Awareness Program, Records Management and Trial Court Support.

c. John Sullivan, UCS Statewide Americans with Disabilities Act Coordinator. As the Statewide ADA Coordinator, Mr. Sullivan is responsible for oversight over all services, programs and activities that assists in ensuring access to court services and programs for court users with disabilities in compliance with the Americans with Disabilities Act.

d. Shawn Kerby, Assistant Deputy Counsel for Labor Relations. As Assistant Deputy Counsel for Labor Relations, Ms. Kerby is responsible for providing legal counsel

to the Office of Labor Relations regarding the Civil Service Law, Labor Law, and assisting the Director of Labor Relations in negotiating various collective bargaining agreements for all twelve of the unions that represent non-judicial personnel across the state.

e. Scott Murphy, Chief of Staff for the Deputy Chief Administrative Judge ("DCAJ") for Courts Outside of New York City. As Chief of Staff for the DCAJ for Courts Outside of New York City, Mr. Murphy is responsible for developing policies and procedures related to court operations, special projects, and administrative functions for courts in 57 of 62 counties (those other than NYC) in the state. Mr. Murphy is also responsible for providing managerial assistance to staff members, court employees, and other administrative department personnel, managing budget preparation, and. program management.

f. Jennifer DiLallo, Deputy Chief of Staff for the DCAJ for Courts Outside of New York City. As Deputy Chief of Staff for the DCAJ for Courts Outside of New York City, Ms. DiLallo is responsible for assisting the Chief of Staff and the DCAJ in developing policies and procedures related to court operations, special projects, and administrative functions for courts in 57 of 62 counties in the state. Ms. DiLallo is also responsible for providing managerial assistance to staff members, court employees, and other administrative department personnel, managing budget preparation, and. program management.

g. Linda Dunlap-Miller, Chief of Staff for the DCAJ for the New York City Courts. As Chief of Staff for the DCAJ for Courts Outside of New York City, Ms. Dunlap-Miller is responsible for developing policies and procedures related to court

operations, special projects, and administrative functions for courts in the five boroughs (counties) of New York City. Ms. Dunlap-Miller is also responsible for providing managerial assistance to staff members, court employees, and other administrative department personnel, managing budget preparation, and. program management.

h. Keith Miller, Principal Management Analyst for OCA's Division of Human Resources, Judiciary Benefits. As Principal Management Analyst for OCA's Division of Human Resources, Judiciary Benefits, Mr. Miller is responsible to the for management, oversight, and administration of UCS's employee benefits such as medical, dental and vision, commuter benefits, deferred compensation, workers' compensation, work-life assistance programs, flex spending accounts, and life insurance.

i. Michelle Smith, Chief of Staff for the Office of Justice Initiatives ("OJI"). As Chief of Staff for the OJI, Ms. Smith is responsible for oversight, management, and policy development over the OJI's subdivisions which include, Equal Justice in the Courts, Access to Justice, Youth and Emerging Adult Justice, Child Welfare and Family Justice, Policy and Planning, Judiciary Civil Legal Services, and Diversity and Inclusion. OJI is responsible for providing oversight and management over various justice-based initiatives to ensure meaningful access to justice for all court users of civil, criminal and family court across the state.

j. Rosemary Martinez-Borges, Deputy Chief of Staff for the OJI. As Deputy Chief of Staff for the OJI, Ms. Martinez-Borges responsible for assisting the Chief of Staff in oversight, management, and policy development over the OJI's subdivisions

which include, Equal Justice in the Courts, Access to Justice, Youth and Emerging Adult Justice, Child Welfare and Family Justice, Policy and Planning, Judiciary Civil Legal Services, and Diversity and Inclusion. OJI is responsible for providing oversight and management over various justice-based initiatives to ensure meaningful access to justice for all court users of civil, criminal and family court across the state.

37. The VEC voting members had diverse backgrounds and expertise, with a mix of executive, human resources, management, and legal experience, including knowledge of state and federal civil rights statutes such as Title VII and the Americans with Disabilities Act.

38. In addition to the above voting members, the VEC also included Mindy Jeng, who acted as counsel to the VEC. Ms. Jeng was a non-voting member and her duties included advising VEC members of logistical and legal matters, oversight of the process for employees to submit applications and the effort to redact the exemption requests, as well as oversight over the review process. Ms. Jeng's responsibilities as counsel to the VEC is discussed in more detail in Mindy Jeng's Declaration submitted in support of UCS's motion for summary judgment.

39. Sharing in responsibilities in providing legal counsel to the VEC was Anthony R. Perri, Deputy Counsel for Criminal Justice. Mr. Perri was also a non-voting member and his duties included advising VEC members of legal matters and oversight of the process for employees to submit applications. Mr. Perri also attended the weekly meetings of VEC members who were discussing and voting on exemptions and was the point of contact between UCS and the outside counsel that UCS hired for development and implementation of the Vaccination Policy (Paul Weiss. Aside from his work with the VEC, as Deputy Counsel for Criminal Justice, Mr. Perri's full-time responsibilities include liaising with and advising UCS criminal court staff on legal and

policy matters related to criminal actions.

40. As UCS began to receive and review religious exemption requests, it became apparent to the VEC that the majority of applicants gave one or both of the following reasons for not wanting to get the COVID-19 vaccination: (1) the applicant expressed a concern about the connection between fetal stem cells and the development of the COVID-19 vaccine; and/or (2) the applicant expressed a concern about the sanctity or purity of his or her own body.

41. The VEC was tasked with reviewing the exemption requests also found that, in many cases, the applicants' personal statements did not provide sufficient information to adequately address the applicant's opposition to receiving the COVID-19 vaccination was based upon a religious belief, based upon a philosophical belief, based upon concern for the safety and efficacy of the available COVID-19 vaccines, and whether the applicant adhered to his or her belief consistently in regard to other vaccines and medical treatments, or just in regard to the COVID-19 vaccine.

42. In response to the above outlined concerns of the VEC in reviewing the requests, UCS—in consultation with its' outside counsel—developed a supplemental form to obtain additional information from applicants to be able consider an applicant's stated basis for requesting a religious exemption. The supplemental form contained two sections which invited the applicant to provide further information regarding his or her beliefs. The first section ("Section A") asked the applicant to review and acknowledge information regarding the COVID-19 vaccines and the HEK-293 fetal stem cell line which was used in the development of the COVID-19 mRNA vaccines. Section A also asked applicants about their prior, current, and future use of specific prescription and over-the-counter drugs and vaccines that also used the HEK-198 cell line in its development or testing. The second section ("Section B") requested further information from the

applicant regarding their beliefs about the sanctity or purity of his or her own body.

43. The vast majority of applicants who sought a religious exemption (other than a small handful) were asked to complete either Section A or B or both sections of the supplemental form based upon the information they provided in the initial request. Those who were asked to complete the supplemental form professed to have a variety of religious beliefs and practices. UCS's COVID-19 vaccination policy for its employees was essential at the time to minimize the spread of COVID-19 throughout UCS courtrooms and its facilities, thereby protecting the safety of UCS employees and the public, avoiding shortages of essential staff members due to COVID-19 related illness and quarantine periods, and enabling UCS to maintain an accessible forum for justice in accordance with its core mission. As a result of the policy approximately 93% of UCS employees were vaccinated.

44. In response to UCS's policy, over 1,200 judges and non-judicial staff applied for exemptions. Of that 1,200, approximately 1,000 were based on religious grounds. UCS granted approximately 536 of UCS employees who sought a religious exemption and denied approximately 363 such requests.

45. Of those 363 employees who were denied exemptions, in March 2022, UCS determined that 103 employees were not in compliance with its Vaccination Policy because they had not been vaccinated. The other 260 employees either became vaccinated, obtained medical-based exemptions, quit, or retired from service after their requests were denied. Effective April 7, 2022, UCS terminated the employment of the 103 non-compliant employees. Plaintiff was one of the 103 employees.

***The Exemption Review Process***

46. The VEC that was set up to review religious exemption requests were divided

into two working groups (Working Group A and Working Group B) to review the hundreds of exemption requests UCS received. The application forms were divided between the two working groups for initial review. A quorum of at least three working group members was required at each review meeting. UCS's in-house counsel attended the meetings of both working groups. A majority of the working group memberspresent at a meeting was required to grant or deny an application.

47. If one of the working groups voted to deny an application, the application went to the full VEC for further review. A religious supplemental application, read together with the original submission, was denied only if a majority of a quorum of the full VEC agreed with the working group that it should be denied. (A quorum for a full VEC meeting was five members.) Employees whose exemption requests were then granted by the VEC were notified of the approved exemption and were then required to submit proof of weekly COVID tests and continuing to wear a mask and engage in social distancing while at work—the same as those with medical exemptions.

48. Both the full VEC and the working groups adopted a "blind" review process, which means that the identity of the exemption applicant and all identifying informationwere redacted from the forms presented to the working groups and the VEC before they were reviewed. Neither the working groups nor the any member of the VEC ever personally spoke with or asked any of the exemption applicants about their applications, and all applications were, and continue to be, kept confidential.

49. In sum, for the vast majority of submissions, there were three levels of review before a religious exemption request can be denied (initial and supplemental working group review, and full VEC review); all reviews are done on a "blind" basis; and the review was solely to determine whether the applicant's opposition to being vaccinated was based on a sincerely held

religious belief. Applications were not denied based on what their belief is or the source of the belief, or whether the applicant identifies with one particular religion or another. UCS granted exemptions to employees professing adherence to a wide variety of religious beliefs and faiths. The VEC did not in any way seek to assess the validity of any employee's professed religious beliefs, including Plaintiff's.

50. If an application for a religious exemption is denied, the VEC sent the applicant a notice stating that his or her request was denied and explaining that the applicant must submit proof of the first dose of a COVID-19 vaccination within 10 calendar days.

51. If a UCS employee who was denied an exemption (religious or medical) failed to be vaccinated by the deadline provided, the employee's supervisor would contact the employee and give notice to them that they must obtain proof of vaccination by the close of business on the following day. If an employee did not submit proof of vaccination by the close of business on the following day, the employee was then notified they were deemed "unfit for duty." The declaration of an employee being deemed "unfit for duty" was a term of art that meant that employee could not report for work until they upload proof of being vaccinated. Once an employee was deemed "unfit for duty" and continued to be out of compliance with the Vaccination Policy, the employee was required to stay home and charge the time against his or her accrued compensatory time and/or annual leave until their leave was exhausted. After that, the employee was placed on "lost time," which meant that they were no longer being paid, but they continued to receive benefits, including health insurance, until notified by the New York Civil Service Commission that they were required to pay the full amount of their health insurance benefit.

52. Effective April 7, 2022 UCS terminated the employment of all the 103 employees who had been denied exemptions and remained compliant with the Vaccination Policy, including

Plaintiff.

***Plaintiff's Applications for a Religious Exemption***

53. UCS's and Plaintiff's prior submissions to the Court contain copies of her application for a religious exemption.

54. As her submissions show, on September 27, 2021, Plaintiff submitted a request for a religious exemption to the COVID-19 vaccination.

55. On November 8, 2021, Plaintiff was asked to submit the supplemental form. The request stated that plaintiff was required to submit a completed supplemental form on or before November 22, 2021. On November 16, 2021, Plaintiff submitted her supplemental form.

56. On December 29, 2021, UCS notified Plaintiff that her exemption request was denied and she was directed to submit proof of vaccination on or before January 10, 2022.

57. On January 3, 2022, Plaintiff submitted a second supplemental request. However, all determinations made by the VEC were final. Plaintiff's second submission was not considered by the VEC.

***UCS's Vaccination Policy Submission Deadlines***

58. When UCS announced that it was going to implement the Vaccination Policy on September 10, 2021, the memorandum outlining the policy stated that all judges and non-judicial employees were required to receive a vaccination to COVID-19 on or before September 27, 2021. The policy also stated that any non-judicial employee or judge who wanted to seek a religious or medical exemption to the COVID-19 vaccination must submit his or her exemption request on or before September 27, 2021. That deadline was later extended to October 18, 2021 due to litigation that was commenced by several unions representing UCS employees. The policy explicitly stated that, "no exemption requests will be considered unless they are fully completed on the appropriate

form and filed through the portal." (ECF #13-1, UCS Ex. A).

59. The memorandum further stated that, "employees submitting an exemption application will be notified…that more information is needed in order to consider the employee's request for an exemption…." (ECF #13-1, UCS Ex. A).

60. The memorandum further stated that the non-compliance "may result in disciplinary action, up to and including termination." The religious exemption form also states, "if a judge or employee refuses to provide the information necessary for UCS to review and consider their request for religious exemption, they will be required to comply with UCS COVID-19 Vaccination mandate." The form states again that "incomplete submissions will not be reviewed…" (ECF #13-1, UCS Ex. A).

61. As to the supplemental form, the instructions explicitly stated, "if a judge or employee refuses to provide the information requested in the supplemental form necessary for UCS to review and consider their request, they will be required to comply with UCS COVID-19 Vaccination mandate." (ECF #13-1, UCS Ex. A).

62. The supplemental form further informed the applicant that "the decision is final and not subject to internal appeal." (ECF #13-1, UCS Ex. A).

63. UCS implemented firm deadlines to ensure a swift and orderly process in reviewing exemption requests and notifying applicants of a decision. At the time UCS implemented the Vaccination Policy, UCS was focused on resuming in-person public access to the courts in an effort to ensure that the rights of litigants in both civil and criminal proceedings were not further impacted by any delays caused by COVID-19.

64. The vast majority of employees complied with the given deadlines, and none of the UCS employee unions challenged them or requested extensions on behalf of their members.

65. In addition to UCS's focus on resuming in-person court operations, UCS also accounted for the possibility that a substantial number of the more than 16,000 persons employed with UCS across New York State would seek an exemption to the COVID-19 vaccination policy. Indeed, that possibility became a reality when UCS received approximately 1,200 UCS employees (approximately 7.5% of the total UCS workforce) sought exemptions from UCS's vaccination policy on either medical or religious grounds.

66. As a member of the VEC, I was required to review approximately 50 applications per week from October 2021 through December 2021. My own personal review of the applications took approximately 7 hours per week. I then attended weekly meetings to discuss the applications and vote whether to grant or deny an application. These meetings would usually last from one to two hours. Based on my knowledge and conversations with other VEC members, I believe each of them devoted similar amounts of time in addition to their regular duties.

67. In addition to the weekly meetings to vote upon an exemption request, I attended meetings to vote on exemption requests that a working group had voted to deny. When a working group voted to deny an exemption request, the full VEC then reviewed the request, and a quorum of voting members was required to discuss the application and submit a final vote on whether to grant or deny the request. When I was asked to attend a meeting to vote upon the request, these meetings would typically last one to two hours.

68. Like all of the other members of the VEC, the duties of my participation on the VEC were in addition to my duties as Chief of Administration of the UCS. As Chief of Administration, my main responsibilities include oversight of each division of the OCA (the administrative arm of UCS) including, but not limited to, Human Resources, Financial Management, Technology, Court Operations, Administrative Services, Public Safety,

Communications, Public Affairs, and Court Facilities. In furtherance of my oversight responsibilities on the above divisions, I develop policies and procedures for management of the OCA.

69. On a daily basis, my responsibilities include, but are not limited to, preparing and reviewing program proposals, standards, reports and policy directives, reviewing and approving personnel and financial transactions involving significant policy decisions, developing priorities and policies for the OCA, screening and hiring candidates for management positions within the OCA, and managing and evaluating the work of all of the aforementioned divisions of the OCA.

70. In addition to my daily duties as described above, throughout the relevant time period in the Fall of 2021, during which the majority of exemption requests were received and reviewed, UCS was attempting to bring all UCS courthouses and facilities across New York back to full in-person operations, coordinate the effort to develop the testing process for employees granted an exemption request, another task in which I, and many of the VEC members, had full involvement in.

71. Thus, it was imperative that UCS implement a policy that explicitly articulated to both judges and non-judicial employees the need for timely compliance with the application deadlines to ensure that the process for reviewing employee requests proceeded in as quick of a manner as possible so that courts could begin to resume in-person operations and the voting members of the VEC – many of whom were also responsible for orchestrating the effort to resume in-person operations across the state as quickly and seamlessly as possible – could resume their regular duties.

72. Like all of the other VEC members, my work on the VEC became a priority over my duties as Chief of Administration in order to address each application I reviewed in a timely

manner. Simply because I participated on the VEC did not mean that my other work was put on hold. Instead, I had to manage addressing the needs of the judicial branch of the New York government with my responsibilities in reviewing exemption requests. The needs of UCS did not stop because of my participation on the VEC. Rather, I—like all of the VEC members—had to juggle two full-time positions, both of which were a significant burden on each of the members' time and attention, and equally important to UCS's operations. As stated above, this period was particularly difficult for myself and other members of UCS administration because UCS was in the process of resuming full in-person operations at each of the 220 UCS courthouses and facilities across the state in a safe manner, consistent with the rapidly changing CDC guidance on curbing the spread of COVID-19.

73. Due to the burdensome nature of having to review hundreds of medical and religious exemption requests in response to Vaccination Policy, it became clear to UCS that this process needed to be performed and completed in an orderly and timely manner as the first step in opening the UCS courthouses to full in-person operations. Accordingly, UCS needed to impose strict deadlines to prevent employees from submitting an endless amount of inquiries, late requests, and "appeals" of denials which would have required the VEC to dedicate an arduous amount of time away from their regular daily duties to review and meet to discuss the repeated submissions. Indeed, UCS's assumption that this process would be burdensome came to fruition when it received 1,200 exemption requests, 960 of which required a multi-step review process, requiring the each of the members of the VEC to dedicate approximately 7 hours per week for over twelve weeks to reviewing and discussing exemption requests.

74. The imposition of strict deadlines upon employees seeking an exemption was also one of the only ways in which UCS could prevent employees from plagiarizing their colleagues

who were granted exemptions. Early on, it was apparent to the VEC that many employees were submitting identical form letters from various religious organizations in support of their requests. It was clear that employees were discussing amongst themselves what to include in the forms in order to receive a favorable determination. UCS wanted its employees to provide honest, independent statements articulating their religious beliefs, it did not want employees submitting identical requests to "game the system." UCS reasonably believed that imposing strict deadlines for submissions and declining to allow appeals of denials not only furthered the goal of returning to full in-person operations, but also to prevent widespread abuse of the exemption process.

75. The VEC was not limited in reviewing only religious exemption requests. The VEC also considered and reviewed exemption requests based on documented medical needs. Unlike medical exemption requests, however, employees seeking a religious exemption were not required to submit supporting documents to verify their religious beliefs.[1] As a result, in reviewing requests for religious exemptions, the VEC was not evaluating the sincerity of an employee's stated religious beliefs but was assessing the consistency of his or her statements. If an employee provided a statement that did not make it clear to the VEC that the objection was religious in nature, the VEC was unable to make a determination and either required additional information to help inform the VEC of the basis for the objection or were denied because the employee simply did not provide the information asked of him or her.

76. Employees whose exemption requests were granted were notified of the approved exemption. In order to maintain the exemption, the employee was then required to submit proof

[1] Although it was not required of an employee to submit any documents to support his or her request for a religious exemption, the Vaccination Policy memo invited and encouraged employees to submit any documents they deemed necessary to assist UCS in evaluating a request. No requests for a religious exemption were denied because an applicant declined to submit supporting documents. In contrast, if an employee failed to provide responses to the forms' questions, the VEC denied the request on the basis that it did not have sufficient information to make an informed determination.

of a weekly COVID test (whether the application was granted on religious or medical grounds). Each employee was provided with 1 hour of paid leave time to be tested until UCS ended its vaccination policy on February 15, 2023. During the relevant period, approximately 694 employees required testing for approximately 57 weeks (January 10, 2022 to February 15, 2023). In total, approximately 39,500 paid hours were provided by UCS to employees who required testing. In addition to paying employees for this leave, in some circumstances other employees were paid overtime to cover the exempt employees or fewer tasks were completed each week. Accordingly, accommodating employees to be able to be tested on a weekly basis was a significant burden on the UCS's resources and personnel.

77. As a result of its exemption process, UCS was able to begin reopening all 220 of its courthouses and facilities to the public for in-person operations. UCS's vaccination policy compliance resulted in a 93% vaccination rate and only 103 employees were terminated for non-compliance with the policy.

78. Looking prospectively and in preparation for likely future public health emergencies, it is essential that UCS be able to implement a similar policy such as the one implemented in response to COVID-19. It is imperative that UCS be able to implement policies, such as the Vaccination Policy, in response to any future public health emergencies so as to mitigate any potential impacts such emergencies may have on the rights of the public who use UCS's facilities and the duty of UCS to keep its' judicial and non-judicial staff safe. Due to the size and diversity of UCS's workforce and the urgency in which public health emergencies need to be responded to, it would be untenable to implement a policy that allows for multiple extensions and appeals for individual applicants for an exemption. If UCS were to implement a policy that allows for addressing hundreds of requests for extensions and appeals it would potentially require

the need to hire and train additional staff just for the purposes of reviewing and engaging in a one-on-one interactive processes for every applicant who seeks an exemption. It would not be possible to assemble a committee of UCS and OCA executive officers, like the VEC, for a policy that requires addressing and engaging one-on-one with hundreds of applicants.

***The End of the Vaccination Policy and Reinstatement of Employees Terminated Due to Non-Compliance with the Vaccination Policy***

79. On February 15, 2023, UCS rescinded its vaccination policy and as of that date, no longer required judges and non-judicial employees to be vaccinated against COVID-19. The recission of the policy also meant that those who were granted exemptions were no longer required to test weekly for COVID-19 and report those results.

80. At the time UCS announced that it was rescinding the vaccination policy UCS also announced that it would allow any employee who was terminated as a result of non-compliance to seek reinstatement beginning on February 17, 2023. On April 20, 2023, the UCS distributed a letter to all previously terminated employees stating that the employee was eligible to seek reinstatement. The letter provided a blank reinstatement request and invited the employee to fill out the request and submit it to UCS. As of the date of this Affidavit, approximately 79 employees have been reinstated.

81. Plaintiff submitted a reinstatement request which was received by UCS on May 25, 2023. On June 22, 2023 Plaintiff was reinstated to her position of Court Officer at the Richmond County Criminal Courthouse.

Dated: July 28, 2023

Justin A. Barry

Sworn to before me this
28th day of July, 2023

Notary Public

LISA NAZIA HANIFF
Notary Public, State of New York
No. 01HA6348480
Qualified in Queens County
Commission Expires September 26, 2026

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
JESSICA BERGIN,

Plaintiff, Ind. No. 22-CV-5264 (BMC)

-against-

NEW YORK STATE UNIFIED COURT SYSTEM,

Defendants.
----------------------------------------------------------------------X

**DECLARATION OF MINDY JENG**

I, Mindy Jeng, declare:

1. I am employed as Administrative Counsel in the Office of Court Administration ("OCA"), the administrative arm of the New York State Unified Court System ("UCS") and have held that position since July 8, 2021.

2. In my role as Administrative Counsel, I assist the OCA Chief of Administration, Justin Barry, and the OCA Chief of Operations, Nancy Barry, in the oversight and administration of UCS. My responsibilities include assisting on various projects spearheaded by the Chief of Administration and the Chief of Operations, working on pending litigation cases, acting as a liaison with various UCS boards, and acting as Director of the Pro Bono Scholars Program.

3. I am submitting this declaration in support of UCS' motion for summary judgment and in opposition to plaintiff's proposed motion for summary judgment. I have personal knowledge of the facts set forth in this declaration.

***The Unified Court System's COVID-19 Employee Vaccination Policy and the Creation of the Vaccination Exemption Committee***

4. On September 10, 2021, UCS implemented its COVID-19 vaccine policy, applicable to all judicial and non-judicial staff. *See*, ECF #13-1, (UCS's "Ex. A")

5. In accordance with Title VII of the Civil Rights Act of 1964 and other

applicable laws, UCS gave its employees the opportunity to apply for medical and religious exemptions from the vaccination policy.

6. In order to review and consider employee applications for exemptions, UCS created its Vaccination Exemption Review Committee ("VEC"). The VEC's responsibilities and process for reviewing employee exemption applications is discussed in more detail in Justin Barry's Affidavit ("Barry Aff.") submitted in support of UCS' Motion for Summary Judgment.

7. Specifically, my role as attorney and counsel for the VEC included advising the VEC members of logistical and legal matters, oversight of the process for employees to submit their applications, redactions of applications (before review by the VEC voting members), coordinating and leading VEC meetings for purposes of reviewing employee applications and making determinations by committee vote, and recording the determinations of the VEC.

***UCS Employee Medical and Religious Exemption Applications***

8. Between September 10 and October 18, 2021—the deadline for submitting an application—approximately 1,200 UCS employees (out of approximately 16,000 total UCS employees) sought exemptions from UCS' vaccination policy on either medical or religious grounds. After October 18, 2021, UCS and the VEC allowed a limited number of employees to submit exemption applications under exceptional circumstances such as if the employee was on a leave of absence during the application period, newly hired employees, or if the employee recently developed or was diagnosed with a medical condition for which vaccination was contra-indicated.

9. In October 2021, after receiving and reviewing scores of completed application forms, the VEC found that the vast majority of applications seeking a *religious*

exemption professed one or both of the following reasons for not wanting to get the COVID-19 vaccine: (1) the applicant expressed a concern about the connection between fetal cells and the development of the COVID-19 vaccine; and or (2) the applicant expressed a concern about the sanctity or purity of his or her body.

10. The VEC also found in many cases that the applicants' statements did not provide sufficient information to adequately assess the requests, specifically to determine such things as whether an applicant's opposition to being vaccinated was based on a religious belief, as opposed to a philosophical belief or a concern about safety, and whether the applicant adhered to his or her belief consistently in regard to other vaccines and medical treatments, or if only in opposition to the COVID-19 vaccine.

11. As a result, the VEC created a supplemental form, titled Supplemental Affidavit of Religious Objection to COVID-19 Vaccination (the "supplemental form"), to obtain additional information from applicants in order to evaluate their exemption requests. Section A of the Supplemental Affidavit was designed to obtain additional information about the applicant's beliefs regarding the connection between COVID-19 vaccines and fetal cells. Section B was designed to obtain additional information about the applicant's beliefs concerning the sanctity or purity of his or her body.

12. The VEC granted or denied a very small number of applications based solely on an applicant's initial form. The VEC, however asked the vast majority of applicants seeking a religious exemption—more than 960—to submit the supplemental form by a date certain, approximately a week after being notified.

***The Religious Exemption Application Review Process***

13. Given the significant number of applications (over 1,200 or approximately 7.5% of all UCS staff) and the time needed by the VEC members needed to review, meet, and vote

on each application, the VEC divided itself into two working groups (Working Group A and Working Group B), with each group responsible for reviewing at least half of the total number of applications.

14. During the busiest period of time reviewing applications from October through December 2021, each VEC member, whether part of group A or group B, was required to review over 50-100 applications per week. With the VEC working as quickly as possible, it took the VEC approximately 12 weeks to review all 1,200 applications submitted.

15. To ensure impartiality and to avoid any pretense of bias or favoritism, the VEC determined that all employee applications would be anonymized to exclude identifying information before they were reviewed by the VEC voting members. Accordingly, I oversaw a separate team of three UCS employees tasked with redacting identifying information from all employee applications and supporting documentation. Similar to VEC voting members, these three UCS employees also had other full-time work responsibilities. I estimate that myself and the other three employees each spent on average four to five hours per week redacting employee applications and supporting documentation during this time period.

16. Both the full VEC and the working groups adopted a "blind" review process. In addition to redacting identifying information from the employees' applications and supporting documents before they were reviewed, VEC members did not speak with or communicate with applicants about their applications, and all applications were kept confidential. The blind review process was important to prevent bias or favoritism, but it also would have been logistically burdensome—if not impossible—for VEC voting members to meet with applicants as part of the review process.

17. During the same period, each working group would meet at least once per

week to discuss the applications and vote whether to grant or deny them. In light of each VEC voting members' regular job responsibilities, particularly during late 2021 when UCS administrators were still working to bring the court system back to full operation, it was often difficult to coordinate schedules to meet. A quorum of at least three working group voting members was required at each review meeting. Additionally, UCS's in-house Deputy Counsel Anthony Perri attended the majority of meetings of both working groups. A majority of the members of each working group present at a meeting was required to grant or deny an application.

18. If one of the working groups voted to deny an application, the application then went to the full VEC for further review. An application based on religious beliefs could be denied only if a *majority of a quorum of the full VEC* agreed—based on a second vote—that it should be denied. Due to the difficulties in scheduling meetings, the VEC decided that a quorum for a full VEC meeting was five out of the eleven voting members.

19. In sum, for the vast majority of applications, there were three levels of review before a religious exemption request could be denied (initial and supplemental working group review, and full VEC review); all reviews were done on a "blind" basis; and the review was solely to determine whether the applicant's opposition to being vaccinated was based on a sincerely held religious belief. Applications were not denied based on an employee's religious beliefs, the source thereof, or whether the applicant identifies with a particular religion. Employee applications professed adherence to a wide variety of religious beliefs and faiths, and the VEC granted exemptions for employees across the spectrum of such beliefs. The VEC did not in any way seek to assess the validity of any employee's beliefs.

***Granted Employee Applications***

20. The VEC granted a majority of employee applications.

21. Specifically, in regard to the requests for exemptions on religious grounds,

UCS records show that, through February 2, 2022,[1] the VEC had granted 536 of such requests (approximately 60% of those ruled upon) and had denied 363 (approximately 40% of those ruled upon). For instances in which the employee either retired, quit, was vaccinated, or applied for a medical exemption, the VEC did not issue decisions on their original requests.

22. The VEC granted a greater percentage of requests for religious exemptions than it did requests for medical exemptions. As of February 2, 2022, the VEC had granted 82 requests for medical exemption (approximately 33% of those ruled upon) and denied166 such requests (approximately 67% of those ruled upon).

23. Employees whose exemption requests were granted were notified of the approved exemption. In order to maintain the exemption, the employee was then required to submit proof of a weekly COVID test (whether the application was granted on religious or medical grounds) and continue wearing a mask and engage in social distancing while at work, all of which required monitoring by supervising staff. Each employee was provided with one hour of paid excused leave time to be tested until UCS ended its vaccination policy on February 15, 2023.

***Plaintiff's Application***

24. In accordance with UCS' vaccination policy, plaintiff made an application to be exempt from the UCS' vaccination on the basis of her religious beliefs.

25. On September 26, 2021, plaintiff submitted her application to be exempt from UCS' COVID-19 vaccination policy. *See*, ECF #13-2, (UCS's "Ex. B").

26. On November 8, 2021, UCS requested that plaintiff complete a supplemental form, including both Sections A and B thereof. *See*, ECF #13-3, (UCS's "Ex. C").

27. On November 26, 2021, plaintiff submitted her supplemental form. *See*,

[1] The vast majority of these applications were reviewed and voted on before December 31, 2021, except for limited circumstances as discussed above. *See* ¶ 8.

Case: 25-721, 08/25/2025, DktEntry: 24.1, Page 198 of 283

ECF #13-4, (UCS's "Ex. D")

28. Thereafter, VEC Working Group B reviewed plaintiff's application and supplemental form. Working Group B voted to deny plaintiff's application. Thereafter, pursuant to the VEC's internal procedures (*see* ¶ 18), plaintiff's application was reviewed by five members of the VEC who then voted and ultimately denied her request. According to my personal notes, kept as counsel for the VEC, the VEC denied her request on the basis that she had failed to adequately answer the questions in the supplemental form.

29. By letter, dated December 29, 2021, UCS informed plaintiff that her application had been denied and that she had until January 10, 2022 to submit evidence of receiving her vaccination dose or she would be considered unfit for duty on the basis that she could not enter UCS courthouses or facilities as an employee. *See*, ECF #13-5, (UCS's "Ex. E").

30. On January 3, 2022, plaintiff submitted a second version of the supplemental affidavit. *See*, ECF #16-1, (Plaintiff's "Ex. 1"). The VEC treated plaintiff's second submission as a new application to be exempt from its vaccination policy. Given that plaintiff was not on leave during the original application period, not a new hire, nor was her new application made on a medical basis, I informed her supervisors by email on January 4, 2022 that the new submission that she submitted on January 3, 2022 would not be considered by UCS or the VEC. Siudzinski Decl., UCS Ex. J.

31. On or about April 1, 2022, UCS found that plaintiff was not in compliance with its vaccination policy and that she did not intend to become vaccinated, nor had she been granted a religious or medical exemption. Accordingly, UCS terminated plaintiff's employment, along with 102 other employees, for failure to comply with the policy.

32. On February 15, 2023, UCS announced that it would be ending its COVID-19 vaccination policy effective February 17, 2023 and offered reinstatement to any

employee who had been terminated from employment—including plaintiff—or had quit in lieu of becoming vaccinated.

33. On or about June 22, 2023, plaintiff was reinstated to her position as Court Officer in the Richmond County Criminal Courthouse.

Pursuant to 28 U.S.C § 1746, I declare under penalty of perjury pursuant that the foregoing is true and correct.

Executed on July 28, 2023.

Mindy Jeng

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X
JESSICA BERGIN,

Plaintiff,

-against-

NEW YORK STATE UNIFIED COURT SYSTEM,

Defendants.

----------------------------------------------------------------------X

Ind. No. 22-CV-5264 (BMC)

**SUPPLEMENTAL DECLARATION OF MICHAEL J. SIUDZINSKI**

**MICHAEL J. SIUDZINSKI**, an attorney duly admitted to the Bars of this State and this Court, declares and states as follows, under penalties of perjury:

1. I am an Assistant Deputy Counsel in the office of Counsel for the New York State Office of Court Administration, attorney for defendant the New York State Unified Court System (hereinafter "UCS") in this action.

2. I submit this supplemental declaration in opposition to plaintiff's motion for summary judgment and in further support of the UCS's motion for summary judgment on the grounds asserted in the accompanying Reply Memorandum of Law.

3. The Exhibits annexed hereto continue after UCS's previously submitted exhibits ("F", "G", "H", etc.) in its motion to dismiss and motion for summary judgment.

4. Attached hereto as Exhibit L are copies of two emails sent by plaintiff to "nyscourtemployees.nomandate@gmail.com" in which she attaches and shares documents concerning her religious exemption requests.

5. Attached hereto as Exhibit M is a copy an email sent by plaintiff to UCS Director

of Human Resources, Carolyn Grimaldi, dated January 1, 2022.

6. Attached hereto as Exhibit N are excerpts from the Deposition Transcript of plaintiff Bergin, dated May 24, 2023.

7. Attached **WHEREFORE**, UCS respectfully requests that the Court issue an order granting its motion to for summary judgment, denying Plaintiff's motion for summary judgment and dismissing this action in its entirety, and granting such other and further relief as the Court deems just, proper, and appropriate.

Pursuant to 28 U.S.C. § 1746 I declare under penalty of perjury that the foregoing is true and correct. Executed on August 11, 2023.

/S/
MICHAEL J. SIUDZINSKI

**From:** missinjb5@icloud.com,
**To:** nyscourtemployees.nomandate@gmail.com,
**Subject:** "AFFIDAVIT OF RELIGIOUS OBJECTION TO COVID-19 VACCINATION" Bergin
**Date:** Thu, Dec 30, 2021 9:41 pm

---

Open my shared note:

AFFIDAVIT OF RELIGIOUS OBJECTION
TO COVID-19 VACCINATION
Notes

Sent from my iPhone

Bergin 00135

**From:** missinjb5@icloud.com,
**To:** nyscourtemployees.nomandate@gmail.com,
**Subject:** Bergin- Religious Exem Denial
**Date:** Wed, Dec 29, 2021 12:56 pm
**Attachments:** IMG_6062.jpg (111K), IMG_6063.jpg (133K), IMG_6064.jpg (101K), IMG_6065.jpg (70K), IMG_6066.jpg (120K), IMG_6067.jpg (57K), IMG_7760.PNG (673K), IMG_7762.PNG (665K), IMG_7764.PNG (656K), IMG_7766.PNG (650K), IMG_7768.PNG (613K), IMG_7770.PNG (673K), IMG_7772.PNG (633K), IMG_9924.PNG (245K)

---

Bergin 00136

Sent from my iPhone

10:17

# Religious Exemption

JE

You
To Carolyn Grimaldi

Jan 1

Good Evening,
I have submitted a religious exemption and was denied. While the notice states no appeal, I have been informed that I may have been denied on format as opposed to sincerety. I was unaware I had only the room in the boxes provided to write my responses, and I simply wrote a separate piece of paper with my collective answers instead. I would like to respectfully request the opportunity to fill out the form again, as I need to express my religious beliefs and freedoms. I would like to keep working and not be deemed unfit when I can fix the format of my submission and continue testing weekly and abiding by procedure. Thank you,

Jessica Bergin
Court Officer Richmond Criminal Court

Get [Outlook for iOS](Outlook for iOS)

Reply to All

Mail Search Calendar

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

________________________________

JESSICA BERGIN,

Plaintiff,

v. Index No.

NEW YORK STATE UNIFIED COURT 22-CV-5264

SYSTEM,

Defendants.

________________________________

VIDEOCONFERENCE DEPOSITION OF

JESSICA BERGIN

DATE: Wednesday, May 24, 2023

TIME: 9:57 a.m.

LOCATION: New York Unified Court System
25 Beaver Street, Room 1170
New York, NY 10004

REPORTED BY: Mario Melara, Notary Public

JOB NO.: 5935510

J. BERGIN

policy had a different type exemption aside from seeking a religious exemption?

A Yes.

Q Okay. What was your understanding of what the other exemption was?

A Medical.

Q Okay. Are you aware or do you know that for those seeking both a religious and a medical exemption were not issued orange cards?

A Yes, I was aware.

Q Okay. Did you ever have any discussions with anyone on the vaccine committees regarding policies? And I want to limit that to prior to your denial.

A Would you be able to refresh my recollection as to who was on the exemption committee?

Q Sure.

A I just don't want to answer incorrectly.

MR. SIUDZINSKI: Well, let's rephrase this. Did you have a conversation with

J. BERGIN

anyone other than UCS personnel at your courthouse within UCS or OCA about your vaccination exemption request?

THE WITNESS: I thought it was limited. It was like you could just go -- go in and have a dialogue, but I -- to my recollection, no.

MR. SIUDZINSKI: Would you have had a conversation with anyone here at 25 Beaver Street in OCA?

THE WITNESS: I'm not sure who works here, honestly, and this is pre-denial; correct?

BY MS. ROTHMAN:

Q Yes, this is pre-denial. Were you aware of any colleagues of yours that had applied for any religious exemptions to the vaccine?

A Yes.

Q Okay. Approximately how many of your colleagues that you are aware of that applied for religious exemption to the vaccine?

MR. WARSHAWSKY: By colleagues, do

J. BERGIN

you mean in her courthouse?

MS. ROTHMAN: In her courthouse, yes.

THE WITNESS: You said approximately how many?

BY MS. ROTHMAN:

Q Yeah.

A Had applied, specifically applied?

Q Yes.

A Maybe between five and ten. Maybe.

Q Okay. Do you recall any of their names?

A Yes.

Q And what are their names?

A I don't really know. They just told me if they did, or they didn't; not really sure. It's like I don't know who exactly did, but people that voice to me that they were applying for one: Sam [ph], Melissa [ph], Carol [ph].

MR. SIUDZINSKI: Can you provide last names, please?

MR. WARSHAWSKY: What's that?

J. BERGIN

MR. SIUDZINSKI: Last names, please, and/or job titles.

THE WITNESS: And/or?

MR. SIUDZINSKI: If you don't know their last name, maybe you know where they work or what they do.

THE WITNESS: These are court officers that I worked with. Olivia [ph]. I've been told other people were going to. I don't know for certain if they did.

BY MS. ROTHMAN:

Q Yeah, only the ones that you know for certain.

A That I know submitted one.

Q Yes.

A Vinny [ph]. They were all court officers. I'm sure there's more. I don't want it to seem like I'm not -- I just don't remember. That's who -- for now, that's who I know for certain.

Q Okay. Did any of these officers show you their exemption requests?

A Yes.

Q Okay. When did they show you

J. BERGIN

their exemption requests?

A I can't answer that because there was a multi-step process where -- these are estimates -- we were informed of the mandates. I would say a short time later, the request was due for submission.

I'm sure I saw -- I've seen them before that before that point -- some before that point. There was a short time before it asked for supplemental information. In between supplemental and resubmission, I'm almost certain I've seen more for supplementals to those first ones.

Maybe even after denial, I can't say for sure, but over those months of where we were informed of the mandate and when we were denied, I've seen many and thereafter for this case as well.

Q Okay. I just want to talk about the time period from right now before the denial; okay?

Did any of these officers or anyone else assist you in drafting your

J. BERGIN

initial request? Did any of these officers or anyone else assist you in drafting the supplemental request? Any of those officers or anyone else.

A I do recall there were examples that were circulating to which I did not use.

EXAMINATION

BY MR. SIUDZINSKI:

Q Examples of the original request or the supplemental?

A Supplemental.

Q And who was circulating this?

A I don't recall. I just remember -- I recall -- I have seen that. I just chose to write my own.

Q When you say you saw them, you saw them hardcopy, electronic copy, something else?

A I don't remember.

Q Did you circulate either your original request or your supplemental request to anyone before submitting it to UCS?

J. BERGIN

A I don't think I did.
Q Inside or outside of UCS?
A To anyone?
Q To anyone.
A Before submitting it?
Q Before submitting it.
A Can I answer with 100 percent certainty? No. To the best of my recollection, I did not.
Q Do you recall anyone giving you suggestions or edits on how to draft it?
A Before submission?
Q Before submission.
A Probably.
Q Do you recall what that is?
A Any. More so through conversations.
Q And when you said through conversations because they had seen your draft or because you were talking about it?
A Probably the latter.
Q Do you recall showing your draft to coworkers at UCS?

J. BERGIN

A I don't know.

Q Did you share the draft with Pastor Ron?

A No.

EXAMINATION

BY MS. ROTHMAN:

Q When you said that -- correct me if I'm wrong -- when you said that you had talked about your request where you had received edits and/or suggestions, not because they had seen your request, but because you had talked about your request.

Do you recall how you discussed your request? Was it verbally, in an email, text message, or something else?

MR. WARSHAWSKY: I'm going to object to the form of the question.

A There was many, many general questions as we were also employed or working throughout this whole time if we're talking about in work. Most likely, texting as well.

I can't say for certain exact. Just many general conversations as to what

J. BERGIN

was occurring.

Q Was it just what was occurring, or did you have specific text message conversations with regard to what you wrote and what other people wrote in your religious exemption requests?

A Yeah, probably.

Q As you sit here today, do you still have any of those text message conversations?

A Probably.

MR. WARSHAWSKY: Text message conversations about what? Your question was so compound. When she said, "Yes, probably," she could've been saying yes to almost anything.

MR. SIUDZINSKI: Anything related to UCS's COVID-19 vaccination policy.

MR. WARSHAWSKY: Any discussions about the COVID-19 vaccination policy?

MR. SIUDZINSKI: Between September and December.

THE WITNESS: Can you just ask the question one more time? I apologize.

J. BERGIN

BY MS. ROTHMAN:

Q Sure. The text message conversations that you've had with any of your colleagues regarding the COVID-19 policy, as your sit here today, do you still have those text messages?

A Probably.

Q Okay. Text message that you have regarding your discussion of your answers on your religious exemption request, do you still have those text message conversations?

MR. WARSHAWSKY: I'm going to object to that question because I don't think she's actually testified to that specific point yet. That was the ambiguity of your prior question.

MS. ROTHMAN: I don't think there was an ambiguity, but I will certainly reask the question.

BY MS. ROTHMAN:

Q You have stated -- and again, correct me if I'm wrong -- that you had conversations in text message form

Case: 25-721, 08/25/2025, DktEntry: 24.1, Page 216 of 283



J. BERGIN

regarding your religious exemption request and answers you put in your religious exemption; is that correct?

A I don't think specifically I -- that's what I said.

Q Okay. Do you recall having a text message conversation with anybody in UCS regarding what you put in your religious exemptions, whether that be the initial exemption or your supplemental? And I'm talking only about before denial.

A And that doesn't have to include specific answers, that could be anything before.

Q Anything regarding your specific exemption requests.

A I'm sure I have those conversations, most likely. I can't say off the top of my head to the specifics of them.

Q Okay. As you sit here today, do you still have any of those text message conversations?

A Probably.

J. BERGIN

Q Okay. I'm going to ask that save those text message conversations and we will certainly be following with a request for those text message conversations.

Did you have any text message conversations with anybody at UCS regarding those there, meaning the people that you've had conversations, those people, their exemption request? Any responses they may have put in their request or anything regarding their requests, again, before your denial.

A Yes.

Q Okay. Do you still have those text message conversations?

A Probably.

Q Okay. Again, I'm going to ask that you save those, and we will make a response to follow up on it.

Do you have social media? Do you have any social media accounts?

A No.

Q No Instagram?

J. BERGIN

on or about December 29, 2021?
A Yes.
Q What if anything did you do upon receiving your denial?
A Just kept working.
Q Did you reach out to anybody?
A There were many conversations in the courthouse. I don't believe -- I don't remember at this time reaching out to anyone specifically.
Q Between when you submitted your request on November 16, 2021 and your denial on December 29th of 2021, did you have a conversation with anybody -- or I'm sorry -- a conversation with anybody at the courthouse regarding what you submitted as your supplemental?
A Yes.
Q Okay. Was it the people that we listed, Sam [ph], Melissa [ph], Carol [ph], Olivia [ph], Vinny [ph]?
A And many others.
Q Okay. Did they discuss with you what they wrote on their supplementals?

J. BERGIN

A That whole period is quite fuzzy, but I do recall many people saying to me thereafter why didn't I write yes or no?

Q And what was your response?

A I believed what I gave them was sufficient.

Q Okay. Did you maintain that position that what you believed your response was sufficient? Did you maintain that position up until the day before your denial?

A Up until I saw the word "denied," that's what I thought.

Q Okay. Did at any time before you received this denial, at any time did anyone tell you what you should or should not have done in addition to just saying yes or no?

A There was many conversations among many people in the confines of the courts, and again, not just myself. Many people wrote and said many different things.

Case: 25-721, 08/25/2025, DktEntry: 24.1, Page 220 of 283



J. BERGIN

So there was speculation all around as to who wrote right thing, who may or may not get denied because, again, everyone received their denials at different times, so some people weren't even approved or denied yet, so there was much conversation just regarding the entire topic.

Q You specifically -- I believe you had specifically said Olivia [ph] had also submitted a letter from the ICC; correct?

A That's my assumption; that's my belief.

Q How did you come to that belief?

A Through conversation. We're talking pre this case.

Q When did you first aware that Olivia [ph] had submitted a letter from the ICC?

A I don't remember.

Q Was it before this case?

A Yes.

Q Okay. Was it before you got

J. BERGIN

denied?
A Yes.
Q Okay. Do you know that Olivia [ph] had been granted an exemption?
A Yes.
Q When did you find out that Olivia [ph] had been granted her exemption?
A Around this time, I think. I don't remember an exact date.
Q Around the time you were denied?
A Yes, because within that, I guess you would say, few week or month period, all the approvals and denials were coming in, and it was known that she was one of them that were approved.
Q Was she approved before you received your denial?
A Don't know the answer.
Q Okay. Had you asked to see a copy of her initial exemption request and her supplemental request?
A I don't think I did.
Q Okay. After you received your

J. BERGIN

denial, did you reach out to anybody -- any supervisors -- at Richmond County Courthouse with respect to reversing your denial, submitting any other information, or anything like that?

A Can I go back to the last question? Can I answer both of them? I just want to add something to the last question.

Q Sure.

A I just can't say with certainty if I saw any of her documents. Your question was did I request them. I don't think I did. I'm uncertain because I saw many, if I saw hers. I just wanted to make that clear.

As far as the second question, did I ask anyone, specifically, supervisory, if I could resubmit? Is that the question?

Q Yeah, any supervisors at Richmond County if you could resubmit or how to reverse a denial or anything like that.

J. BERGIN

A Yes.

Q And when did you obtain those exemption requests?

A All different times. There -- there were some that were emailed to me -- all of which you have -- some were emailed to me directly from people that wanted to help, essentially. I don't remember the length; I'm sure I could check the timestamps.

Some might have been in the -- when I was in the courthouse. I would say from the time of the mandate until the denial, in that time period, but I don't have exact time 'cause it was different.

Q Any of the -- or, wait. Withdraw that. The ones that you received that you exchanged with us, did you know if all of those employees were granted an exemption or denied an exemption?

A I believe -- I always like to believe that most of those people were approved. Can I say that for a surety that I know that person is still there?

J. BERGIN

connectivity interruption--

A Those are just conversations. I -- I don't remember asking for or soliciting anyone's exemptions.

Q And you said, though, that these might've been circulating around, not just given to you?

A It's possible.

Q And what is your understanding of why those might've been circulating around at that time?

A I can't speak for other people. Possibly just seeing who was approved, who was denied, comparing them.

Q Part of these conversations that were going on -- you said that there were many conversations -- did the conversations include discussions of the answers that got granted verses the answers that got denied?

A I don't remember specifics of the conversations because, again, it was such a choppy timeline about people getting approved, people getting denied.

Case: 25-721, 08/25/2025, DktEntry: 24.1, Page 225 of 283



J. BERGIN

THE WITNESS: No.

BY MS. ROTHMAN:

Q I'm going to show you an email that you have provided. It's dated January 1st. It's from you to Carolyn Grimaldi. At the very frame, Bates Stamped at the bottom, it's Bergin 00022, and actually, we're going to mark this as -- we're at this point -- Exhibit F. Do you recognize this document?

(Exhibit F was marked for identification.)

A I do.

Q Okay. What is this document that you're looking at?

A This is an email from my court email address that I had sent to Carolyn Grimaldi [ph].

Q Okay. And it was dated January 1st.

A Yes.

Q And are you going to believe that's January 1st of 22?

A Yes.

J. BERGIN

Q It says on the second line, "I have been informed that I may have been denied on format, as opposed to sincerity." When you say you've been informed, what did you mean by that?

A I mean the conversations I've had with people.

Q With who?

A Family, people in the courthouse. Once people found out that I had been denied, then I would get the denied conversations. So I had just written quietly to be respectful or formal what I wrote her.

Q Did any of you supervisors at Richmond County Courthouse tell you that you had been denied based on format?

A No.

Q Okay. Did anyone from the vaccine exemption committee tell you that you had been denied based on format?

A No.

Q So your information came solely from anecdotal conversations you had with

J. BERGIN

colleagues?

A correct.

Q Okay.

A And others.

Q So at this time, you believed, or as you say in this email, that your denial was based on format, as opposed to sincerity.

A That's what I believed.

Q Okay.

MS. ROTHMAN: I've got to go through my notes, but, like, if you have anything for them?

MR. SIUDZINSKI: Let's take five minutes, then, if that's all right.

THE REPORTER: All right. We are off the record.

(Off the record.)

THE REPORTER: Okay. It is two o'clock in the afternoon. We are back on the record.

//

//

//

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

JESSICA BERGIN,

Plaintiff,

-against-

NEW YORK STATE UNIFIED COURT SYSTEM,

Defendant.

**MEMORANDUM DECISION AND ORDER**

22-cv-5264 (BMC)

**COGAN**, District Judge.

This is an action for religious discrimination under Title VII brought by a court officer employed by the New York Unified Court System. Plaintiff contends that her employer failed to accommodate her request for a religious exemption from its COVID-19 vaccination policy. Plaintiff also claims that defendant has not demonstrated any undue hardship that would result from granting her reasonable accommodations to the COVID-19 vaccination policy. This case is before the Court on the parties' cross-motions for summary judgment.

## BACKGROUND

Plaintiff Jessica Bergin is a Christian and a member of International Christian Center, a General Council Church of the Assemblies of God. Plaintiff holds the religious belief that receiving a vaccine developed or tested with aborted fetal cell lines perpetuates the evil of abortion. When defendant issued an official memorandum requiring employees to receive COVID-19 vaccinations, plaintiff submitted a request for a religious accommodation to comply with the vaccine policy according to the process defendant had created for such requests. Plaintiff included a three-page letter, including quotes from scripture that supported her beliefs,

and a letter from her pastor, explaining plaintiff's sincerely held religious beliefs that prevented her from complying with the vaccine mandate.

Defendant responded with a letter requesting "more information before it can make a final determination" about plaintiff's religious accommodation request, including a questionnaire with follow-up questions. Plaintiff then submitted another personal statement explaining her religious beliefs and how they conflicted with the vaccine mandate. Plaintiff did not fill out the questionnaire, except to direct defendant to her personal statement for the answers to defendant's questions. Plaintiff did not include answers to defendant's questions about her use of other medications and vaccines, asserting that it was important to her to keep her medical information private.

After the deadline for responding to the questionnaire had passed, defendant denied plaintiff's request for a religious accommodation. Plaintiff then submitted another response to the questionnaire, this time filling out the questionnaire completely. Counsel for defendant notified plaintiff's supervisor that plaintiff had submitted this "new religious exemption request" but that the previous decision denying plaintiff's request was final, and the new request would not be considered. When plaintiff did not show proof of a COVID-19 vaccination by the requisite deadline, she was put on administrative leave until she used all of her accrued paid leave days, at which point she was terminated for failing to comply with the vaccine mandate.

Plaintiff then commenced this lawsuit. Her complaint states one claim for religious discrimination under Title VII. Defendant has since rescinded its vaccination policy and reinstated plaintiff. Both parties have cross-moved for summary judgment.

## DISCUSSION

### I. Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is warranted where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view all facts in the light most favorable to the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (citing Adickes v. S. H. Kress & Co., 398 U.S. 144, 158-59 (1970)). There is no genuine issue of material fact "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 212 (2d Cir. 2001) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

"Cross-motions for summary judgment do not alter [this] basic standard, but simply require the court to determine whether either of the parties deserves judgment as a matter of law on facts that are not in dispute." AFS/IBEX v. AEGIS Managing Agency Ltd., 517 F. Supp. 3d 120, 123 (E.D.N.Y. 2021) (citing Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001)). A court need not grant summary judgment for either party, "[r]ather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." Morales, 249 F.3d at 121 (citing Schwabenbauer v. Bd. of Educ., 667 F.2d 305, 314 (2d Cir. 1981)).

### II. Religious Discrimination

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such

individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Under Title VII, "[t]he term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). Accordingly, it is "an unlawful employment practice . . . for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of his employees and prospective employees." Trans World Airlines. Inc. v. Hardison, 432 U.S. 63, 74 (1977).

To establish a *prima facie* case of failure to accommodate under Title VII, plaintiffs "must show that '(1) they held a bona fide religious belief conflicting with an employment requirement; (2) they informed their employers of this belief; and (3) they were disciplined for failure to comply with the conflicting employment requirement.'" Baker v. The Home Depot, 445 F.3d 541, 546 (2d Cir. 2006) (quoting Knight v. Conn Dep't of Pub. Health, 275 F.3d 156, 167 (2d Cir. 2001)). If a plaintiff has established a *prima facie* case, "the burden then shifts to the employer to show it could not accommodate the employee['s] religious beliefs without undue hardship." Vasquez v. City of New York - Off. of Mayor, No. 22-cv-5068, 2024 WL 1348702, at *5 (E.D.N.Y. Mar. 30, 2024).

### A. *Prima Facie* Case

Here, the parties do not dispute, and the Court agrees, that plaintiff has satisfied the first and third factors for her *prima facie* case: plaintiff held a bona fide religious belief conflicting with defendant's vaccine policy and she was terminated for her failure to comply with this policy. The remaining question is whether plaintiff adequately informed defendant of her religious belief through her request for accommodation.

"An employer need have 'only enough information about an employee's religious needs to permit the employer to understand the existence of a conflict between the employee's religious practices and the employer's job requirements.'" Hickey v. State Univ. of New York at Stony Brook Hosp., No. 10-cv-1282, 2012 WL 3064170, at *7 (E.D.N.Y. July 27, 2012) (quoting Brown v. Polk Cnty., Iowa, 61 F.3d 650, 654 (8th Cir. 1995)). Specifically, submitting a "religious accommodation form with a two-page letter that detail[s] religious objections to [a] COVID-19 vaccination requirement" is sufficient to inform an employer of an employee's religious objections to a vaccine policy. Jackson v. New York State Off. of Mental Health - Pilgrim Psychiatric Ctr., No. 23-cv-04164, 2024 WL 1908533, at *6 (E.D.N.Y. May 1, 2024) (citations omitted). This is exactly what plaintiff did here.

It is undisputed that plaintiff submitted a religious accommodation form, personal statement, and statement from her pastor detailing plaintiff's religious beliefs that conflict with defendant's vaccine mandate. This was sufficient to satisfy the requirement that plaintiff inform defendant of her conflicting religious beliefs with an employment requirement. Plaintiff's failure to properly fill out defendant's questionnaire asking follow-up questions does not change this analysis, as plaintiff had already adequately informed defendant of her beliefs.

Nor does plaintiff's failure to properly complete the questionnaire create a question of material fact about the sincerity of plaintiff's religious beliefs. Defendant does not contest, based on her initial request alone, that plaintiff had a sincerely held religious belief in conflict with the vaccine mandate. In fact, defendant has admitted, through its Rule 30(b)(6) witness and Chief of Administration, that plaintiff's initial request for a religious accommodation was "perfectly adequate" and "explained a religious belief." Given the lack of dispute regarding plaintiff's sincerely held religious belief in conflict with the vaccine mandate, plaintiff's failure to properly

fill out the questionnaire does not change the fact that plaintiff has satisfied this prong of the *prima facie* case for a failure to accommodate religious beliefs under Title VII.

Defendant relies on Ferrelli v. Unified Court System, No. 22-cv-68, 2022 WL 673863 (N.D.N.Y. March 7, 2022), which involved the same vaccine mandate and the same supplemental questionnaire, to reach a contrary conclusion. There, the plaintiffs sought to invalidate the vaccine mandate on religious freedom grounds. The court held that the vaccine mandate was a neutral and generally applicable requirement, and that the supplemental questionnaire could be used to test the sincerity of employees' claimed religious beliefs: "[T]he Court finds that a limited factual inquiry of the type pursued by Defendants is narrowly tailored to stem the spread of COVID-19 because it enables the state to distinguish between sincerely held religious beliefs and those beliefs that are either contrived or not religious in nature." Id. at *8.

The instant case is very different. Plaintiff is challenging neither the vaccine mandate nor the right of defendant to inquire about the sincerity of its employees' religious beliefs through the supplemental questionnaire. Instead, she is asserting, as defendant has conceded, that her initial exemption claim was "religious" and "not contrived." The initial exemption claim was satisfactory to show that her religious belief was sincerely held, and therefore the supplemental questionnaire, in her particular case, was superfluous.

Because there is no dispute that plaintiff held a bona fide religious belief conflicting with defendant's vaccine policy or that plaintiff was terminated for her failure to comply with this policy, and the undisputed facts show that plaintiff met the legal test for adequately informing defendant of this belief, there is a *prima facie* case of failure to accommodate plaintiff's religious beliefs under Title VII.

**B. Undue Hardship**

This Court agrees with defendant that "considering and responding to employees' inquiries, submissions, and requests made after the deadline would have been an undue hardship on its operations." Plaintiff's supplemental response to the questionnaire, submitted after the vaccine policy's deadline, cannot be considered in determining whether defendant failed to accommodate plaintiff's religious beliefs.[1]

However, dispensing with any obligation to consider plaintiff's late response does not alter the fact that plaintiff has demonstrated a *prima facie* case without regard to the supplemental questionnaire, and that it would have been no hardship at all on defendant – which, again, concedes the sincerity of her initial exemption claim – to grant the exemption. Based on that first request, there is no dispute of material fact that plaintiff had a bona fide religious belief that conflicted with the vaccine mandate, defendant knew of this belief, and defendant terminated plaintiff for her failure to comply with the vaccine mandate. There was no need, and therefore no undue hardship, for defendant to consider plaintiff's late supplemental response.

Furthermore, there would have been no undue hardship in granting plaintiff's religious accommodation request. First, defendant granted 555 religious accommodation requests (out of 937 applications), permitting accommodations of the same sort requested by plaintiff. Second, defendant has since rescinded its vaccination policy and, tellingly, reinstated plaintiff to her former position over a year ago.[2]

---

[1] An accommodation is an undue hardship when it is "substantial in the overall context of an employer's business." Groff v. DeJoy, 600 U.S. 447, 468 (2023). Defendant received, and had to evaluate, over 1,200 employee exemption requests, comprising 7.5% of defendant's total staff. The committee that reviewed these requests spent hundreds of hours reviewing employees' requests. It would be an undue hardship to require defendant to consider employees' requests or supplemental responses received after the deadline.

[2] Defendant's final argument is that E.E.O.C. v. Abercrombie & Fitch Stores, Inc., 575 U.S. 768 (2015), requires plaintiff to show that defendant was motivated to discriminate against her. The case does not apply in this context. Abercrombie merely held that when the employee (or prospective employee, as in that case) does not inform the

If defendant wanted to send out a supplemental questionnaire for every claim of religious exemption, there was, as Ferrelli holds, no constitutional impediment in doing so. But if the claim for religious exemption itself presented sufficient grounds to grant the exemption, as defendant concedes it did here, defendant could not use the failure to timely complete the supplemental questionnaire as a reason to deny the exemption.

**CONCLUSION**

Plaintiff's motion for summary judgment [26] is granted and defendant's motion for summary judgment [27] is denied. By separate order, the Court will set this matter down for trial on the issue of damages.

**SO ORDERED.**

Brian M. Cogan
U.S.D.J.

Dated: Brooklyn, New York
October 7, 2024

employer of her need for a religious accommodation, the employer's employment decision, if motivated in substantial part by the desire to frustrate the exercise of the religious practice without the presence of an undue burden, is still actionable under Title VII. Here, defendant was well aware of plaintiff's need for a religious exemption.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| JESSICA BERGIN, Plaintiff, -against- NEW YORK STATE UNIFIED COURT SYSTEM, Defendant. | : | **MEMORANDUM DECISION AND ORDER** 22-cv-5264 (BMC) |

**COGAN**, District Judge.

This case is before the Court on defendant's motion for certification of appealability and reconsideration of this Court's memorandum decision and order granting plaintiff's motion for summary judgment and denying defendant's motion for summary judgment. The Court held that plaintiff established a *prima facie* case of failure to accommodate a religious belief under Title VII because defendant did not accommodate plaintiff's request for a religious exemption from its COVID-19 vaccination policy, even though defendant acknowledged that plaintiff had a valid religious exemption. Furthermore, there was no undue hardship to defendant in accommodating plaintiff. For the reasons stated below, the Court denies defendant's motion for certification of appealability and reconsideration.

## BACKGROUND

As detailed in the Court's previous decision granting plaintiff's motion for summary judgment, plaintiff holds the religious belief that receiving a vaccine developed or tested with fetal cell lines perpetuates the evil of abortion. When defendant issued an official memorandum requiring employees to receive COVID-19 vaccinations, plaintiff submitted a request for a

Case: 25-721, 08/25/2025, DktEntry: 24.1, Page 237 of 283

religious accommodation to comply with the vaccine policy according to the process defendant had created for such requests. Plaintiff included a three-page letter with quotes from scripture that supported her beliefs and a letter from her pastor explaining plaintiff's sincerely held religious beliefs that prevented her from complying with the vaccine mandate.

Defendant responded with a letter requesting "more information before it can make a final determination" about plaintiff's religious accommodation request, including a questionnaire with follow-up questions. Plaintiff submitted another personal statement explaining her religious beliefs and how they conflicted with the mandate. Plaintiff did not fill out the questionnaire, except to direct defendant to her personal statement for the answers to defendant's questions. Plaintiff did not include answers to defendant's questions about her use of other medications and vaccines, asserting that it was important to her to keep her medical information private.

After the deadline for responding to the questionnaire had passed, defendant denied plaintiff's request for a religious accommodation. Plaintiff then submitted another response to the questionnaire, this time filling out the questionnaire completely. Counsel for defendant notified plaintiff's supervisor that this "new religious exemption request" would not be considered. When plaintiff did not show proof of a COVID-19 vaccination by the requisite deadline, she was put on administrative leave until she used all of her accrued paid leave days, at which point she was terminated for failing to comply with the vaccine mandate. Plaintiff commenced this lawsuit, stating one claim for religious discrimination under Title VII. Defendant has since rescinded its vaccination policy and reinstated plaintiff.

On the parties' cross-motions for summary judgment, the Court granted plaintiff's motion, finding that plaintiff adequately informed defendant of her bona fide religious belief conflicting with defendant's vaccine policy through her first submission, she was terminated for

her failure to comply with the policy, and there was no undue hardship to defendant in providing plaintiff a religious accommodation because defendant did not need to consider plaintiff's late submission for it to know of and accommodate plaintiff's bona fide religious belief. The Court set a trial on the issue of damages.

Defendant identifies three issues it believes are appropriate for certification of appealability or reconsideration: (1) whether an employer must grant a religious accommodation without seeking further information in response to an employee's initial application or if the employer is entitled to probe the sincerity of the employee's belief by seeking additional information even if, on its face, the initial application could be found to be sufficient; (2) whether a party's response to a pre-discovery contention interrogatory may be deemed a concession of a point of law when the party does not have sufficient information to answer the interrogatory and states so in its answer; and (3) whether summary judgment may be granted in the plaintiff's favor if the court determines that a plaintiff-employee has established a *prima facie* claim and also that the defendant-employer has demonstrated undue hardship.

**LEGAL STANDARD**

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To establish a *prima facie* case of failure to accommodate a religious belief under Title VII, a plaintiff "must show that '(1) they held a bona fide religious belief conflicting with an employment requirement; (2) they informed their employers of this belief; and (3) they were disciplined for failure to comply with the conflicting employment requirement.'" Baker v. The Home Depot, 445 F.3d 541, 546 (2d Cir. 2006) (quoting Knight v. Conn Dep't of Pub. Health,

275 F.3d 156, 167 (2d Cir. 2001)). If a plaintiff has established a *prima facie* case, "the burden then shifts to the employer to show it could not accommodate the employee['s] religious beliefs without undue hardship." Vasquez v. City of New York – Off. of Mayor, No. 22-cv-5068, 2024 WL 1348702, at *5 (E.D.N.Y. Mar. 30, 2024) (quoting Knight, 275 F.3d at 167), reconsideration denied, 2024 WL 1886656 (E.D.N.Y. Apr. 30, 2024).

District courts have discretion to certify an issue for interlocutory appeal where the issue involves "a controlling question of law as to which there is substantial ground for difference of opinion and [where] an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). Because "[i]t is a basic tenet of federal law to delay appellate review until a final judgment has been entered," Koehler v. Bank of Bermuda Ltd., 101 F.3d 863, 865 (2d Cir. 1996) (citation omitted), § 1292(b) "must be strictly construed" and "only exceptional circumstances" will justify a departure from the final judgment rule. Wausau Bus. Ins. Co. v. Turner Constr. Co., 151 F. Supp. 2d 488, 491 (S.D.N.Y. 2001) (internal quotations marks and citations omitted). The Second Circuit has repeatedly emphasized that district courts must "exercise great care in making a § 1292(b) certification." Id. at 491-92 (citing Westwood Pharm., Inc. v. Nat'l Fuel Gas Dist. Corp., 964 F.2d 85, 89 (2d Cir. 1992)). Accordingly, a district court may deny certification even where the statutory criteria are met. See Republic of Colombia v. Diageo N. Am. Inc., 619 F. Supp. 2d 7, 9 (E.D.N.Y. 2007) (citation omitted).

To succeed on a motion for reconsideration, the moving party must "point to controlling decisions or data that the court overlooked – matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." Shrader v. CSX Transp., Inc., 70 F.3d

Case: 25-721, 08/25/2025, DktEntry: 24.1, Page 240 of 283

255, 257 (2d Cir. 1995) (citations omitted). A motion for reconsideration "should not be granted where the moving party seeks solely to relitigate an issue already decided." Id.

## DISCUSSION

### I. Certification of Appealability

#### *a. Employer's Ability to Seek Additional Information*

Defendant argues that whether an employer is entitled to probe the sincerity of an employee's religious belief by seeking additional information even if, on its face, the employee's initial application could be found to be sufficient, is a controlling question of law with substantial ground for difference of opinion. However, that was not the question decided by this Court's Order. The caselaw is clear that an employer may ask follow-up questions to probe the sincerity of an employee's religious belief even if the employee's initial application could be found to be sufficient. See, e.g., Ferrelli v. Unified Court System, No. 22-cv-68, 2022 WL 673863, at *8 (N.D.N.Y. March 7, 2022). What defendant may not do is deny an employee a religious accommodation based on the format of her answers to such follow-up questions when it has conceded that it does not contest the sincerity of her belief as expressed in her initial application.

Defendant asserts that "at all points throughout this litigation it has been UCS's position that it has not had sufficient information about plaintiff's alleged religious beliefs because of her failure to provide responses to its request for additional information." That is not true. In defendant's opposition to plaintiff's motion for summary judgment, defendant explicitly disclaimed any argument that plaintiff's religious belief was not sincerely held: "[f]or purposes of UCS and plaintiff's respective motions for summary judgment, UCS has not raised as a defense any argument or facts concerning whether plaintiff has a bona fide religious belief (element 1) or whether she was disciplined for failing to comply (element 3)." The remaining question before this Court was whether plaintiff adequately informed defendant of her religious belief through her request for

accommodation. Assuming, as defendant has throughout this litigation, that plaintiff's religious belief was sincere, this Court determined that plaintiff's initial application adequately conveyed the existence of this religious belief to defendant.

This posture is different from one in which an employee's initial application *might or might not* be found sufficient: defendant, as a matter of strategy in defending this case, chose to challenge only whether it received adequate notice of plaintiff's religious belief, thus conceding that plaintiff's religious belief, as expressed in her initial application, was sincerely held. Because notice was the only element of a *prima facie* case of failure to accommodate a religious belief that defendant challenged, and this Court found no material facts disputing that defendant received notice of plaintiff's religious belief through her initial application, defendant's right to ask follow-up questions to determine the sincerity of plaintiff's belief did not arise. Defendant accuses the Court of having moved the goal posts in its summary judgment decision, but the Court simply took defendant's stated position and decided the case based on that – it is defendant's current motion that is seeking to recast the issue. But the issue defendant wishes to appeal was not implicated by this Court's order.

Furthermore, an immediate appeal from the Court's order will not materially advance the ultimate termination of the litigation. The parties agree that there will be a final judgment in this case after, at most, a one- or two-day trial on damages. And the parties have indicated they may stipulate to the amount of damages owed, avoiding trial altogether. This is not the sort of "rare exception to the final judgment rule that generally prohibits piecemeal appeals . . . reserved for those cases where an intermediate appeal may avoid protracted litigation." Koehler, 101 F.3d at 865-66. If defendant still wishes to appeal, it may do so in short order once the straightforward issue of damages is resolved.

***b. Pre-Discovery Contention Interrogatory Response as Judicial Admission***

The second issue defendant raises for certification of appealability, whether a party's response to a pre-discovery contention interrogatory may be deemed a concession of a point of law when the party states that it does not have sufficient information to answer the interrogatory, is also not appropriate for a certification of appealability. Defendant points to no substantial ground for difference of opinion. The caselaw is clear that "[c]ontention interrogatories are treated as judicial admissions which usually estop the responding party from later asserting positions not included in its answers, unless the failure was substantially justified or is harmless." In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig., 117 F. Supp. 3d 276, 294 (S.D.N.Y. 2015) (internal quotation marks and footnote omitted) (barring vicarious liability theory when plaintiff did not raise theory in response to contention interrogatories). Defendant's assertion that it provided the response before discovery had occurred "and UCS had no information to make a sufficient determination" is unavailing. "Failure to amend a contention interrogatory pursuant to Federal Rule of Civil Procedure 26(e) can bar use of a theory of liability. . . . [P]rejudice is not required for preclusion under Rule 37(c)(1), nor does Rule 37(c)(1) require a showing that the omission was made in bad faith." Id. (footnotes omitted). Defendant does not point to caselaw that treats responses to contention interrogatories any differently. Because there is no substantial ground for difference of opinion and the same considerations discussed above counsel that an immediate appeal will not materially advance the ultimate termination of the litigation, the Court will not certify an appeal based on this issue.

***c. Existence of Undue Hardship***

The third issue defendant raises for certification of appealability, whether summary judgment may be granted for an employee if the employer has demonstrated undue hardship,

misinterprets this Court's previous holding and is not appropriate for a certification of appealability. In granting plaintiff's motion for summary judgment, the Court held that although it would have been an undue hardship for defendant to consider plaintiff's form submitted after the deadline for religious accommodation requests, defendant had no obligation to consider the late form. The Court then held that, disregarding the late form because defendant had no duty to consider it, plaintiff still had satisfied the *prima facie* elements of a failure to accommodate claim based on her initial, timely submission.

Defendant misstates the Court's opinion by asserting that the Court granted summary judgment despite defendant's undue hardship – it was precisely because defendant did not demonstrate undue hardship with regard to plaintiff's initial exemption application that the Court granted plaintiff's motion for summary judgment. Defendant presents no controlling question of law as to which there is substantial ground for difference of opinion, rendering this issue inappropriate for certification of appealability.

**II. Reconsideration**

Defendant asserts that the Court erred in finding that defendant conceded that plaintiff had a sincerely held religious belief. The denial of certification largely determines the disposition of this motion as well. Defendant's opposition to plaintiff's motion for summary judgment and contention interrogatories provide clear concessions on this point. Defendant does not direct the Court to any "controlling decisions or data that the court overlooked – matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." Shrader, 70 F.3d at 257 (2d Cir. 1995) (citations omitted). Because defendant does not point to any error this Court needs to correct, defendant's motion for reconsideration on this issue is denied.

Defendant posits a "parade of horribles," consisting of the bureaucratic difficulties in maintaining vaccine exemption review procedures for some future epidemic, if this Court's decision stands. The Court does not see it. Nothing in the Court's decision prevents or discourages an employer from asking follow-up questions to an employee's original exemption request either as a matter of course, or if it has specific questions about that request. This Court's decision merely holds that if, within the litigation, the employer acknowledges that the employee's original religious exemption request was valid, the employer cannot use the follow-up request to invalidate the original exemption request unless there is some fundamental contradiction between the two that casts doubt on the validity of the original request. Defendant has never contended that is the case here.[1]

**CONCLUSION**

For the foregoing reasons, defendant's motion for certification of appealability and reconsideration [37] is denied.

**SO ORDERED.**

Brian M. Cogan
U.S.D.J.

Dated: Brooklyn, New York
November 4, 2024

[1] Although not material here, the Court will note some skepticism about whether the main focus of defendant's follow-up request – what other (non-COVID-19) vaccinations the applicant may have had, which may also have been derived from fetal cells – is directed to ferret out an insincerity in the applicant's religious belief, as opposed to indicating an employer's hostility towards claims for religious exemptions. First of all, if other vaccines were an important factor in assessing sincerity, one would think their disclosure would be a mandatory part of the initial exemption request. In addition, tripping applicants up based on childhood or other vaccines which they may not have been aware were derived from fetal cells seems a poor proxy for testing the sincerity of their religious belief concerning the COVID-19 vaccine, considering the extensive publicity it has received.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

--------------------------------------------------------------X

JESSICA BERGIN,

Plaintiff,

-against-

NEW YORK STATE UNIFIED COURT SYSTEM,

Defendant.

--------------------------------------------------------------X

**CONSENT JUDGMENT AND ORDER**

22-cv-5264 (BMC)

This CONSENT JUDGMENT AND ORDER (hereinafter "Consent Judgment") is made by and between Plaintiff Jessica Bergin ("Plaintiff") and Defendant New York State Unified Court System (hereinafter "UCS"), as of the date this Consent Judgment is "So Ordered" by a Judge of the United States District Court for the Eastern District of New York:

**WHEREAS**, on or about September 2, 2022, Plaintiff commenced the above-captioned civil action by filing a complaint (the "Complaint") in the United States District Court for the Eastern District of New York, Case Number 22-cv-5264, against Defendant UCS;

**WHEREAS**, the Complaint alleged a single claim against Defendant UCS pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII");

**WHEREAS**, the allegations and claim in the Complaint, together with any related filings and proceedings, constitute "the Action";

**WHEREAS**, Defendant UCS and the State of New York expressly deny any wrongful conduct or liability, or violation of any federal, state or local statute, ordinance or law, in connection with the events alleged in the Action;

**WHEREAS**, by Decision and Order, dated October 7, 2024, the Court (Cogan, J.)

granted Plaintiff's Motion for Summary Judgment, finding Defendant UCS liable for Plaintiff's Title VII claim in all respects and allowing the Action to proceed to trial for purposes of determining damages and other relief for Plaintiff's Title VII claim, and denying Defendant's Motion for Summary Judgment;

**WHEREAS**, Defendant UCS desires to pursue an appeal of the legal questions raised in its Motion for Summary Judgment, denied by the Court's October 7, 2024 Decision and Order, and Plaintiff and Defendant desire to resolve the issue of reasonable damages, both economic and compensatory, without further proceedings before the District Court including a trial in the Action;

**WHEREAS**, no party hereto is an infant or incompetent person for whom a committee has been appointed, and no person not a party to this Consent Judgment has an interest in the subject matter of the Action; and

**NOW**, **THEREFORE**, in consideration of the mutual promises, covenants, representations, and other consideration contained in this Consent Judgment, Plaintiff and Defendant hereby stipulate and agree, and the Court orders, as follows:

1. **Final Order**: Plaintiff and Defendant intend that this Consent Judgment together with the Court's October 7, 2024 Decision and Order, which is attached hereto as Exhibit A and incorporated by reference herein, constitute a final order in this Action for purposes of taking an appeal to the United States Court of Appeals, Second Circuit. No further litigation or proceedings shall be taken regarding the issue of damages and attorneys' fees and costs, except attorneys' fees and costs that may arise after execution of this Consent Judgment.

2. **Appeal and Fulfillment of Terms**: Upon the Court's so-ordering of this Consent Judgment, Defendant may seek an appeal, pursuant to all applicable federal statutes and rules, of

any legal questions raised by the Complaint, Defendant's Motion for Summary Judgment, and the Court's October 7, 2024 Decision and Order in this Action. "Time for Payment": Payments are contingent upon Plaintiff's prevailing party status at the conclusion of the case and in no event will Plaintiff be entitled to demand or receive the payments referenced in this Consent Judgment prior to the issuance of a mandate by the U.S. Court of Appeals for the Second Circuit affirming the final judgment, or the voluntary withdrawal of the appeal by Defendant, or a determination by Defendant to not appeal (signified by Defendant's decision not to file a notice of appeal and the expiration of the time for same).

3. **Salary Step Increase**: For and in consideration of Plaintiff's execution of this Consent Judgment, her agreement to be bound by its terms, and her undertakings as set forth herein, Defendant UCS shall increase Plaintiff's "salary step" a single step in the Pay Schedule attached to and incorporated into the collective bargaining agreement between UCS and Plaintiff's employee union, the New York State Court Officers Association, in effect at the time of fulfilment of the terms herein. The salary step required hereunder shall be effectuated in Plaintiff's official payroll records no later than 10 business days after the Time for Payment set forth in Paragraph 2.

4. **Payment to Plaintiff by Defendant Unified Court System**:

For and in consideration of Plaintiff's execution of this Consent Judgment, her agreement to be bound by its terms, and her undertakings as set forth herein, subject to any withholding for taxes to the State of New York and the United States Internal Revenue Service ("IRS"), Defendant UCS shall pay the sum of Ninety-Five Thousand and Fifty-Four Dollars and Zero Cents ($95,054.00) which, together with those payments detailed in Paragraph 5, shall be full and complete satisfaction of all claims, allegations, or actions, direct or indirect, known or

unknown, that Plaintiff had, has, or may have against Defendant UCS and or the New York State Office of Court Administration ("OCA") (including, but not limited to, any of UCS's and/or OCA's officials, employees, or agents, whether in their individual or official capacities), and/or the State of New York (including, but not limited to, any and all agencies, departments, and subdivisions thereof) arising out of any conduct, acts or omissions prior to, and as of the date of this Consent Judgment, including but not limited to those asserted in the Action. Payment of the above-referenced sum shall be made as follows:

(a) A single payment in the gross amount of Ninety-Five Thousand and Fifty-Four Dollars and Zero Cents ($95,054.00), less applicable income tax withholdings and deductions, for which an I.R.S. Form W2 shall be issued to Plaintiff Jessica Bergin, and which shall be full and complete satisfaction of any and all claims, allegations, or causes of action for back pay, lost wages, lost overtime, and all other income-related damages incurred by Plaintiff in connection with any of the acts, transactions, occurrences, or omissions asserted in the Action against Defendants.

(b) The payment as set forth in subsection (a) of this paragraph shall be made payable to the order of Jessica Bergin.

5. **Payments to Plaintiff and Plaintiff's Attorneys:** For and in consideration of Plaintiff's execution of this Consent Judgment, her agreement to be bound by its terms, and her undertakings as set forth herein, the State of New York, on behalf of Defendant, shall pay the total sum of One Hundred Forty Thousand and Three Hundred and Twenty-Nine Dollars and Fifty Cents ($140,329.50) which, together with those payments detailed in Paragraph 4, shall be full and complete satisfaction of all claims, allegations, or actions, direct or indirect, known or

unknown, that Plaintiff had, has, or may have against Defendant UCS and/or the New York State Office of Court Administration ("OCA") (including, but not limited to, any of UCS's and/or OCA's officials, employees, or agents, whether in their individual or official capacities), and/or the State of New York (including, but not limited to, any and all agencies, departments, and subdivisions thereof) arising out of any conduct, acts or omissions prior to, and as of the date of this Consent Judgment , including but not limited to those asserted in the Action. Payment of the above-referenced sum shall be made as follows:

(a) A single payment in the gross amount of One Hundred Forty Thousand and Three Hundred and Twenty-Nine Dollars and Fifty Cents ($140,329.50), for which an I.R.S. Form 1099 shall be issued, and which shall be full and complete satisfaction of any and all claims, allegations, or causes of action for compensatory damages (including, but not limited to, physical injury, pain and suffering, mental and emotional anguish and trauma, reputational damages, punitive damages, and liquidated damages), and any and all claims, allegations, or causes of action for attorneys' fees, costs, disbursements, and expenses incurred by Plaintiff for any and all legal counsel who have at any time represented Plaintiff in the Action as well as in connection with any of the acts, transactions, occurrences, or omissions asserted in the Action against Defendant.

(b) The payment as set forth in subsection (a) of this paragraph shall be made payable to the order of Steven M. Warshawsky as attorney for Jessica Bergin, 118 North Bedford Road, Suite 100, Mount Kisco, NY, 10549.

6. **Payments and Accrual of Interest:** Payment for the above-described amounts

shall not become due until the Time for Payment as described in Paragraph 2 or upon written agreement of the parties or their representatives. In the event that payment of either amount specified in Paragraphs 4 and 5 of this Consent Judgment has not been made by the one hundred twentieth (120th) day after the Time for Payment, interest on any part of the amount not paid by the one hundred twentieth (120th) day shall accrue at the statutory rate prescribed by 28 U.S.C. § 1961, commencing on the one hundred twenty-first (121st) day.

7. **Responsibility of Plaintiff and Plaintiff's Attorneys for Taxes:** With the exception of any payroll taxes withheld on the payment referred to in Paragraph 4 herein, any other taxes, or interest or penalties on taxes, on the payments referred to in Paragraph 5 of this Consent Judgment shall be the sole and complete responsibility of Plaintiff (or Plaintiff's attorneys respectively, for fees paid to said attorneys). Plaintiff and Plaintiff's attorneys acknowledge and agree that they shall have no claim, right, or cause of action against UCS and/or OCA (including, but not limited to, any of UCS's and/or OCA's officials, employees, or agents, whether in their individual or official capacities), nor the State of New York, or any of their agencies, departments, divisions, officers, employees, agents, attorneys, insurers, and assigns, whether in their individual or official capacities, or any of them, or all of them, on account of such taxes, interest, or penalties.

8. **Binding Effect on Successors and Assigns:** The terms and conditions of this Consent Judgment shall inure to the benefit of, and be binding upon, the successors and assigns of each party hereto.

9. **Authority:** Each signatory to this Consent Judgment hereby represents and warrants that he, she, or it has the requisite authority to enter into this Consent Judgment, and has not previously assigned or transferred any rights or interests with respect to the matters covered

by this Consent Judgment.

10. **Voluntary Agreement:** Plaintiff represents that she has thoroughly discussed all aspects of this Consent Judgment with her attorneys, that she is represented by counsel, and Plaintiff represents that she has carefully read and fully understands all of the provisions of the Consent Judgment. Plaintiff represents that she executes and delivers the Consent Judgment voluntarily after being fully informed of its terms, contents, and effect, and acknowledges that she understands its terms, contents, and effect. Plaintiff acknowledges that she has been advised of her right to seek the advice of an attorney and that she is and has been represented by counsel of her own choosing before agreeing to the terms of this Consent Judgment, and no compromise or representation of any kind, other than as set forth or referred to herein, has been made to any party or any one acting on behalf of any party.

11. **Negotiated Agreement**: The parties acknowledge that each party has participated and cooperated in the drafting and preparation of this Consent Judgment. The language in all parts of this Consent Judgment shall be in all cases construed according to its fair meaning and not strictly for or against any party.

12. **No Admission of Liability:** Defendant UCS acknowledges the findings made by the Court in its October 7, 2024 Decision and Order; however, nothing contained herein shall constitute an admission by Defendant UCS or the State of New York that they deprived Plaintiff of any right or failed to perform any duty under the constitutions, charters, statutes, rules, regulations, or other laws of the United States or, the State of New York, or the City of New York, or that any action or inaction by them was unlawful or wrongful. It is understood and agreed that any actions taken or payments made pursuant to this Consent Judgment are made solely to avoid the burdens and expense of protracted litigation; that this Consent Judgment and

Case: 25-721, 08/25/2025, DktEntry: 24.1, Page 252 of 283

the actions taken and payments made pursuant hereto are not to be construed as constituting any admission of wrongdoing or liability on the part of Defendant, the State of New York, or any of their present and former agencies, entities, departments, offices, subdivisions, subsidiaries, affiliates, administrators, principals, officers, employees, directors, members, trustees, shareholders, agents, attorneys, insurers, heirs and assigns, whether in their individual or official capacities, or any of them, or all of them, and that they expressly deny any wrongdoing or liability. Nothing contained in this Consent Judgment shall be deemed to constitute a policy, custom, or practice of Defendant UCS and/or OCA, or the State of New York, or any of their offices, agencies, departments, divisions, subdivisions, officials, employees, or agents, whether in their individual or official capacities.

13. **Headings:** The headings contained in this Consent Judgment are for convenience of reference only and are not a material part of this Consent Judgment.

14. **Submission to the Court:** Upon signature by all parties and counsel for parties, this Consent Judgment shall be submitted without further notice to the Court to be "So Ordered" and publicly filed on the Court's docket.

15. **Counterparts:** This Consent Judgment may be executed in several counterparts, each of which shall be deemed an original and which, taken together, shall constitute one and the same instrument, and may be executed by facsimile or PDF signature and notary seal.

16. **Acknowledgement of Full Understanding:** Plaintiff acknowledges and agrees that Plaintiff has fully read, understand, and voluntarily enters into this Consent Judgment. Plaintiff acknowledges and agrees that Plaintiff has had an opportunity to ask questions and consult with an attorney of Plaintiff's choice before signing this Consent Judgment.

**IN WITNESS WHEREOF**, the parties hereto acknowledge that they have read this

Consent Judgment and accept and agree to the provisions contained herein, and have each executed this Consent Judgment to be effective on the day and date indicated below.

Dated: March 8, 2025

JESSICA BERGIN

STATE OF New York )
) ss.:
COUNTY OF Richmond )

On the 8th day of March, 2025, before me personally came and appeared JESSICA BERGIN, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument, and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

Christine Rizzo.
NOTARY PUBLIC

CHRISTINE RIZZO
NOTARY PUBLIC, STATE OF NEW YORK
NO. 01RI5023709
QUALIFIED IN RICHMOND COUNTY
MY COMMISSION EXPIRES 03/26/2026

Dated: March 10, 2025

THE WARSHAWSKY LAW FIRM
*Attorney for Plaintiff*
By:

Steven Warshawsky
118 North Bedford Rd., Suite ~~340~~ 100
Mount Kisco, NY ~~10459~~ 10549
(914) 864-3353

Dated: March 10, 2025

DAVID NOCENTI
Counsel, NYS Office of Court Administration
*Attorney for Defendant UCS*

By:

Michael J. Siudzinski
Assistant Deputy Counsel
25 Beaver Street, 10th Floor
New York, NY 10004
(212) 428-2150

Dated: March 10, 2025

**SO ORDERED:**

Brian M. Cogan

Honorable Brian M. Cogan
United States District Judge

# Exhibit A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------- X

JESSICA BERGIN,

Plaintiff,

-against-

NEW YORK STATE UNIFIED COURT SYSTEM,

Defendant.

---------------------------------------------------------- X

**MEMORANDUM DECISION AND ORDER**

22-cv-5264 (BMC)

**COGAN**, District Judge.

This is an action for religious discrimination under Title VII brought by a court officer employed by the New York Unified Court System. Plaintiff contends that her employer failed to accommodate her request for a religious exemption from its COVID-19 vaccination policy. Plaintiff also claims that defendant has not demonstrated any undue hardship that would result from granting her reasonable accommodations to the COVID-19 vaccination policy. This case is before the Court on the parties' cross-motions for summary judgment.

## BACKGROUND

Plaintiff Jessica Bergin is a Christian and a member of International Christian Center, a General Council Church of the Assemblies of God. Plaintiff holds the religious belief that receiving a vaccine developed or tested with aborted fetal cell lines perpetuates the evil of abortion. When defendant issued an official memorandum requiring employees to receive COVID-19 vaccinations, plaintiff submitted a request for a religious accommodation to comply with the vaccine policy according to the process defendant had created for such requests. Plaintiff included a three-page letter, including quotes from scripture that supported her beliefs,

and a letter from her pastor, explaining plaintiff's sincerely held religious beliefs that prevented her from complying with the vaccine mandate.

Defendant responded with a letter requesting "more information before it can make a final determination" about plaintiff's religious accommodation request, including a questionnaire with follow-up questions. Plaintiff then submitted another personal statement explaining her religious beliefs and how they conflicted with the vaccine mandate. Plaintiff did not fill out the questionnaire, except to direct defendant to her personal statement for the answers to defendant's questions. Plaintiff did not include answers to defendant's questions about her use of other medications and vaccines, asserting that it was important to her to keep her medical information private.

After the deadline for responding to the questionnaire had passed, defendant denied plaintiff's request for a religious accommodation. Plaintiff then submitted another response to the questionnaire, this time filling out the questionnaire completely. Counsel for defendant notified plaintiff's supervisor that plaintiff had submitted this "new religious exemption request" but that the previous decision denying plaintiff's request was final, and the new request would not be considered. When plaintiff did not show proof of a COVID-19 vaccination by the requisite deadline, she was put on administrative leave until she used all of her accrued paid leave days, at which point she was terminated for failing to comply with the vaccine mandate.

Plaintiff then commenced this lawsuit. Her complaint states one claim for religious discrimination under Title VII. Defendant has since rescinded its vaccination policy and reinstated plaintiff. Both parties have cross-moved for summary judgment.

## DISCUSSION

### I. Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is warranted where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view all facts in the light most favorable to the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (citing Adickes v. S. H. Kress & Co., 398 U.S. 144, 158-59 (1970)). There is no genuine issue of material fact "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 212 (2d Cir. 2001) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

"Cross-motions for summary judgment do not alter [this] basic standard, but simply require the court to determine whether either of the parties deserves judgment as a matter of law on facts that are not in dispute." AFS/IBEX v. AEGIS Managing Agency Ltd., 517 F. Supp. 3d 120, 123 (E.D.N.Y. 2021) (citing Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001)). A court need not grant summary judgment for either party, "[r]ather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." Morales, 249 F.3d at 121 (citing Schwabenbauer v. Bd. of Educ., 667 F.2d 305, 314 (2d Cir. 1981)).

### II. Religious Discrimination

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such

individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Under Title VII, "[t]he term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). Accordingly, it is "an unlawful employment practice . . . for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of his employees and prospective employees." Trans World Airlines. Inc. v. Hardison, 432 U.S. 63, 74 (1977).

To establish a *prima facie* case of failure to accommodate under Title VII, plaintiffs "must show that '(1) they held a bona fide religious belief conflicting with an employment requirement; (2) they informed their employers of this belief; and (3) they were disciplined for failure to comply with the conflicting employment requirement.'" Baker v. The Home Depot, 445 F.3d 541, 546 (2d Cir. 2006) (quoting Knight v. Conn Dep't of Pub. Health, 275 F.3d 156, 167 (2d Cir. 2001)). If a plaintiff has established a *prima facie* case, "the burden then shifts to the employer to show it could not accommodate the employee['s] religious beliefs without undue hardship." Vasquez v. City of New York - Off. of Mayor, No. 22-cv-5068, 2024 WL 1348702, at *5 (E.D.N.Y. Mar. 30, 2024).

### A. *Prima Facie* Case

Here, the parties do not dispute, and the Court agrees, that plaintiff has satisfied the first and third factors for her *prima facie* case: plaintiff held a bona fide religious belief conflicting with defendant's vaccine policy and she was terminated for her failure to comply with this policy. The remaining question is whether plaintiff adequately informed defendant of her religious belief through her request for accommodation.

"An employer need have 'only enough information about an employee's religious needs to permit the employer to understand the existence of a conflict between the employee's religious practices and the employer's job requirements.'" Hickey v. State Univ. of New York at Stony Brook Hosp., No. 10-cv-1282, 2012 WL 3064170, at *7 (E.D.N.Y. July 27, 2012) (quoting Brown v. Polk Cnty., Iowa, 61 F.3d 650, 654 (8th Cir. 1995)). Specifically, submitting a "religious accommodation form with a two-page letter that detail[s] religious objections to [a] COVID-19 vaccination requirement" is sufficient to inform an employer of an employee's religious objections to a vaccine policy. Jackson v. New York State Off. of Mental Health - Pilgrim Psychiatric Ctr., No. 23-cv-04164, 2024 WL 1908533, at *6 (E.D.N.Y. May 1, 2024) (citations omitted). This is exactly what plaintiff did here.

It is undisputed that plaintiff submitted a religious accommodation form, personal statement, and statement from her pastor detailing plaintiff's religious beliefs that conflict with defendant's vaccine mandate. This was sufficient to satisfy the requirement that plaintiff inform defendant of her conflicting religious beliefs with an employment requirement. Plaintiff's failure to properly fill out defendant's questionnaire asking follow-up questions does not change this analysis, as plaintiff had already adequately informed defendant of her beliefs.

Nor does plaintiff's failure to properly complete the questionnaire create a question of material fact about the sincerity of plaintiff's religious beliefs. Defendant does not contest, based on her initial request alone, that plaintiff had a sincerely held religious belief in conflict with the vaccine mandate. In fact, defendant has admitted, through its Rule 30(b)(6) witness and Chief of Administration, that plaintiff's initial request for a religious accommodation was "perfectly adequate" and "explained a religious belief." Given the lack of dispute regarding plaintiff's sincerely held religious belief in conflict with the vaccine mandate, plaintiff's failure to properly

fill out the questionnaire does not change the fact that plaintiff has satisfied this prong of the *prima facie* case for a failure to accommodate religious beliefs under Title VII.

Defendant relies on Ferrelli v. Unified Court System, No. 22-cv-68, 2022 WL 673863 (N.D.N.Y. March 7, 2022), which involved the same vaccine mandate and the same supplemental questionnaire, to reach a contrary conclusion. There, the plaintiffs sought to invalidate the vaccine mandate on religious freedom grounds. The court held that the vaccine mandate was a neutral and generally applicable requirement, and that the supplemental questionnaire could be used to test the sincerity of employees' claimed religious beliefs: "[T]he Court finds that a limited factual inquiry of the type pursued by Defendants is narrowly tailored to stem the spread of COVID-19 because it enables the state to distinguish between sincerely held religious beliefs and those beliefs that are either contrived or not religious in nature." Id. at *8.

The instant case is very different. Plaintiff is challenging neither the vaccine mandate nor the right of defendant to inquire about the sincerity of its employees' religious beliefs through the supplemental questionnaire. Instead, she is asserting, as defendant has conceded, that her initial exemption claim was "religious" and "not contrived." The initial exemption claim was satisfactory to show that her religious belief was sincerely held, and therefore the supplemental questionnaire, in her particular case, was superfluous.

Because there is no dispute that plaintiff held a bona fide religious belief conflicting with defendant's vaccine policy or that plaintiff was terminated for her failure to comply with this policy, and the undisputed facts show that plaintiff met the legal test for adequately informing defendant of this belief, there is a *prima facie* case of failure to accommodate plaintiff's religious beliefs under Title VII.

### B. Undue Hardship

This Court agrees with defendant that "considering and responding to employees' inquiries, submissions, and requests made after the deadline would have been an undue hardship on its operations." Plaintiff's supplemental response to the questionnaire, submitted after the vaccine policy's deadline, cannot be considered in determining whether defendant failed to accommodate plaintiff's religious beliefs.[1]

However, dispensing with any obligation to consider plaintiff's late response does not alter the fact that plaintiff has demonstrated a *prima facie* case without regard to the supplemental questionnaire, and that it would have been no hardship at all on defendant – which, again, concedes the sincerity of her initial exemption claim – to grant the exemption. Based on that first request, there is no dispute of material fact that plaintiff had a bona fide religious belief that conflicted with the vaccine mandate, defendant knew of this belief, and defendant terminated plaintiff for her failure to comply with the vaccine mandate. There was no need, and therefore no undue hardship, for defendant to consider plaintiff's late supplemental response.

Furthermore, there would have been no undue hardship in granting plaintiff's religious accommodation request. First, defendant granted 555 religious accommodation requests (out of 937 applications), permitting accommodations of the same sort requested by plaintiff. Second, defendant has since rescinded its vaccination policy and, tellingly, reinstated plaintiff to her former position over a year ago.[2]

[1] An accommodation is an undue hardship when it is "substantial in the overall context of an employer's business." Groff v. DeJoy, 600 U.S. 447, 468 (2023). Defendant received, and had to evaluate, over 1,200 employee exemption requests, comprising 7.5% of defendant's total staff. The committee that reviewed these requests spent hundreds of hours reviewing employees' requests. It would be an undue hardship to require defendant to consider employees' requests or supplemental responses received after the deadline.

[2] Defendant's final argument is that E.E.O.C. v. Abercrombie & Fitch Stores, Inc., 575 U.S. 768 (2015), requires plaintiff to show that defendant was motivated to discriminate against her. The case does not apply in this context. Abercrombie merely held that when the employee (or prospective employee, as in that case) does not inform the

If defendant wanted to send out a supplemental questionnaire for every claim of religious exemption, there was, as Ferrelli holds, no constitutional impediment in doing so. But if the claim for religious exemption itself presented sufficient grounds to grant the exemption, as defendant concedes it did here, defendant could not use the failure to timely complete the supplemental questionnaire as a reason to deny the exemption.

**CONCLUSION**

Plaintiff's motion for summary judgment [26] is granted and defendant's motion for summary judgment [27] is denied. By separate order, the Court will set this matter down for trial on the issue of damages.

**SO ORDERED.**

Brian M. Cogan

U.S.D.J.

Dated: Brooklyn, New York
October 7, 2024

employer of her need for a religious accommodation, the employer's employment decision, if motivated in substantial part by the desire to frustrate the exercise of the religious practice without the presence of an undue burden, is still actionable under Title VII. Here, defendant was well aware of plaintiff's need for a religious exemption.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------------X

JESSICA BERGIN,

Plaintiff,

-against-

NEW YORK STATE UNIFIED COURT SYSTEM,

Defendant.

---------------------------------------------------------------------X

Ind. No. 22-CV-5264 (BMC)

**NOTICE OF APPEAL**

**PLEASE TAKE NOTICE** that defendant hereby appeals to the United States Court of Appeals for the Second Circuit from the Decision and Order granting plaintiff's motion for summary judgment on the issue of liability, entered by the Honorable Brian Cogan on October 7, 2024, which, together with the so-ordered Consent Judgment determining the damages, entered on March 10, 2025, constitute a final order for purposes of appeal, a copy of both are annexed hereto.

Dated: March 26, 2025

Respectfully submitted,

DAVID NOCENTI
Counsel
Office of Court Administration
Attorney for Defendant UCS

By: ______________________
MICHAEL J. SIUDZINSKI
Assistant Deputy Counsel
25 Beaver Street, 10th Fl.
New York, New York 10004
(212) 428-2150

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

JESSICA BERGIN,

Plaintiff,

-against-

NEW YORK STATE UNIFIED COURT SYSTEM,

Defendant.

---------------------------------------------------------------X

**CONSENT JUDGMENT AND ORDER**

22-cv-5264 (BMC)

This CONSENT JUDGMENT AND ORDER (hereinafter "Consent Judgment") is made by and between Plaintiff Jessica Bergin ("Plaintiff") and Defendant New York State Unified Court System (hereinafter "UCS"), as of the date this Consent Judgment is "So Ordered" by a Judge of the United States District Court for the Eastern District of New York:

**WHEREAS**, on or about September 2, 2022, Plaintiff commenced the above-captioned civil action by filing a complaint (the "Complaint") in the United States District Court for the Eastern District of New York, Case Number 22-cv-5264, against Defendant UCS;

**WHEREAS**, the Complaint alleged a single claim against Defendant UCS pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII");

**WHEREAS**, the allegations and claim in the Complaint, together with any related filings and proceedings, constitute "the Action";

**WHEREAS**, Defendant UCS and the State of New York expressly deny any wrongful conduct or liability, or violation of any federal, state or local statute, ordinance or law, in connection with the events alleged in the Action;

**WHEREAS**, by Decision and Order, dated October 7, 2024, the Court (Cogan, J.)

granted Plaintiff's Motion for Summary Judgment, finding Defendant UCS liable for Plaintiff's Title VII claim in all respects and allowing the Action to proceed to trial for purposes of determining damages and other relief for Plaintiff's Title VII claim, and denying Defendant's Motion for Summary Judgment;

**WHEREAS**, Defendant UCS desires to pursue an appeal of the legal questions raised in its Motion for Summary Judgment, denied by the Court's October 7, 2024 Decision and Order, and Plaintiff and Defendant desire to resolve the issue of reasonable damages, both economic and compensatory, without further proceedings before the District Court including a trial in the Action;

**WHEREAS**, no party hereto is an infant or incompetent person for whom a committee has been appointed, and no person not a party to this Consent Judgment has an interest in the subject matter of the Action; and

**NOW**, **THEREFORE**, in consideration of the mutual promises, covenants, representations, and other consideration contained in this Consent Judgment, Plaintiff and Defendant hereby stipulate and agree, and the Court orders, as follows:

1. **Final Order**: Plaintiff and Defendant intend that this Consent Judgment together with the Court's October 7, 2024 Decision and Order, which is attached hereto as Exhibit A and incorporated by reference herein, constitute a final order in this Action for purposes of taking an appeal to the United States Court of Appeals, Second Circuit. No further litigation or proceedings shall be taken regarding the issue of damages and attorneys' fees and costs, except attorneys' fees and costs that may arise after execution of this Consent Judgment.

2. **Appeal and Fulfillment of Terms**: Upon the Court's so-ordering of this Consent Judgment, Defendant may seek an appeal, pursuant to all applicable federal statutes and rules, of

any legal questions raised by the Complaint, Defendant's Motion for Summary Judgment, and the Court's October 7, 2024 Decision and Order in this Action. "Time for Payment": Payments are contingent upon Plaintiff's prevailing party status at the conclusion of the case and in no event will Plaintiff be entitled to demand or receive the payments referenced in this Consent Judgment prior to the issuance of a mandate by the U.S. Court of Appeals for the Second Circuit affirming the final judgment, or the voluntary withdrawal of the appeal by Defendant, or a determination by Defendant to not appeal (signified by Defendant's decision not to file a notice of appeal and the expiration of the time for same).

3. **<u>Salary Step Increase</u>**: For and in consideration of Plaintiff's execution of this Consent Judgment, her agreement to be bound by its terms, and her undertakings as set forth herein, Defendant UCS shall increase Plaintiff's "salary step" a single step in the Pay Schedule attached to and incorporated into the collective bargaining agreement between UCS and Plaintiff's employee union, the New York State Court Officers Association, in effect at the time of fulfilment of the terms herein. The salary step required hereunder shall be effectuated in Plaintiff's official payroll records no later than 10 business days after the Time for Payment set forth in Paragraph 2.

4. **<u>Payment to Plaintiff by Defendant Unified Court System</u>**:

For and in consideration of Plaintiff's execution of this Consent Judgment, her agreement to be bound by its terms, and her undertakings as set forth herein, subject to any withholding for taxes to the State of New York and the United States Internal Revenue Service ("IRS"), Defendant UCS shall pay the sum of Ninety-Five Thousand and Fifty-Four Dollars and Zero Cents ($95,054.00) which, together with those payments detailed in Paragraph 5, shall be full and complete satisfaction of all claims, allegations, or actions, direct or indirect, known or

unknown, that Plaintiff had, has, or may have against Defendant UCS and or the New York State Office of Court Administration ("OCA") (including, but not limited to, any of UCS's and/or OCA's officials, employees, or agents, whether in their individual or official capacities), and/or the State of New York (including, but not limited to, any and all agencies, departments, and subdivisions thereof) arising out of any conduct, acts or omissions prior to, and as of the date of this Consent Judgment, including but not limited to those asserted in the Action. Payment of the above-referenced sum shall be made as follows:

(a) A single payment in the gross amount of Ninety-Five Thousand and Fifty-Four Dollars and Zero Cents ($95,054.00), less applicable income tax withholdings and deductions, for which an I.R.S. Form W2 shall be issued to Plaintiff Jessica Bergin, and which shall be full and complete satisfaction of any and all claims, allegations, or causes of action for back pay, lost wages, lost overtime, and all other income-related damages incurred by Plaintiff in connection with any of the acts, transactions, occurrences, or omissions asserted in the Action against Defendants.

(b) The payment as set forth in subsection (a) of this paragraph shall be made payable to the order of Jessica Bergin.

5. **Payments to Plaintiff and Plaintiff's Attorneys:** For and in consideration of Plaintiff's execution of this Consent Judgment, her agreement to be bound by its terms, and her undertakings as set forth herein, the State of New York, on behalf of Defendant, shall pay the total sum of One Hundred Forty Thousand and Three Hundred and Twenty-Nine Dollars and Fifty Cents ($140,329.50) which, together with those payments detailed in Paragraph 4, shall be full and complete satisfaction of all claims, allegations, or actions, direct or indirect, known or

unknown, that Plaintiff had, has, or may have against Defendant UCS and/or the New York State Office of Court Administration ("OCA") (including, but not limited to, any of UCS's and/or OCA's officials, employees, or agents, whether in their individual or official capacities), and/or the State of New York (including, but not limited to, any and all agencies, departments, and subdivisions thereof) arising out of any conduct, acts or omissions prior to, and as of the date of this Consent Judgment , including but not limited to those asserted in the Action. Payment of the above-referenced sum shall be made as follows:

(a) A single payment in the gross amount of One Hundred Forty Thousand and Three Hundred and Twenty-Nine Dollars and Fifty Cents ($140,329.50), for which an I.R.S. Form 1099 shall be issued, and which shall be full and complete satisfaction of any and all claims, allegations, or causes of action for compensatory damages (including, but not limited to, physical injury, pain and suffering, mental and emotional anguish and trauma, reputational damages, punitive damages, and liquidated damages), and any and all claims, allegations, or causes of action for attorneys' fees, costs, disbursements, and expenses incurred by Plaintiff for any and all legal counsel who have at any time represented Plaintiff in the Action as well as in connection with any of the acts, transactions, occurrences, or omissions asserted in the Action against Defendant.

(b) The payment as set forth in subsection (a) of this paragraph shall be made payable to the order of Steven M. Warshawsky as attorney for Jessica Bergin, 118 North Bedford Road, Suite 100, Mount Kisco, NY, 10549.

6. **Payments and Accrual of Interest:** Payment for the above-described amounts

shall not become due until the Time for Payment as described in Paragraph 2 or upon written agreement of the parties or their representatives. In the event that payment of either amount specified in Paragraphs 4 and 5 of this Consent Judgment has not been made by the one hundred twentieth (120th) day after the Time for Payment, interest on any part of the amount not paid by the one hundred twentieth (120th) day shall accrue at the statutory rate prescribed by 28 U.S.C. § 1961, commencing on the one hundred twenty-first (121st) day.

7. **Responsibility of Plaintiff and Plaintiff's Attorneys for Taxes:** With the exception of any payroll taxes withheld on the payment referred to in Paragraph 4 herein, any other taxes, or interest or penalties on taxes, on the payments referred to in Paragraph 5 of this Consent Judgment shall be the sole and complete responsibility of Plaintiff (or Plaintiff's attorneys respectively, for fees paid to said attorneys). Plaintiff and Plaintiff's attorneys acknowledge and agree that they shall have no claim, right, or cause of action against UCS and/or OCA (including, but not limited to, any of UCS's and/or OCA's officials, employees, or agents, whether in their individual or official capacities), nor the State of New York, or any of their agencies, departments, divisions, officers, employees, agents, attorneys, insurers, and assigns, whether in their individual or official capacities, or any of them, or all of them, on account of such taxes, interest, or penalties.

8. **Binding Effect on Successors and Assigns:** The terms and conditions of this Consent Judgment shall inure to the benefit of, and be binding upon, the successors and assigns of each party hereto.

9. **Authority:** Each signatory to this Consent Judgment hereby represents and warrants that he, she, or it has the requisite authority to enter into this Consent Judgment, and has not previously assigned or transferred any rights or interests with respect to the matters covered

by this Consent Judgment.

10. **Voluntary Agreement:** Plaintiff represents that she has thoroughly discussed all aspects of this Consent Judgment with her attorneys, that she is represented by counsel, and Plaintiff represents that she has carefully read and fully understands all of the provisions of the Consent Judgment. Plaintiff represents that she executes and delivers the Consent Judgment voluntarily after being fully informed of its terms, contents, and effect, and acknowledges that she understands its terms, contents, and effect. Plaintiff acknowledges that she has been advised of her right to seek the advice of an attorney and that she is and has been represented by counsel of her own choosing before agreeing to the terms of this Consent Judgment, and no compromise or representation of any kind, other than as set forth or referred to herein, has been made to any party or any one acting on behalf of any party.

11. **Negotiated Agreement**: The parties acknowledge that each party has participated and cooperated in the drafting and preparation of this Consent Judgment. The language in all parts of this Consent Judgment shall be in all cases construed according to its fair meaning and not strictly for or against any party.

12. **No Admission of Liability:** Defendant UCS acknowledges the findings made by the Court in its October 7, 2024 Decision and Order; however, nothing contained herein shall constitute an admission by Defendant UCS or the State of New York that they deprived Plaintiff of any right or failed to perform any duty under the constitutions, charters, statutes, rules, regulations, or other laws of the United States or, the State of New York, or the City of New York, or that any action or inaction by them was unlawful or wrongful. It is understood and agreed that any actions taken or payments made pursuant to this Consent Judgment are made solely to avoid the burdens and expense of protracted litigation; that this Consent Judgment and

the actions taken and payments made pursuant hereto are not to be construed as constituting any admission of wrongdoing or liability on the part of Defendant, the State of New York, or any of their present and former agencies, entities, departments, offices, subdivisions, subsidiaries, affiliates, administrators, principals, officers, employees, directors, members, trustees, shareholders, agents, attorneys, insurers, heirs and assigns, whether in their individual or official capacities, or any of them, or all of them, and that they expressly deny any wrongdoing or liability. Nothing contained in this Consent Judgment shall be deemed to constitute a policy, custom, or practice of Defendant UCS and/or OCA, or the State of New York, or any of their offices, agencies, departments, divisions, subdivisions, officials, employees, or agents, whether in their individual or official capacities.

13. **Headings:** The headings contained in this Consent Judgment are for convenience of reference only and are not a material part of this Consent Judgment.

14. **Submission to the Court:** Upon signature by all parties and counsel for parties, this Consent Judgment shall be submitted without further notice to the Court to be "So Ordered" and publicly filed on the Court's docket.

15. **Counterparts:** This Consent Judgment may be executed in several counterparts, each of which shall be deemed an original and which, taken together, shall constitute one and the same instrument, and may be executed by facsimile or PDF signature and notary seal.

16. **Acknowledgement of Full Understanding:** Plaintiff acknowledges and agrees that Plaintiff has fully read, understand, and voluntarily enters into this Consent Judgment. Plaintiff acknowledges and agrees that Plaintiff has had an opportunity to ask questions and consult with an attorney of Plaintiff's choice before signing this Consent Judgment.

**IN WITNESS WHEREOF**, the parties hereto acknowledge that they have read this

Consent Judgment and accept and agree to the provisions contained herein, and have each executed this Consent Judgment to be effective on the day and date indicated below.

Dated: March 8, 2025

JESSICA BERGIN

STATE OF New York )
) ss.:
COUNTY OF Richmond )

On the 8th day of March, 2025, before me personally came and appeared JESSICA BERGIN, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument, and acknowledged to me that she executed the same in her capacity, and that by her signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

Christine Rizzo.
NOTARY PUBLIC

CHRISTINE RIZZO
NOTARY PUBLIC, STATE OF NEW YORK
NO. 01RI5023709
QUALIFIED IN RICHMOND COUNTY
MY COMMISSION EXPIRES 03/26/2026

Dated: March 10, 2025

THE WARSHAWSKY LAW FIRM
*Attorney for Plaintiff*
By:

Steven Warshawsky
118 North Bedford Rd., Suite ~~340~~ 100
Mount Kisco, NY ~~10459~~ 10549
(914) 864-3353

Dated: March 10, 2025

DAVID NOCENTI
Counsel, NYS Office of Court Administration
*Attorney for Defendant UCS*

By:

Michael J. Siudzinski
Assistant Deputy Counsel
25 Beaver Street, 10th Floor
New York, NY 10004
(212) 428-2150

Dated: March 10, 2025

**SO ORDERED:**

Brian M. Cogan

Honorable Brian M. Cogan
United States District Judge

# Exhibit A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------- X

JESSICA BERGIN,

Plaintiff,

-against-

NEW YORK STATE UNIFIED COURT SYSTEM,

Defendant.

---------------------------------------------------------- X

**MEMORANDUM DECISION AND ORDER**

22-cv-5264 (BMC)

**COGAN**, District Judge.

This is an action for religious discrimination under Title VII brought by a court officer employed by the New York Unified Court System. Plaintiff contends that her employer failed to accommodate her request for a religious exemption from its COVID-19 vaccination policy. Plaintiff also claims that defendant has not demonstrated any undue hardship that would result from granting her reasonable accommodations to the COVID-19 vaccination policy. This case is before the Court on the parties' cross-motions for summary judgment.

## BACKGROUND

Plaintiff Jessica Bergin is a Christian and a member of International Christian Center, a General Council Church of the Assemblies of God. Plaintiff holds the religious belief that receiving a vaccine developed or tested with aborted fetal cell lines perpetuates the evil of abortion. When defendant issued an official memorandum requiring employees to receive COVID-19 vaccinations, plaintiff submitted a request for a religious accommodation to comply with the vaccine policy according to the process defendant had created for such requests. Plaintiff included a three-page letter, including quotes from scripture that supported her beliefs,

and a letter from her pastor, explaining plaintiff's sincerely held religious beliefs that prevented her from complying with the vaccine mandate.

Defendant responded with a letter requesting "more information before it can make a final determination" about plaintiff's religious accommodation request, including a questionnaire with follow-up questions. Plaintiff then submitted another personal statement explaining her religious beliefs and how they conflicted with the vaccine mandate. Plaintiff did not fill out the questionnaire, except to direct defendant to her personal statement for the answers to defendant's questions. Plaintiff did not include answers to defendant's questions about her use of other medications and vaccines, asserting that it was important to her to keep her medical information private.

After the deadline for responding to the questionnaire had passed, defendant denied plaintiff's request for a religious accommodation. Plaintiff then submitted another response to the questionnaire, this time filling out the questionnaire completely. Counsel for defendant notified plaintiff's supervisor that plaintiff had submitted this "new religious exemption request" but that the previous decision denying plaintiff's request was final, and the new request would not be considered. When plaintiff did not show proof of a COVID-19 vaccination by the requisite deadline, she was put on administrative leave until she used all of her accrued paid leave days, at which point she was terminated for failing to comply with the vaccine mandate.

Plaintiff then commenced this lawsuit. Her complaint states one claim for religious discrimination under Title VII. Defendant has since rescinded its vaccination policy and reinstated plaintiff. Both parties have cross-moved for summary judgment.

## DISCUSSION

### I. Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is warranted where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must view all facts in the light most favorable to the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (citing Adickes v. S. H. Kress & Co., 398 U.S. 144, 158-59 (1970)). There is no genuine issue of material fact "where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 212 (2d Cir. 2001) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

"Cross-motions for summary judgment do not alter [this] basic standard, but simply require the court to determine whether either of the parties deserves judgment as a matter of law on facts that are not in dispute." AFS/IBEX v. AEGIS Managing Agency Ltd., 517 F. Supp. 3d 120, 123 (E.D.N.Y. 2021) (citing Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001)). A court need not grant summary judgment for either party, "[r]ather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." Morales, 249 F.3d at 121 (citing Schwabenbauer v. Bd. of Educ., 667 F.2d 305, 314 (2d Cir. 1981)).

### II. Religious Discrimination

Title VII makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such

individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Under Title VII, "[t]he term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). Accordingly, it is "an unlawful employment practice . . . for an employer not to make reasonable accommodations, short of undue hardship, for the religious practices of his employees and prospective employees." Trans World Airlines. Inc. v. Hardison, 432 U.S. 63, 74 (1977).

To establish a *prima facie* case of failure to accommodate under Title VII, plaintiffs "must show that '(1) they held a bona fide religious belief conflicting with an employment requirement; (2) they informed their employers of this belief; and (3) they were disciplined for failure to comply with the conflicting employment requirement.'" Baker v. The Home Depot, 445 F.3d 541, 546 (2d Cir. 2006) (quoting Knight v. Conn Dep't of Pub. Health, 275 F.3d 156, 167 (2d Cir. 2001)). If a plaintiff has established a *prima facie* case, "the burden then shifts to the employer to show it could not accommodate the employee['s] religious beliefs without undue hardship." Vasquez v. City of New York - Off. of Mayor, No. 22-cv-5068, 2024 WL 1348702, at *5 (E.D.N.Y. Mar. 30, 2024).

### A. *Prima Facie* Case

Here, the parties do not dispute, and the Court agrees, that plaintiff has satisfied the first and third factors for her *prima facie* case: plaintiff held a bona fide religious belief conflicting with defendant's vaccine policy and she was terminated for her failure to comply with this policy. The remaining question is whether plaintiff adequately informed defendant of her religious belief through her request for accommodation.

"An employer need have 'only enough information about an employee's religious needs to permit the employer to understand the existence of a conflict between the employee's religious practices and the employer's job requirements.'" Hickey v. State Univ. of New York at Stony Brook Hosp., No. 10-cv-1282, 2012 WL 3064170, at *7 (E.D.N.Y. July 27, 2012) (quoting Brown v. Polk Cnty., Iowa, 61 F.3d 650, 654 (8th Cir. 1995)). Specifically, submitting a "religious accommodation form with a two-page letter that detail[s] religious objections to [a] COVID-19 vaccination requirement" is sufficient to inform an employer of an employee's religious objections to a vaccine policy. Jackson v. New York State Off. of Mental Health - Pilgrim Psychiatric Ctr., No. 23-cv-04164, 2024 WL 1908533, at *6 (E.D.N.Y. May 1, 2024) (citations omitted). This is exactly what plaintiff did here.

It is undisputed that plaintiff submitted a religious accommodation form, personal statement, and statement from her pastor detailing plaintiff's religious beliefs that conflict with defendant's vaccine mandate. This was sufficient to satisfy the requirement that plaintiff inform defendant of her conflicting religious beliefs with an employment requirement. Plaintiff's failure to properly fill out defendant's questionnaire asking follow-up questions does not change this analysis, as plaintiff had already adequately informed defendant of her beliefs.

Nor does plaintiff's failure to properly complete the questionnaire create a question of material fact about the sincerity of plaintiff's religious beliefs. Defendant does not contest, based on her initial request alone, that plaintiff had a sincerely held religious belief in conflict with the vaccine mandate. In fact, defendant has admitted, through its Rule 30(b)(6) witness and Chief of Administration, that plaintiff's initial request for a religious accommodation was "perfectly adequate" and "explained a religious belief." Given the lack of dispute regarding plaintiff's sincerely held religious belief in conflict with the vaccine mandate, plaintiff's failure to properly

fill out the questionnaire does not change the fact that plaintiff has satisfied this prong of the *prima facie* case for a failure to accommodate religious beliefs under Title VII.

Defendant relies on Ferrelli v. Unified Court System, No. 22-cv-68, 2022 WL 673863 (N.D.N.Y. March 7, 2022), which involved the same vaccine mandate and the same supplemental questionnaire, to reach a contrary conclusion. There, the plaintiffs sought to invalidate the vaccine mandate on religious freedom grounds. The court held that the vaccine mandate was a neutral and generally applicable requirement, and that the supplemental questionnaire could be used to test the sincerity of employees' claimed religious beliefs: "[T]he Court finds that a limited factual inquiry of the type pursued by Defendants is narrowly tailored to stem the spread of COVID-19 because it enables the state to distinguish between sincerely held religious beliefs and those beliefs that are either contrived or not religious in nature." Id. at *8.

The instant case is very different. Plaintiff is challenging neither the vaccine mandate nor the right of defendant to inquire about the sincerity of its employees' religious beliefs through the supplemental questionnaire. Instead, she is asserting, as defendant has conceded, that her initial exemption claim was "religious" and "not contrived." The initial exemption claim was satisfactory to show that her religious belief was sincerely held, and therefore the supplemental questionnaire, in her particular case, was superfluous.

Because there is no dispute that plaintiff held a bona fide religious belief conflicting with defendant's vaccine policy or that plaintiff was terminated for her failure to comply with this policy, and the undisputed facts show that plaintiff met the legal test for adequately informing defendant of this belief, there is a *prima facie* case of failure to accommodate plaintiff's religious beliefs under Title VII.

### B. Undue Hardship

This Court agrees with defendant that "considering and responding to employees' inquiries, submissions, and requests made after the deadline would have been an undue hardship on its operations." Plaintiff's supplemental response to the questionnaire, submitted after the vaccine policy's deadline, cannot be considered in determining whether defendant failed to accommodate plaintiff's religious beliefs.[1]

However, dispensing with any obligation to consider plaintiff's late response does not alter the fact that plaintiff has demonstrated a *prima facie* case without regard to the supplemental questionnaire, and that it would have been no hardship at all on defendant – which, again, concedes the sincerity of her initial exemption claim – to grant the exemption. Based on that first request, there is no dispute of material fact that plaintiff had a bona fide religious belief that conflicted with the vaccine mandate, defendant knew of this belief, and defendant terminated plaintiff for her failure to comply with the vaccine mandate. There was no need, and therefore no undue hardship, for defendant to consider plaintiff's late supplemental response.

Furthermore, there would have been no undue hardship in granting plaintiff's religious accommodation request. First, defendant granted 555 religious accommodation requests (out of 937 applications), permitting accommodations of the same sort requested by plaintiff. Second, defendant has since rescinded its vaccination policy and, tellingly, reinstated plaintiff to her former position over a year ago.[2]

---

[1] An accommodation is an undue hardship when it is "substantial in the overall context of an employer's business." Groff v. DeJoy, 600 U.S. 447, 468 (2023). Defendant received, and had to evaluate, over 1,200 employee exemption requests, comprising 7.5% of defendant's total staff. The committee that reviewed these requests spent hundreds of hours reviewing employees' requests. It would be an undue hardship to require defendant to consider employees' requests or supplemental responses received after the deadline.

[2] Defendant's final argument is that E.E.O.C. v. Abercrombie & Fitch Stores, Inc., 575 U.S. 768 (2015), requires plaintiff to show that defendant was motivated to discriminate against her. The case does not apply in this context. Abercrombie merely held that when the employee (or prospective employee, as in that case) does not inform the

If defendant wanted to send out a supplemental questionnaire for every claim of religious exemption, there was, as Ferrelli holds, no constitutional impediment in doing so. But if the claim for religious exemption itself presented sufficient grounds to grant the exemption, as defendant concedes it did here, defendant could not use the failure to timely complete the supplemental questionnaire as a reason to deny the exemption.

## CONCLUSION

Plaintiff's motion for summary judgment [26] is granted and defendant's motion for summary judgment [27] is denied. By separate order, the Court will set this matter down for trial on the issue of damages.

**SO ORDERED.**

Brian M. Cogan

U.S.D.J.

Dated: Brooklyn, New York
October 7, 2024

employer of her need for a religious accommodation, the employer's employment decision, if motivated in substantial part by the desire to frustrate the exercise of the religious practice without the presence of an undue burden, is still actionable under Title VII. Here, defendant was well aware of plaintiff's need for a religious exemption.